UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| TRAVIS DWIGHT GREEN, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CAUSE NO. 4:13-CV-01899 |
| | § | |
| | § | |
| LORIE DAVIS, Director, Texas | § | |
| Department of Criminal Justice, | § | CASE INVOLVING THE DEATH |
| Institutions Division, | § | PENALTY |
| | § | |
| Respondent. | § | |

PETITIONER'S POST-HEARING BRIEF

## TABLE OF CONTENTS

I.    INTRODUCTION & SUMMARY OF ARGUMENT ............................................. 1

    A.  Issues Addressed in this Brief ................................................................ 1

    B.  Summary of Argument ........................................................................... 2

II.    RELEVANT PROCEDURAL HISTORY ........................................................ 5

    A.  Trial Court Proceedings ....................................................................... 6

    B.  Appeal ................................................................................................. 7

    C.  State Post-conviction ........................................................................... 7

III.    LAW GOVERNING PETITIONER'S CLAIMS ........................................... 10

    A.  Burden of Proof on Federal Habeas Claims ....................................... 10

    B.  Legal Standard for Competence to Stand Trial (Claim 4) .................... 11

    C.  Legal Standard for Ineffectiveness (Claims 1 and 5) .......................... 13

        1.  The *Strickland* Standard ............................................................ 14

        2.  Applying *Strickland* to the Penalty Phase .................................. 14

            a.  The prevailing professional norm of a thorough background investigation ................................................................... 14

            b.  Prejudice: a reasonable probability of a single juror responding to mitigation ............................................... 16

        3.  Applying *Strickland* to Competency .......................................... 17

            a.  Prevailing professional norms related to competency ............ 17

            b.  Prejudice from the failure to seek a hearing ......................... 18

IV.    FACTS SHOWING MR. GREEN IS ENTITLED TO RELIEF ........................... 21

    A.  The lay witnesses Green sponsored testified credibly ........................... 21

        1.  Moncriffe's testimony ............................................................... 22

        2.  Robert Sudds' testimony ........................................................... 23

        3.  Michael Turner's testimony ....................................................... 24

        4.  Jerry Jacobs' testimony ............................................................. 26

        5.  John Forward's testimony .......................................................... 27

        6.  Moncriffe, Sudds, Jacobs, Turner and Forward corroborates each other, presenting a consistent picture of a seriously psychotic individual that support Mosnik's forensic diagnosis. ......................................... 29

7. The known course of the mental illness affecting Green supports the conclusion that Green was mentally ill at the time of trial. ............................ 30

B. Dr. Proctor's forensic conclusion that there was "no evidence" that Green was mentally ill is not credible. ............................................................... 31

1. The rationales Proctor used to discount the testimony of Sudds, Jacobs, Turner and Forward detract from Proctor's own credibility. ......................... 31

2. Proctor displayed several unscientific biases. ................................................... 34

3. The thought experiment Proctor used to eliminate mental illness as an explanation for Green's conduct and verbal behavior distorts the process of differential diagnosis. ...................................................................... 36

4. Proctor made basic mistakes that call his proficiency as a diagnostician into question. ..................................................................................................... 38

C. Given Green's present diagnosis, and background evidence provided by eye-witnesses to Green's behavior before and at the time of trial, the best explanation for his conduct and speech, documented in the trial transcripts, is mental illness. ........... 39

D. There is Substantial Evidence of Green's Mental Illness at All Relevant Times .... 40

1. Green Did Not Have a Rational Understanding of the Proceedings ............. 40

2. Green Did Not  Have a Factual Understanding of the Proceedings Against him ...................................................................................................... 42

3. Green did not have the present ability to consult with his lawyer with a reasonable degree of rational understanding. ................................................. 43

V. PROCEDURAL MATTERS ................................................................................ 44

A. The Hearing Evidence Further Supports This Court's Determination that State Habeas Counsel was Ineffective .................................................................................. 44

B. This Court Should Reconsider its Ruling on Claims 4 and 5 in Light of Evidence Adduced at the Hearing ................................................................................................ 45

C. The Procedural Default Doctrine Does Not Bar Relief on Claims 4 or Claim 5 .. 46

1. This case falls within a narrow exception to the usual default rules. .............. 47

2. There is cause for an alleged default .............................................................. 48

a. Cause/Prejudice Part 1: Incompetence ................................................... 48

b. Cause/Prejudice Part 2: *Maples* ............................................................... 51

c. Cause/Prejudice Part 3: *Martinez* ........................................................... 58

VI. CONCLUSION ................................................................................................ 63

# TABLE OF AUTHORITIES

## CASES

*Amadeo v. Zant*, 486 U.S. 214 (1988) ................................................................ 50
*Anderson v. White*, 32 F.3d 320 (8th Cir. 1994) ............................................... 49
*Austin v. Kroger Texas, L.P.*, 864 F.3d 326 (5th Cir. 2017) ............................... 45
*Bolius v. Wainwright*, 597 F.2d 986 (5th Cir. 1979) .......................................... 13
*Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990) ................................... 11, 13
*Brown v. Allen*, 344 U.S. 443 (1953) ........................................................... 47, 51
*Buck v. Davis*, 137 S. Ct. 759 (2017) ................................................................ 17
*Coleman v. Thompson*, 591 U.S. 722 (1991) ..................................................... 46
*Cooper v. Oklahoma*, 517 U.S. 348 (1996) ......................................... 11, 19, 61
*Cullen v. Pinholster*, 563 U.S. 181 (2011) ....................................................... 11
*Davila v. Davis*, 137 S. Ct. 2058 (2017) ........................................ 49, 59, 60, 61
*Davis v. Woodford*, 333 F.3d 982 (9th Cir. 2003) ............................................. 20
*Dietz v. Bouldin*, 579 U.S. ___, 136 S. Ct. 1885 (2016) ................................... 45
*Drope v. Missouri*, 420 U.S. 162 (1975) ........................................ 11, 12, 18, 19
*Dusky v. United States*, 362 U.S. 402 (1960) (per curiam) ........................ 2, 11, 12
*Eddmonds v. Peters*, 93 F.3d 1307 (7th Cir. 1996) ........................................... 20
*Ex parte Brown*, 769 S.W.2d 539 (Tex. Crim. App. 1989) ............................... 53
*Ex parte Eldridge*, 2005 WL 8154074 (Tex. Crim. App. Feb. 9, 2005) ............. 54
*Ex parte Gardner*, 959 S.W.2d 189 (Tex. Crim. App. 1998) ............................ 53
*Ex parte Jennings*, ___ S.W.3d ___, 2018 WL 2247764 (Tex. Crim. App. May 16, 2018)
............................................................................................................ 54
*Ex parte Marshall*, 2014 WL 6462907 (Tex. Crim. App. Nov. 19, 2014) ......... 54
*Ex parte Medina*, 361 S.W.3d 633 (Tex. Crim. App. 2011) ........................ 55, 58
*Ex parte Mines*, 26 S.W.3d 910 (Tex. Crim. App. 2000) ............................ 50, 52
*Ex parte Ochoa*, 2009 WL 2525740 (Tex. Crim. App. Aug. 19, 2009) .............. 54
*Ex parte Tuttle*, 445 S.W.2d 194 (Tex. Crim. App. 1969) ................................ 59
*Ex parte Wilkinson*, 2008 WL 2078508 (Tex. Ct. App.—Ft. Worth May 15, 2008) ......... 13
*Ex parte Yarborough*, 607 S.W.2d 565 (Tex. Crim. App. 1980) ....................... 59
*Fay v. Noia*, 372 U.S. 391 (1963) .................................................................... 47
*Fisher v. Gibson*, 282 F.3d 1283 (10th Cir. 2002) ........................................... 16
*Galtieri v. Wainwright*, 582 F.2d 348 (5th Cir. 1978) (*en banc*) ..................... 55
*Harrington v. Richter*, 562 U.S. 86 (2011) ...................................................... 16
*Hawk v. Olson*, 326 U.S. 271 (1945) ............................................................... 10
*Herring v. New York*, 422 U.S. 853 (1975) ....................................................... 19
*Hill v. Lockhart*, 474 U.S. 52 (1985) ............................................................... 18
*Holland v. Florida*, 560 U.S. 631 (2010) ......................................................... 53
*Holt v. Bowersox*, 191 F.3d 970 (8th Cir. 1999) .............................................. 49
*Hull v. Kyler*, 190 F.3d 88 (3d Cir. 1999) ....................................................... 20
*Indiana v. Edwards*, 554 U.S. 164 (2008) .................................................. 11, 12
*Johnson v. Zerbst*, 304 U.S. 458 (1938) ........................................................... 11

iv

*Kyles v. Whitley*, 514 U.S. 419 (1995) ........................................................................ 16

*Lafler v. Cooper*, 566 U.S. 156 (2012) .................................................................... 19, 20

*Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001) ....................................................... 17

*Maples v. Thomas*, 565 U.S. 266 (2012) ...............................................48, 52, 53, 55

*Martin v. Estelle*, 583 F.2d 1373 (5th Cir. 1978) ...................................................... 13

*Martinez v. Ryan*, 566 U.S. 1 (2013) .......................................................49, 58, 60, 62

*McCoy v. North Carolina*, 494 U.S. 433 (1990) ....................................................... 17

*Medina v. California*, 505 U.S. 437 (1992) ............................................................... 12

*Mills v. Maryland*, 486 U.S. 367 (1988) .................................................................... 17

*Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999) ...................................................... 17

*Murray v. Carrier*, 477 U.S. 478 (1986) ................................................................... 49

*Pate v. Robinson*, 383 U.S. 375 (1966) ...............................................11, 12, 19, 48

*Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001) .......................................................... 16

*Porter v. McCollum*, 558 U.S. 30 (2009) ............................................................ 15, 17

*Quinn v. Guerrero*, 863 F.3d 363 (5th Cir. 2017) .................................................... 46

*Reed v. Ross*, 468 U.S. 1 (1984) .................................................................................. 50

*Rodriguez v. United States*, 395 U.S. 327 (1969) ..................................................... 19

*Roe v. Flores-Ortega*, 528 U.S. 470 (2000) .............................................................. 18

*Rompilla v. Beard*, 545 U.S. 374 (2005) ............................................................. 14, 15

*Seven Elves, Inc. v. Eskenazi*, 635 F.2d. 396 (5th Cir. 1981) ................................... 45

*Silva v. Woodford*, 279 F.3d 825 (9th Cir. 2002) ..................................................... 16

*Simmons v. Reliance Standard Life Ins. Co. of Texas*, 310 F.3d 865 (5th Cir. 2002) ........ 45

*Smith v. Cain*, 565 U.S. 73 (2012) ............................................................................ 17

*Strickland v. Washington*, 466 U.S. 668 (1984) ................................................. passim

*Templet v. HydroChem, Inc.*, 367 F.3d 473 (5th Cir. 2004) ..................................... 46

*Trevino v. Thaler*, 569 U.S. 413 (2013) .............................................................. 58, 59

*Turner v. Duncan*, 158 F.3d 449 (9th Cir. 1998) ...................................................... 17

*United States v. Makris*, 535 F.2d 899 (5th Cir. 1976) ............................................ 13

*Wainwright v. Sykes*, 433 U.S. 72 (1977) ................................................................. 47

*Wearry v. Cain*, 136 S. Ct. 1002 (2013) ................................................................... 17

*Wiggins v. Smith*, 539 U.S. 510 (2003) .............................................................. passim

*Williams (Terry) v. Taylor*, 529 U.S. 362 (2000) .................................................... 15

*Williams v. Taylor*, 529 U.S. 420 (2000) .................................................................. 55

*Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997) ........................................ 18, 20

## STATUTES

28 U.S.C. § 2244(d) .................................................................................................... 53

28 U.S.C. § 2254(b)(1)(B)(ii) ............................................................................... 47, 48

28 U.S.C. § 2254(d) ..................................................................................................... 11

Tex. Code Crim. P. art. 11.071, § 3(a) ........................................................................ 52

Tex. Code Crim. P. art. 11.071, § 5(f) ........................................................................ 54

## OTHER AUTHORITIES

American Bar Association, *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913 (Guideline 10.5) (2003) ................ 51, 62

Diagnostic and Statistical Manual of Mental Disorders IV ................................................. 2

Diagnostic and Statistical Manual of Mental Disorders V ................................................ 2, 37

## RULES

Fed. R. Civ. P. 54(b) ........................................................................................... 45

Fed. R. Civ. P. 59(e) ........................................................................................... 45

Texas Disciplinary R. Prof. Conduct 3.03 ........................................................... 57

## TREATISES

Restatement (Second) of Agency § 112 (1958) .............................................. 55, 57

Restatement (Second) of Agency § 387 (1958) .............................................. 56, 58

Restatement (Second) of Agency § 389 (1958) ................................................... 58

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| TRAVIS DWIGHT GREEN, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CAUSE NO. 4:13-CV-01899 |
| | § | |
| | § | |
| LORIE DAVIS, Director, Texas | § | |
| Department of Criminal Justice, | § | CASE INVOLVING THE DEATH |
| Institutions Division, | § | PENALTY |
| | § | |
| Respondent. | § | |

PETITIONER'S POST-HEARING BRIEF

## I.      INTRODUCTION & SUMMARY OF ARGUMENT

### A.  ISSUES ADDRESSED IN THIS BRIEF

This brief applies the evidence adduced at the evidentiary hearing to three claims, the two on which the hearing was ordered—Claim 4, asserting incompetence to stand trial, and Claim 1, asserting ineffective assistance of counsel at the penalty phase[1]—and also Claim 5, asserting ineffective assistance based on counsel's failure to request a hearing on Mr. Green's competence.[2] Although this Court did not order a hearing on Claim 5, testimony from trial counsel, Tyrone Moncriffe, and the mental health experts, supports the claim, and Mr. Green requests this Court reconsider it in light of that evidence.

---

[1] *See* 1st Am. Pet. (Doc. 30) at 19-31 (Clam 1); *id.* at 65-73 (Claim 4).

[2] 1st Am. Pet. (Doc. 30) at 73-75. Claim 5 incorporates Claims 2 and 3. *Id.* at 74.

This brief also applies the evidence adduced at the hearing to the procedural defenses the State has raised in response to the three claims.

This brief incorporates by this specific reference the averments and arguments made in Mr. Green's First Amended Petition and Reply and Traverse regarding Claims 1, 4, and 5, as if fully set forth herein.

## B.  SUMMARY OF ARGUMENT

Mr. Green currently suffers from a mental illness of such severity that the parties experts, Dr. Diane Mosnik and Dr. Timothy Proctor, agree Green cannot now meet standards set forth in *Dusky v. United States*, 362 U.S. 402 (1960). Green would have neither a factual or rational understanding of the proceedings against him against him, nor would he have the present ability to consult with his attorney with a reasonable degree of rational understanding.

Mosnik and Proctor have each definitively diagnosed Green as having Schizophrenia. Both psychologists agree that Green satisfies multiple domains set forth in the Diagnostic and Statistical Manual of Mental Disorders, versions IV and version V ("DSM IV" and "DSM V") diagnostic of Schizophrenia. Both Mosnik and Proctor have, for example, found pursuant to evaluations of Green that he presently experiences hallucinations, delusions and is affected by a thought disorder. Proctor did not administer psychometric tests. However, Mosnik administered a battery of tests the results of which support her present diagnosis.

The sides and their experts also agree that the onset of schizophrenia, with symptoms similar in severity, occurred well before the present. Proctor, like Dr. Mosnik, accept that the 2003 report of Dr. F. Chen, who evaluated Green when he was hospitalized at TDCJ's Jester IV Unit for psychiatric problems, documents symptoms of schizophrenia similar in type and severity to that which they observed during their later psychological evaluations. Review of Chen's 2003 report, and

2

the testimony about that report from both expert witnesses, confirms that Green was actively hallucinating, delusional, and paranoid in 2003. HT6-125:6-19.[3]

Both Mosnik and Proctor also agree also that the onset of severe mental illness preceded Chen's report. Dr. Proctor testified that Green psychotic break "sometime around the letter he wrote in 2002." HT6-137:12-13. However, Proctor acknowledged another letter Green wrote in September of 2001, shows that by this time Green was "psychotic, meaning out of touch with reality." HT6-123:4-9. The 2001 letter is replete with delusional beliefs the contents of which indicates are based on hallucinatory experiences comparable to those Green presently experiences. HT Exh.11; HT6-121—6-122. Cross examined about a third letter titled "Motion to Recuse Judges," which Green wrote and filed in September 2000, exactly a year earlier, while Green was awaiting trial, Proctor admitted that "Yes, I think this is the first seed of where things are – the psychotic break is happening." HT6-155:17-18.

The parties and their expert differ, however, on the question of whether Green was experiencing symptoms of schizophrenia at the time of trial, nine months earlier than the September 2001 letter. Dr. Proctor concluded in his report and testified a trial there was "**no evidence**" that Green was mentally ill at trial. *Id.*, HT6-53:9-10. Dr. Proctor questioned whether Green had even entered what is called the "prodromal" phase of schizophrenia. *Id.*; HT6-57:22. Dr. Mosnik, on the other hand, testified she was certain that the onset of mental illness severe enough to render Green incompetent under *Dusky* preceded trial by several years.

The sharp difference in opinion about Green's mental illness and competency at trial is an immediate function of two things. First, Mosnik and Proctor had different views regarding the

---

[3] Citations to the transcript of the evidentiary hearing are "HT" followed by the volume number, followed, after a dash, by the page number. Line numbers appear after a colon. For example, "HT6-53:9-10" refers to volume 6 of the hearing transcript, page 53, lines 9 through 10.

3

reliability of third party testimony and reports of Green's behavior before and during trial. Second, Dr. Mosnik and Dr. Proctor had a different opinion about the significance of court reported record of Green's conduct and verbal behavior. Behind their different views of the reliability and significance of the evidence lie differences in their methods.

Dr. Mosnik relied on her interview and testing of Green, the psychological literature regarding the onset and course of the disease, statements and testimony of family members, including Robert Sudds (brother), Jerry Jacobs (cousin), Michael Turner (family friend), John Forward (cellmate pretrial), and the affidavits of Clarence LaDay (fellow inmate pretrial). Dr. Mosnik relied, too, on the deposition and hearing testimony of Green's stand by counsel,[1] Tyrone Moncriffe. On the other hand, Dr. Mosnik criticized the report of Dr. Rubenzer, who interviewed Green at the time of trial and drafted a report for the trial court in which he concluded Green was competent to stand trial.

Proctor did not place any confidence in the testimony of Moncriffe, Sudd, Jacob, Turner, Forward, or the affidavits of LaDay. Proctor relied, instead, on Rubenzer's report, and on his telephonic interview of Moncriffe in January of 2019. HT6- HT6-97:5-7 Proctor agreed that if these witnesses were accurately describing how Green acted and expressed himself pretrial and during trial that would a forensic diagnosis of schizophrenia. However, Proctor classified the testimony of these witnesses as anecdotal, and doubted its accuracy because, in Proctor's opinion, neither the transcripts nor Rubenzer's report, nor Harris County Jail employees left records corroborating these witnesses' descriptions of Green's actions and expressions. HT6-116:2-8; HT6-161:9-10; HT6-224:21-22.

In contrast to Dr. Proctor conclusion that there was "no evidence" in the trial record that Green was mentally ill, Dr. Mosnik testified that the trial record provided a rich source of evidence

---

[1] Moncriffe took over, as appointed counsel, at the beginning of the punishment phase.

that Green was suffering from schizophrenia. HT2-132:6-13. According to Dr. Mosnik, Green's verbal behavior at trial, exhibited features characteristic of "disorganized speech, which, according to the psychological literature, indicates a formal though disorder. HT2-91:11-12, HT2-98:2-6, HT2-100:16-25. Mosnik also pointed to incidents documented in the transcripts that corroborated Moncriffe's, Jacobs', Turner's, Forward's, and LaDay's accounts of Green's non-verbal behavior, which she described as "grossly disorganized." HT3-16:4–HT3-17:7. On several occasions, for example, the transcripts show that Green had appeared in court in his Harris County Jail suit and refused to put on the street clothes Moncriffe had provided him. Mosnik also reviewed pleading in the District Clerk's file, such as the September 2000 letter, that Green wrote, which in her view, was evidence Green was psychotic at trial.

Proctor, on the other hand, attributed Green's verbal behavior, as captured by the court reporter to a variety of factors, including Green's lack of education, low intelligence, lack of public speaking ability, and stress of trial. HT6-183:23-184:11. Dr. Proctor discounted implications of Green's speech on the ground there may have been a mistake in the transcripts. HT6-184:7-9.

Dr. Proctor agreed, at times, that reasonable psychologists could conclude that a thought disorder could Green's performance at trial. HT6-198: However, Dr. Proctor himself excluded mental illness entirely using the following thought experiment: faced with transcripts recording Green's action or speech, or a witnesses description of Green verbal or non-verbal conduct, Proctor imagined whether someone in Green's circumstance, with his characteristics, but who was not mentally ill, would behave or produce similar speech. If Proctor could conceive of this happening, Proctor excluded the data as evidence that Green was mentally ill at the time of trial.

## II.    RELEVANT PROCEDURAL HISTORY

This Court described the factual and procedural history in its first Memorandum and Order. Mem. & Order (Doc. 55) at 1-4. Although Mr. Green has consistently maintained

his innocence, he stands convicted of the capital murder for the killing of Kristin Loesch on September 2, 1999.

### A. TRIAL COURT PROCEEDINGS

On September 18, 1999, Texas charged Mr. Green with capital murder. CR 2. On September 20, 1999, the trial court appointed Bill Goode and Charles Hinton to represent Mr. Green. CR 4. At an undetermined time, the trial court replaced Mr. Goode with Wayne Hill.

Beginning in February 2000, fellow inmates in the Harris County Jail began preparing motions for Mr. Green to file, including some seeking to remove his attorneys. HT2-21-43; Pet's Exs. 6, 7, 8, 13, 14, 23, 24, 26, 30, 31, 32, 35-38, 52-53, and 56.

In response to these motions, the trial court held two hearings on Mr. Green's assumed desire to represent himself at trial. The first took place on March 21, 2000. 2 RR 2-20. Mr. Green repeatedly asked to have counsel assist him in his defense. *Id.* at 5, 7, 14-16.

On April 4, 2000, the trial court appointed attorney Tyrone Moncriffe as standby counsel for Mr. Green. 3 RR 32.

On August 17, 2000, the trial court held another hearing related to Mr. Green's putative desire to represent himself. 3 RR 4-40. Throughout the proceedings Mr. Green expressed confusion about whether he wanted the assistance of counsel or to represent himself by, *inter alia*, repeatedly asking for "assistants." 3 RR 12; *id.* at 20; *id.* at 34. Nevertheless, the court found Mr. Green competent to represent himself. *Id.* at 39-40.

Jury selection started on November 14, 2000. 7 RR.

On November 20, 2000, the trial court appointed psychologist Steven Rubenzer to evaluate Mr. Green for competence to stand trial. 5 RR 6-7. Dr. Rubenzer saw Mr. Green on November 22, 2000, "very briefly" on November 28, 2000, and observed him in court "for approximately one hour during jury selection on November 29, 2000." Doc. 30-5 (Resp. Hr'g Ex. 2). Although Dr. Rubenzer submitted a report, he was not able to complete his evaluation. Resp. Ex. 2 at 13. There was no hearing.

The State gave its opening statement and evidence was taken the same day Dr. Rubenzer's report was filed with the court, December 4, 2000. Resp. Ex. 2; 15 RR.

On December 7, 2000, the jury returned a verdict in favor of a death sentence, and the court sentenced Mr. Green to death that same day. CR 287-88.

### B. APPEAL

On March 16, 2001, Mr. Green, through appointed counsel Ken Goode, filed in the Court of Criminal Appeal his opening brief on appeal. The brief of barely 20 pages raised nine points of error.

In an unpublished decision, the Texas Court of Criminal Appeals affirmed the conviction and sentence. *Green v. State*, No. 77, 036 (Tex. Crim. App. Jun. 26, 2002).

### C. STATE POST-CONVICTION[5]

On February 15, 2001, the trial court appointed attorney Ken J. McLean to represent Mr. Green in state post-conviction writ proceedings.

---

[5] The state post-conviction record was not properly assembled by the clerk, and is not available through the ECF docket. Therefore, Mr. Green has no reliable means of citing the state habeas record.

On July 11, 2001, McLean filed an unopposed motion for a 90-day extension of time to file Mr. Green's habeas application. He asserted the extension was necessary "[b]ecause of other pending legal matters and the loss of my house and cars during a flood on June 8, 2001." The trial court granted the extension the same day giving Mr. Green until October 15, 2001, to apply for state post-conviction relief.

On October 15, 2001, McLean filed on Mr. Green's behalf an application for habeas corpus relief under Tex. Code Crim. Proc. art. 11.071. The application raised seven "claims." Only the first claim, which was based entirely on the appellate record, was supported by facts and legal argument. Claims Two and Three rested on the same legal theory as Claim One, but was supported only by McLean's assertion that "Applicant intends to develop the facts and law of these extra-record grounds for habeas relief with all deliberate speed." Claims Four through Seven were merely claim headings supported by neither factual allegations not any citations to law, followed by the same assertion that "Applicant intends to develop the facts and law of these extra-record grounds for habeas relief with all deliberate speed." None of the "claims" asserted as a basis for relief that Mr. Green is, or ever was, mental ill.

Mr. Green, proceeding *pro se*, attempted to file his own habeas application. But, on February 11, 2002, the trial court dismissed it on grounds that Mr. Green was represented by Mr. McLean, and had not advised the court that he wanted to proceed *pro se*.

On September 5, 2002, the State filed its answer. The State noted that McLean's first, second, and third claims were "previously raised and rejected on direct appeal," and "[a]s such, the issue[s] need not be considered in the instant writ proceeding or in any subsequent

proceedings." As to the remaining claims, the State primarily relied upon McLean's complete failure to substantiate them.

On August 1, 2005, the State filed proposed findings of fact and conclusions of law for the denial of relief.

On November 26, 2007, after being prompted to do so by the State, the trial court issued an order requiring that "both parties submit any additional filings on or before December 19, 2007, so that the Court can resolve the issues, enter findings of fact and forward its recommendation to the Court of Criminal Appeals."

On December 14, 2007, McLean filed an agreed-upon motion to extend the time for final submissions to January 11, 2008. The trial court granted the motion that same day.

On February 28, 2008, McLean issued a subpoena for records to the medical division of the Polunsky Unit, the prison where Mr. Green was housed. The subpoena specifically sought "Prisoner Travis Green's most recent psychological evaluation."

On February 25, 2008, three days *before* issuing the subpoena, McLean filed a "motion" in the trial court stating,

> After a reexamination of all pleadings in the case and plausible defenses raised on habeas corpus but undeveloped because of no factual support, postconviction counsel is of the opinion that issues raised and briefed on direct appeal and habeas corpus are preserved under the Antiterrorism and Effective Death Penalty Act ("AEDPA") of April 24, 1996; consequently, counsel will file no further pleadings in the trial court.

On March 3, 2008, the State amended its proposed findings and conclusions.

On March 28, 2008, the State moved for the second time to have the application disposed of.

On April 23, 2008, McLean filed a "Statement of Counsel" in which he said that he could not "in good faith file Proposed Findings of Fact and Conclusions of Law requesting that the Trial Court recommend to the Texas Court of Criminal Appeals that relief be granted." Instead, he offered his statement. He claims that he "examined the pleadings on direct appeal, the pleadings on habeas corpus, and reviewed the State's file via the 'Open Records Act.'" Based on that, he said, he had no reason to believe there was a *Brady* violation, as he previously alleged.

McLean also said, "I have reviewed Mr. Green's most recent mental health evaluation dated May 17, 2007, at the Jest IV Unit. There is no indication in those records that Mr. Green is mentally ill or incompetent[.]" McLean also asserted that during the trial proceedings "Mr. Green was examined by mental health experts and found to be competent to stand trial and only saddled by a 'swollen' view of his intellect." McLean then repudiated all the grounds he had asserted in the habeas application.

At some point thereafter, McLean died. On or about April 14, 2009, Daniel Easterling was appointed to represent Mr. Green.

On March 6, 2013, the Texas Court of Criminal Appeals denied Mr. Green's state habeas application. *Ex parte Green*, No. WR-48,019-02 (unpublished).

## III.   LAW GOVERNING PETITIONER'S CLAIMS

### A. BURDEN OF PROOF ON FEDERAL HABEAS CLAIMS

"Petitioner carries the burden in a collateral attack on a judgment." *Hawk v. Olson*, 326 U.S. 271, 279 (1945). Mr. Green must "convince[] the court by a preponderance of

evidence" that his constitutional rights were violated. *Johnson v. Zerbst*, 304 U.S. 458, 468 (1938); *Bouchillon v. Collins*, 907 F.2d 589, 592 (5th Cir. 1990).

State habeas counsel for Mr. Green effectively abandoned him and therefore the claims at issue here were not presented to the Texas state courts. Therefore, the claims were not "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). Therefore, the limitations on a federal habeas court's power to grant relief codified in § 2254(d) do not apply here. *Cullen v. Pinholster*, 563 U.S. 181, 186 (2011) ("not all federal habeas claims by state prisoners fall within the scope of § 2254(d), which applies only to claims 'adjudicated on the merits in State court proceedings'") (quoting § 2254(d)).

## B. LEGAL STANDARD FOR COMPETENCE TO STAND TRIAL (CLAIM 4)

"[T]he conviction of an accused person while he is legally incompetent violates due process." *Pate v. Robinson*, 383 U.S. 375, 378 (1966). The Supreme Court has "repeatedly and consistently recognized" the right not to be tried while incompetent. *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996).

> Competency to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so.

*Cooper*, 517 U.S. at 354.

"[T]wo cases ... set forth the Constitution's 'mental competence' standard, *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam), and *Drope v. Missouri*, 420 U.S. 162 (1975)." *Indiana v. Edwards*, 554 U.S. 164, 169-170 (2008).

> *Dusky* defines the competency standard as including both (1) "whether" the defendant has "a rational as well as factual understanding of the

11

proceedings against him" and (2) whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." 362 U.S., at 402. *Drope* repeats that standard, stating that it "has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." 420 U.S., at 171.

*Edwards*, 554 U.S. at 170 (emphasis omitted).

When conducting a retrospective competency determination, the focus must be on the petitioner's actual ability at the time of trial. *Dusky*, 362 U.S. at 402 ("test *must be* whether he has *sufficient present ability* to consult with his lawyer with a reasonable degree of rational understanding—and whether he *has* a rational as well as factual understanding of the proceedings against him") (emphasis added). *See also Pate*, 383 U.S. at 387.

In cases where many years have passed between the trial and habeas review, the Supreme Court has favored a new trial over a retrospective competency determination as the remedy for the violation of the right not to be tried with an unresolved doubt regarding competency. *See, e.g., Drope*, 420 U.S. at 183 (granting new trial when trial court refused to conduct hearing to determine defendant's competence to stand trial); *Pate*, 383 U.S. at 386-87 (ordering new trial for defendant who did not receive adequate competency hearing); *Dusky*, 362 U.S. at 403 (vacating the conviction after holding that there were insufficient facts to support the finding that petitioner was competent to stand trial and recognizing the "difficulties of retrospectively determining the petitioner's competency as of more than a year ago"). *See also Medina v. California*, 505 U.S. 437, 458 (1992) ("Anticipatory protective procedures are necessary as well because 'we have previously emphasized the difficulty of

retrospectively determining an accused's competence to stand trial.'") (quoting *Pate*, 383 U.S. at 387).

> A retrospective determination of competency is allowed if there is sufficient evidence available to assure that a reliable determination of competency can be made. *Bolius v. Wainwright*, 597 F.2d 986, 988 (5th Cir. 1979) (citing [*United States v.*] *Makris*, 535 F.2d [899,] 904–05 [5th Cir. 1976)]). "'If the court finds that a meaningful competency hearing cannot be conducted, then of course, the writ must issue.'" *Bouchillon v. Collins*, 907 F.2d 589, 594 n. 14 (5th Cir. 1990) (quoting *Martin v. Estelle*, 583 F.2d 1373, 1374 (5th Cir. 1978)).

*Ex parte Wilkinson*, 2008 WL 2078508 at *5 (Tex. Ct. App.—Ft. Worth May 15, 2008).

## C.  Legal Standard for Ineffectiveness (Claims 1 and 5)

In Claim 1, Mr. Green asserts that the death sentence was imposed in violation of the Sixth Amendment right to effective assistance of counsel because trial counsel Monciriffe unreasonably failed to investigate and present mitigation evidence. 1st Am. Pet'n. (Doc. 30) at 19-31.

In Claim 5 of the Amended Petition, Mr. Green asserts that his Sixth Amendment right to effective assistance of counsel was violated when first standby counsel, then trial counsel Tyrone Moncriffe failed to seek a judicial determination of Mr. Green's competence. 1st Amend. Pet'n. (Doc. 30) at 73-75. Like Claim 4, Claim 5 was procedurally defaulted when state habeas counsel McLean failed to raise it. This Court previously held, based on the trial record, that "state habeas counsel was reasonable and was justified in concluding that trial counsel was not ineffective for failing to challenge the competency and knowing and voluntary waiver determinations, and thus deciding not to investigate further." Order (Doc. 72) at 18-19. More specifically, this Court cited Mr. Green's "'lucid and

responsive'" answers to the trial court's questions during hearings on his purported desire to represent himself, *id.* at 18 (quoting Memo. & Order (Doc. 55) at 13," and the conclusions of Dr. Steven Rubenzer. *Id.* at 18-19.

### 1.  *The Strickland Standard* [6]

"An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). Performance is "measured against an objective standard of reasonableness, under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotation marks and citations omitted). Prejudice requires that Mr. Cade show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "[B]oth the performance and prejudice components ... are mixed questions of law and fact." *Id.* at 698.

### 2.  *Applying Strickland to the Penalty Phase*

#### a.  The prevailing professional norm of a thorough background investigation

The Supreme Court has cautioned against any "checklist" or "detailed rules for counsel's conduct" because they would "interfere with the constitutionally protected independence of counsel," and "distract counsel from the overarching mission of vigorous advocacy of the defendant's cause." *Strickland*, 466 U.S. at 688-689. At the same time, the

---

[6] *Strickland v. Washington*, 466 U.S. 668 (1984).

Supreme Court has identified certain basic duties that must be met in every case. Counsel have

> particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution.  Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.

*Id.* at 688.

Additionally, criminal defense counsel have a "duty to investigate," *Strickland*, 466 U.S. at 690, and capital defense counsel have an "'obligation to conduct a thorough investigation of the defendant's background.'" *Wiggins*, 539 U.S. at 523; (quoting *Williams (Terry) v. Taylor*, 529 U.S. 362, 396 (2000)); *see also Porter v. McCollum*, 558 U.S. 30, 39 (2009). This investigation must precede and inform counsel's actions such that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports limitations on investigation." *Strickland*, 466 U.S. at 690-91.

It is not enough that counsel simply do some investigation. In *Wiggins*, the Supreme Court "held counsel 'fell short of ... professional standards' for not expanding their investigation beyond the presentence investigation report and one set of records they obtained, particularly 'in light of what counsel actually discovered' in the records." *Porter*, 558 U.S. at 39. Thus, the question is whether counsel's investigation was reasonable in light of the information available to him, regardless of whether the source of the information suggests its content. *See Rompilla*, 545 U.S. at 385, 389.

### b. Prejudice: a reasonable probability of a single juror responding to mitigation

*Strickland* required Mr. Green to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is less than a preponderance. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). *Strickland*'s standard did not require Mr. Green to "show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, at 693. Still, the "likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

*Strickland*'s prejudice test requires the Court to consider all of trial counsel's unprofessional errors against "the totality of the evidence" adduced at trial and in post-conviction proceedings. *Strickland*, 466 U.S. at 695; *Wiggins*, 539 U.S. at 536; *Williams*, 529 U.S. at 397. Courts must consider that "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Strickland*, at 695-96. Determinations of prejudice require a cumulative assessment of counsel's errors:

> Taking the unaffected findings as given, and taking due account of the effect of the errors on the remaining findings, a court making a prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.* at 696.[7]

---

[7] Accord *Fisher v. Gibson*, 282 F.3d 1283, 1307-11 (10th Cir. 2002); *Silva v. Woodford*, 279 F.3d 825, 834 (9th Cir. 2002); *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001); *Lindstadt v. Keane*,

The Supreme Court has further clarified the prejudice test by rejecting as unreasonable under § 2254(d)(1) state court determinations that "discount entirely the effect that [post-conviction] testimony might have had on the jury." *Porter*, 558 U.S. at 43. *See also Smith v. Cain*, 565 U.S. 73, 76 (2012); *Wearry v. Cain*, 136 S. Ct. 1002, 1007 (2013).

*Strickland* requires reviewing courts "proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision." 466 U.S. at 695. In Texas, as elsewhere, that means each juror was exercising her right to make an individual assessment of the strength and weight of the mitigation evidence, *McCoy v. North Carolina*, 494 U.S. 433, 442-43 (1990) (explaining *Mills v. Maryland*, 486 U.S. 367 (1988)), and that any juror's vote for a life sentence would have prevented imposition of the death penalty. Tex. Code Crim. P. art. 37.071, §§ 2(e)-(g). Thus, the ultimate question is whether, had the jury been able to consider Mr. Green's "life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537; *Buck v. Davis*, 137 S. Ct. 759, 776 (2017).

### 3.  *Applying Strickland to Competency*

#### a.  Prevailing professional norms related to competency

The assessment of whether Mr. Green's trial counsel fulfilled their duties must be guided by codified norms such as those in the American Bar Associations Standards for Criminal Justice ("ABA Standards"), and Guidelines for the Appointment and Performance

---

239 F.3d 191, 199 (2d Cir. 2001); *Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999); *Turner v. Duncan*, 158 F.3d 449, 457 (9th Cir. 1998).

of Counsel in Death Penalty Cases ("ABA Guidelines"). *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 688. The relevant ABA Standards called upon trial counsel to secure an independent assessment of Mr. Green's competence from the first time they had reason to doubt it. ABA Criminal Justice Standards, Defense Function § 4-3.6 and Commentary; ABA Standards, Mental Health, Standard 7-4.2 ("Defense counsel should move for evaluation of the defendant's competence to stand trial whenever the defense counsel has a good faith doubt as to the defendant's competence"). Because, in part, "judges must depend to some extent on counsel to bring [competence] issues into focus," *Drope, supra*, 420 U.S. at 176-77, prevailing professional norms require that defense counsel bring evidence suggesting incompetence to the attention of the court. *Williamson v. Ward*, 110 F.3d 1508, 1517 (10th Cir. 1997).

As discussed *supra*, the ABA Guidelines also call on trial counsel to closely monitor the defendant's mental condition and to consult experts regarding any signs of incompetence. ABA Guideline 10.7 and Commentary.

### b.  Prejudice from the Failure to Seek a Hearing

Where a deficiency of trial counsel "caused the defendant to forfeit a judicial proceeding to which he was otherwise entitled," the defendant establishes prejudice by showing he would have received the process he lost. *Roe v. Flores-Ortega*, 528 U.S. 470, 485 (2000). For example, where counsel is deficient in advising the defendant to plead guilty, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985) (quoted in *Flores-Ortega*). Similarly, where the defendant instructed

his counsel to file a notice of appeal, and the attorney failed to carry out the instruction, the defendant "'should be treated exactly like any other appellant'" and need not "'specify the points he would raise were his right to appeal reinstated.'" *Flores-Ortega*, 528 U.S. at 485 (quoting *Rodriguez v. United States*, 395 U.S. 327, 330 (1969)). Where a defendant has shown that his counsel gave him objectively unreasonable advice about a plea offer, prejudice exists when he "has shown that but for counsel's deficient performance there is a reasonable probability he and the trial court would have accepted the guilty plea." *Lafler v. Cooper*, 566 U.S. 156, 174 (2012). *See also Herring v. New York*, 422 U.S. 853, 862-64 (1975) (denial of right to give closing argument in bench trial required new trial with no further showing of prejudice).

Mr. Green was constitutionally entitled to a competency hearing if the information before the trial court raised a *bona fide* doubt as to his competence. *Pate*, 383 U.S. at 385; *Drope*, 420 U.S. at 172. Where the available information is sufficient to bring the defendant's competence into doubt, it is contradictory to argue he could waive his right to a hearing. *Pate*, at 383. Because competence is rudimentary to a fair trial, *Cooper*, 517 U.S. at 354, it is a violation of due process for the trial court to proceed to trial or judgment without conducting a hearing. *Drope*, 420 U.S. at 180-81; *Pate*, 383 U.S. at 385. Thus, Mr. Green can establish prejudice by showing that if his counsel had presented the available evidence to the trial court, that court would have been required to hold a hearing.

Some U.S. Courts of Appeals have held that a petitioner who asserts his counsel were ineffective for failing to invoke his rights under *Pate* and *Drope* demonstrates prejudice by showing a reasonable probability he was tried while incompetent. *See Hull v. Kyler*, 190 F.3d

88, 105 (3d Cir. 1999) (citing *Eddmonds v. Peters*, 93 F.3d 1307, 1317 (7th Cir. 1996), *cert. denied*, 520 U.S. 1172 (1997); and *Felde v. Butler*, 817 F.2d 281, 282 (5th Cir. 1987)); *see also Williamson, supra*, 110 F.3d at 1519 (same)); *cf. Davis v. Woodford*, 333 F.3d 982, 997 (9th Cir. 2003) (because petitioner failed to prove he was tried while incompetent, petitioner could not prevail on claim that counsel erred in failing to request a competency hearing).

In light of *Lafler v. Cooper, Hill, Rodriguez* and *Herring*, and the central importance the Supreme Court has emphasized competence plays in the other rights protected by the Sixth Amendment, Mr. Green submits those cases were wrongly decided. Consider the Supreme Court's recent decision in *Lafler v. Cooper*. The respondent in the Supreme Court, Cooper, was offered a plea agreement that his attorney unreasonably advised him to reject. He went to trial, was convicted, and received a sentence 3.5 times higher than the one offered by the prosecution if Cooper pleaded guilty. *Lafler*, 566 U.S. at 174. In order to show prejudice, Cooper did not have to show a reasonable probability that the trial court would have imposed the sentence recommended in the offer. *Ibid.* On the contrary, the Court found prejudice even though the state trial court on remand had

> discretion in determining whether to vacate the convictions and resentence respondent pursuant to the plea agreement, to vacate only some of the convictions and resentence respondent accordingly, or to *leave the convictions and sentence from trial undisturbed.*

*Ibid.* (emphasis added). Requiring Mr. Green to show a reasonable probability that he would have been found incompetent is incompatible *Lafler*'s holding that a successful petitioner could get the same sentence; incompatible with *Hill*, which does not require a petitioner to show a reasonable probability that he would have fared better at trial; incompatible with

*Flores-Ortega* and *Rodriguez*, which do not require that a petitioner show a reasonable probability of success on appeal; incompatible with *Herring*, which does not require the petitioner to show a reasonable probability that counsel's argument would have swayed the jury.

But it makes little difference because, for the reasons stated in § III.B.2, *supra*, Mr. Green can show, at a minimum, that there is a reasonable probability that he was tried while incompetent.

## IV.    FACTS SHOWING MR. GREEN IS ENTITLED TO RELIEF

### A.  THE LAY WITNESSES GREEN SPONSORED TESTIFIED CREDIBLY

Moncriffe, Jacobs, Forward, and Turner provided the Court with eye-witness accounts of Green's behavior and speech that supported the forensic conclusion that the onset of mental illness preceded trial. They manner in which these witness testified and the type of descriptions they provided bore indicia of reliability. Each of the witnesses had the sincere and serious appearance of persons honestly recollecting troubling and puzzling behavior of a relative or friend. The witnesses demeanor and mode of expression gave the distinct impression that they were not fabricating or exaggerating.

Moncriffe's credibility merits special consideration. Not only did he appear truthful on the stand, Respondent's witnesses testified to Moncriffe's reputation as an exceptional attorney, who was very concerned for his clients. HT5-41:16-20. Moncriffe also testified against his self-interest. Green raised a claim of ineffectiveness of trial counsel, alleging that Moncriffe, when he took over from Green, failed to request a defense expert and competency hearing. Despite the allegations potential adverse professional consequences,

Moncriffe still testified that he believed Green was seriously mentally ill, provided a description of Green's conduct and speech that strongly supported this belief, and stated that he believed Green, at trial, did not have a factual or rational understanding of the proceedings against him. HT1-50:1-8.

### 1. *Moncriffe's testimony*

Moncriffe reported numerous outbursts the cause of which was not ascertainable to Moncriffe. HT1-26:3-6; Moncriffe stated that he had to take Green outside the courtroom to calm him down. HT1-26:8-14. Moncriffe tried to explain why Green had to remain calm, but Green could not control himself. HT1-73:20-23; HT1-74:7-11. Moncriffe confirmed, too, that Green refused to wear the street clothes Moncriffe brought him, and insisted on wearing his Harris County Jail jumpsuit, despite Moncriffe's attempts to explain to Green why this basic aspect of courtroom demeanor was important. HT:1-24:4-19. According to Moncriffe, on several occasions, Green began the day dressed appropriately, but tried to take the street clothes off in the courtroom, causing Moncriffe to intervene. HT1-24:22 – 25:2. Moncriffe stated Green was not just adjusting his clothes, but was beginning to disrobe. *Id.*

Moncriffe said his attempts to communicate basic legal concepts to Green, such as what a peremptory strike was and what "closing argument" meant, was ultimately futile. Equally futile, Moncriffe said, were his attempts to have Green follow simple methods for rating jurors. HT1-89:6-8. Moncriffe testified that basic legal concepts and strategies appeared to be beyond Green's ability to comprehend. According to Moncriffe, trying to communicate basic ideas regarding trial strategy and evidence to Green was comparable to trying to teach a mentally disabled person chemistry. HT1-22:14-20; HT1-35:2-14.

Moncriffe testified that Green appeared to understand and assent to Moncriffe's advice, but could not execute it. HT1-49:16-25. Instead, Green would do the exact opposite after he advised him, choosing jurors, for example, that no defense attorney would place on the jury, such as several police officers, one of whom showed up in uniform. HT1-38:9-24.

Moncriffe's testimony indicated that Green's difficulties comprehending simple ideas and expressing himself were typical rather than isolated events. HT1-49:6-22. Moncriffe testified that Green's written statements, such as when he complained of "invisible services" and of the "invisible conditions" under which he felt he had to communicate with his "assistants" were characteristic of Green's thought processes during his representation. H1-98:1-25. Before the hearing, Moncriffe had reviewed transcripts, which Respondent provided. The transcripts captured Green's voir dire of one juror, an accountant, whom Green attempted peremptorily to strike. However, after the State accepted this juror, Green did too. The reason Green gave for his about face was that the juror knew what percentage 1 out of 3 was. According to Moncriffe, this exchange was typical of Green's reasoning – "a perfect example" – throughout the course of Moncriffe's involvement with the case. HT1-31:10 – 1:32:2.

### 2. *Robert Sudds' testimony*

Sudds is Green's older brother by a different father. HT1-130:19. Sudds and Green were raised mostly in separate households, but live together for a period of time and saw each other on off. Sudds provided some information about what Green was like during Green's teens and twenties. Sudds testified Green talked fast, was interested in electronics. According

to Sudds, sometime before the murder in this case, Green told Sudds he had passed the bar to be an electrician and had secured employment in Oklahoma, although there is no evidence Green ever sat for a test of his electronics ability or was employed as an electrician. HT:1-154:17-21.

Sudds also visited Green while Green was incarcerated in the Harris County Jail for murder. Sudds recalled that Green was very hyper. HT1-156:14. Green also told Sudds that the police or prosecution was listening to him, i.e., monitoring what he was in saying in the Harris County Jail. Sudds testified, further, that police came into the Harris County Jail to harass him, and get him to agree, i.e., confess to the murder. HT1-157:3-4. According to Sudds, Green claimed the police came to the jail to harass him at night. Moreover, the harassment was violent.

> Q. Did he [Green] say they used electroshock on him?
>
> A. Yes, he did . He said they implanted some instrument to his skin.
>
> Q: Into his head?
>
> A: Yes, into his skin.

HT1-157:1-19.

Nonetheless, Green was confident that he would be out, that is set free. HT1-159:8-11.

### 3. Michael Turner's testimony

Michael Turner meet Green and his family through a "mission church" program in Houston's Fourth Ward that Turner helped run. HT1-72. Through these auspices he was in contact with Green as he grew up, starting in early adolescence. HT1. Turner took an

interest in the Green family's well-being. For a period of time, Turner provided transportation and arranged for housing. 1-179:6-25. Turner helped place Green's two younger brothers in a boys' home, HT1-180:19-20, and attempted to find Green employment. HT1-180:10-1-183:25. Turner attended Green's trial for capital murder, and tried to assist him after trial. HT1-187:15-16. Turner kept correspondence from Green.

Turner recalled that Green was hyper as an adolescent and young adult. HT1-175:23 Turner testified an attempt to find Green employment turned into a fiasco. HT1-180:10-1-183:25. Turner secured a job interview for a handyman position with the secretary of the real estate office for which Turner worked. According to Turner, the secretary, became "a little scared," and came to Turner's office across the hall to get Turner's help removing him. HT1-183:17-19. According to Turner, the secretary reported that Green had insisted on performing what he called detailing windows and would not leave. HT1-183:20-21.

Turner testified that, while he and the secretary conferred, Green slipped passed and made his way into a restaurant located in the office building. HT1-184:1-4. The restaurant manager also had to find Turner to help remove Green, who was pitching his ideas for window detailing, unsolicited, to the manager. HT1-184:10-14. Turner said the manager told him, "Hey, this guy [Green] won't leave. I told him I don't want my windows washed and he won't leave." So Turner had to go the restaurant and guide Green out. According to Turner, Green did not grasp the objective of the job interview. HT1-184:18-20.

Turner recollection of trial was remarkable, in that he confirmed that Green insisted on wearing his street clothes in the courtroom. HT1-185:1-8. Turner remembered that he

had to go back to the holdover area adjacent to the court to try to talk Green into putting on street clothes.

After trial Green wrote Turner with various requests. In one letter dated January 7, 2001, only two weeks after trial, Green asked Turner to call the "try to contact someone from the Secret Service and tell them this case was tampered on part of DNA evidence, fingerprint information, fingernail scrapings, witness testimony, police acted illegally...." HT1-193:11-19. In this January 7, 2001, letter Green also asked Turner to get an affidavit from a juror's whose lips Green claimed he had read. Green wrote that the juror "[she said, Sit up straight. They force us to kill you. And her name was Ms Fannie May Scott, black female, about 50 years of age. Mike this means someone went into the jury room during deliberations interfering." HT1-194:11-15.

### 4.  *Jerry Jacobs' testimony*

Jacobs is one of Green's first cousins. HT1-199:9. Jacobs testified, as relevant to each of the claims at issue here, that he lived with Green Shreveport, Louisiana, starting when both were in junior high. HT1-200:10. Their families, nine people total, lived together, along with one grandmother, in a three room house on of which was a kitchen. HT1-201:3.

The house was in the Motown project, and Jacobs said he Green faced violence from neighborhood gangs constantly. HT1-202. Their fear of being accosted, at times, kept them from attending school. Jacobs referred to serious fights, and testified about one incident in which Green was seriously injured, when he was hit the back of a head by brick. HT1-204:21-25. Green lost consciousness and received from medics for the wound to his scalp. *Id.*

Jacobs maintained that after this point Green's behavior changed. According to Jacobs, Green was constantly afraid someone was following him, although no one was doings so. Green's preoccupation began in Louisiana and continued in Houston, to where both Green's and Jacobs's families moved. Green also developed a noticeable habit of blinking his eyes that Jacobs attributed to a racially motivated attack in Louisiana. A car driven by white youths, pulled alongside Green and through a cup of liquid that splashed in Green's eyes.

Jacobs testified that Green talked fast, seemed anxious, and carried on conversations with other persons although no one else was present. HT1-209. Jacobs remembered asking what Green was doing, and recalled Green saying that he was "just tripping." Green behaved in this manner on the street, but also in other circumstance. Jacobs said Green talked to himself in the house as well, talking as thought to another person when only Green and Jacobs were in the room. HT1-211.

Jacobs attended trial, but did not testify. Like Moncriffe and Turner, he recalled that Green refused to change from his jail uniform into street clothes for trial. Jacobs was shocked by the way the situations. According to Jacobs, the Judge Jacobs said that two officer forcible removed Green from the courtroom, one on each side of Green. HT1-213:22 – 1-214:12. Jacobs said he heard arguing from behind the door leading to the holdover tank. Jacobs remembered someone finally yelled at Green to put his "fucking clothes on." *Id.*

### 5. *John Forward's testimony*

Forward was an inmate with Green in the Harris County Jail. Forward's jail records show that he in jail with Green pretrial, from the date Green arrived until approximately June

27

of 2000, when Forward transferred out. Forward testified that he wrote several motions for Green in his own hand for Green to sign, including motions to suppress evidence. Green copied other motions Forward wrote and signed. Forward was the author of Green's legal arguments, including the arguments in a motion to suppress DNA evidence. HT2-22:3-7. Forward also convinced Green that if his attorneys refused to file the motion, they were working against him. Forward had no legal background; he did not have a degree.

Forward corroborated Moncriffe and Jacobs testimony about Green's tendency to talk to himself. Forward also confirmed Moncriffe's difficulties getting Green to focus and execute. According to Forward, Green would start of talking about one subject, "and he would jump to other subjects; and he would never finish what he started. He would never finish anything." HT 2-45:22-25. Green's digressive speech, according to Forward, could last an hour. *Id.* Forward testified, further, that Green responded emotionally, laughing to himself and getting mad at himself when he was talking to himself. HT2-20:9-11.

Forward testified he witnessed a motivational and bizarre behavior from Green. Forward testified that Green also failed to take care of basic hygiene. Forward had to make Green bathe and brush his teeth. HT2-44:12-14. According to Forward, Green also had "a bad masturbation problem." H:2-20:9-11. Green masturbated in public a lot, i.e., in front of other inmates. The sexual conduct enraged fellow inmates to the point that Forward was afraid for Green's physical safety. HT2-20:19-22. According to Forward, even inmates considered weak were calling him names on a regular basis because of Green's aberrant conduct. *Id.* Inmates considered Green "retarded" and told him to his face. HT2-52:1-2.

Forward testimony indicted Green was not aware of the nature or gravity of his legal situation. Forward also had to make Green to go to the law library and prepare. However, Green, he said, seemed tired and lazy. HT 2-36. Forward recalled that, Green "used to be on the phone with his brother or some family members, ... and he would tell them, 'I be going home tomorrow. Come pick me up.'" HT 2-21. These recollections, led Forward describe Green as living in a make-believe world. HT 2-46.

### 6. Moncriffe, Sudds, Jacobs, Turner and Forward corroborates each other, presenting a consistent picture of a seriously psychotic individual that support Mosnik's forensic diagnosis.

Moncriffe, Sudds, Jacobs, Turner, and Forward provided independent accounts of Green's behavior and speech. Moncriffe and Forward descriptions of Green's unfocused, subject jumping speech, his incapacity to focus, his inability to execute plans and grasp basic concepts, as well as his malleable and inappropriate affect provide key evidence supporting Mosnik's determination that Green speech and behavior was grossly disorganized, and, therefore, symptomatic of a thought disorder. These two witnesses, along with Jacobs, also provided descriptions of Green "talking to himself" in appropriate contexts inconsistent with merely thinking out loud, and supportive, instead, of Dr. Mosik's conclusion that before and during trial Green was responding to internal stimuli, i.e., to hallucinations.

The written record does not discredit the testimony of any of the foregoing witnesses about Green's conduct and speech. There is ample evidence, in the transcripts and the clerk's file of like behavior and expressions on Green's part. Several letters and pleadings Green submitted are comparable in their content and composition to Green's post-conviction writings that Mosnik, and Proctor as well, opined were the products of psychosis.

The transcripts indicate that Green acted irrationally, documenting, for example, that Green insisted on wearing his jail clothes, rather than a street clothes, and that the judge had to order him removed from the courtroom on at least one occasion.

Furthermore, Green's social situation is documented in the trial transcripts, and shows Green's level of functioning in multiple areas, such as work, interpersonal relations, and self-care, was markedly below someone of his age, even considering his lack of education and low intelligence. Green was 30 years old at the time of the crime. He claimed to have technical skills and a GED, (3 RR 6), and described his work history as follows:

> I was a telecommunication technician and a full time cook on the night shift at the hospital. Before that I've been a salesman. Audio technician. I'm a sound specialist and frequency expert for many years.

3 RR 29.

However, Green had dropped out of high school in the ninth grade, had no known job training, was unemployed when arrested, and had no employment history to speak of other than briefly held jobs at Kroger's and with a temp agency. Green was without income, without a means of transportation, except for a bicycle, which may not have been his, 15 RR 20, and homeless, unless a relative provided a bed. 1 RR 62. Green had no belongings other than a few items of clothing, and was shirtless, clad only in khaki pants and brown boots, when arrested. 15 RR 277.

### 7.  *The known course of the mental illness affecting Green supports the conclusion that Green was mentally ill at the time of trial.*

Both experts recognized that the typical onset of schizophrenia in males occurs during late teens and early twenties, but in a relatively small percentage, namely, 2%, male onset

occurs after 30. Dr. Mosnik explained that the typical age of onset for African American males is earlier than for males of other races. HT6-234:22-25. Mosnik identified two other factor pointing to an early onset, a family history of mental illness and formal thought disorder, both of which Green has. When Green's trial began, he was 32 years of age, well past the typical age of onset, particularly for subjects with his family background and his diagnosis.

Proctor agreed that Green's writings only seven months after trial show was psychotic by this time. Proctor also acknowledged that the prodromal period usually lasts around three years, but may be somewhat longer or shorter. Proctor's conclusion that there was no evidence of mental illness, at trial and barely any reason to believe Green was in the prodromal stage, not only presupposes an unusually late onset, but an extremely rapid progression of the disease in Green's case, with completion of the prodromal phase and a psychotic break marking the onset of schizophrenia taking place in a matter of months. Neither presupposition is consistent with the psychological literature.

### B. DR. PROCTOR'S FORENSIC CONCLUSION THAT THERE WAS "NO EVIDENCE" THAT GREEN WAS MENTALLY ILL IS NOT CREDIBLE.

#### 1. *The rationales Proctor used to discount the testimony of Sudds, Jacobs, Turner and Forward detract from Proctor's own credibility.*

Dr. Proctor did not place confidence in the testimony Sudds, Jacobs, Turner and Forward. HT6-145:10-12. Proctor acknowledged, after resisting the idea, that Moncriffe's, Jacobs' and Forward's testimony corroborated each other. HT6-146:5-9. Proctor had the opportunity to give reasons for believing that Sudds, Jacobs, Turner or Forward were being

dishonest. HT6-145:6-9. Proctor did not offer any, but asserted the weight given to their testimony should be limited because it did not match up with other evidence. *Id.*

Proctor did not point to evidence inconsistent with any of these witnesses' statements. According to Proctor, though, if Green had exhibited the conduct and verbal behavior these witnesses testified they saw and heard, he would expect trial transcripts and jail records, including Rubenzer's reports, to also reflect similar actions and speech. HT6-113:5-10. However, Proctor maintained the transcripts and jail documents do not record comparable behavior and statements. HT6-113:16-19. Therefore, Proctor considered the testimony of these witnesses to be uncorroborated and anecdotal. HT6-116:6-8, HT6-161:9-11.

Proctor provided two rationales why he took the position that corroboration by transcripts and jail records was necessary in order to accept Sudd's, Jacobs', Turner's, and Forward's testimony as accurate. First, Proctor maintained that if Green was experiencing schizophrenia characterized by symptoms as significant as that which Sudds, Jacobs, Turner and Forward descriptions indicated Green exhibited, then Green would not be able to suppress this aberrant behavior and expressions in the courtroom or when interacting with jail personnel. Second, Proctor maintained that Harris County Jail personnel would have intervened, and left a record of their intervention, if Green were acting aberrantly in public.

In support of his first rationale, Proctor referred to his and Dr. Mosnik's respective interviews of Green Proctor pointed out that Green spoke freely on both occasions about his hallucinations and bizarre delusions. In his view, Green's mental illness prevented Green from withholding his hallucinatory experiences and delusory beliefs. According to Proctor, Green would have spoken freely and uncontrollably on the record or to jail personnel if he

were as psychotic as he is today or as psychotic as Sudd's, Jacob's, Turner's and Forward's testimony implied.

In support of the second rationale, Proctor referred to his experience in the prison system. According to Proctor, jail policy is directed towards preventing sexual misconduct. Hence, had a bad problem with public masturbation, jail personnel would have reported his misconduct and there would be disciplinary reports. Proctor argued similarly from the absence of police reports documenting encounters such as the one Turner described that Turner's description was not probative of mental illness.

However, Green attended the lengthy hearing convened by the federal district court. On a three or four occasions Green attempted to address the court uninvited, but he responded to the Court's directions to desist. Apart from these infrequent interventions, Green sat quietly throughout several days of testimony. Even if Green's thoughts were as thoroughly psychotic as both experts reported, quite evidently he could refrain from declaiming them.

The trial transcripts, moreover, do record numerous incidents in which Green disrupted those proceedings. The Court reporter documented three occasions when Green refused to wear street clothes, and at least one incident when the presiding judge ordered Green removed from the courtroom. Courtroom personnel, namely the prosecutors, testified that the federal hearing that Green did talk audibly to himself while in the courtroom. The clerks record also corroborates testimony that indicates Green was psychotic. The pleading styled Complaint Against Judges is particularly significant. The document is in Green's own hand, unlike numerous other pleadings. Forward transferred to

33

another facility well before Green filed it. The pleading is comparable to the September 2, 2001, letter (HT Exh. 11), both in the form that Green's language takes, and in the level of delusional content. HT3-24:1 – 3-25:25.

Finally, with regard to corroboration, Moncriffe supported Sudd's, Jacobs', Turner's, and Forward's testimony. Moncriffe testified that Green had outbursts that compelled him to take Green aside to settle him down. HT1-26:1-25, HT1-72:6-8. Moncriffe description of his communications with Green corroborate Forward's testimony regarding Green's unfocused, subject jumping dialogues, and Moncriffe's perception of Green's inability to comprehend basic legal concepts and carry out basic strategies corroborated Forward's and LaDay's description of similar intellectual incapacities.

### 2.   *Proctor displayed several unscientific biases.*

Proctor's categorization of Sudd's, Jacobs', Turner's, and Forward's, accounts as anecdotal betrays as a misunderstanding of the type of evidence these witnesses presented. Moncriffe, Sudds, Jacobs, Turners, and Forward, as well as the affiants, LaDay and Duggar, were all eye-witnesses who were very familiar with Green. Each testified as to what he remembered seeing and hearing in the course of close, personal interactions with Green. Jacobs and Forward, in particular, described recurring behavior, not isolated incidents, as did LaDay. Eye-witness testimony, such as these witnesses provided, is direct evidence, and cases which built on it are contrasted with circumstantial cases. Eye-witnesses may be impeached for other reasons, such as memory, opportunity or conditions under which

observations were made. However, eye-witness testimony cannot be dismissed as anecdotal. HT6-116:7.

Proctor also displayed a tendency to interpolate into the record his own beliefs about what Green thought in order to make sense of Green's statements. For example, Proctor was asked to address Green's letter styled "Motion to Recuse Judges," in which Green declares that "detectives falsely reimplemented" his fingerprint information on the victim's neck, declares that Judges had "allowed detectives to falsify vital documents in the case," and calls for the appointment of a "grandmaster." On their face, the statements were false, and unrealistic. However, Proctor maintained that Green was not manifesting paranoid and delusional symptoms characteristic of the mental illness, but rather was "making a case here for what he is saying is evidence of him being innocent." HT5-130:22-25. According to Proctor's interpolation, Green was simply making a case for innocence, very much like other defendants, who Proctor said will "tell you they didn't do it" and have "been framed." HT5-131. In yet another instance, Green, in conducting voir dire, engaged in an extensive senseless monologue that, in part, went as follows:

> Okay. I would say that without doing anything in violation or saying anything in violation, anything that I say, I can prove. I won't say nothing. During trial, I may say something; and if somebody doesn't hear something, I don't know if the jurors are allowed to say anything about hearing something. But I guess I would defer to the judge or whatever later afterwards. But sometimes, I speak and somebody don't hear me or they don't understand where I'm coming from; and I guess I would rather somebody -- what I'm trying to say is I'm asking that you be honest and let anyone hear the case here fairly. And in order to hear something fairly, you have to hear all the facts. And if there's something that someone doesn't hear due to me speaking, not being audible, then that's not being fair. So, if there is something that's said or whatever, I guess it would -- the proper thing, I would say, to refer to the judge.

HT6-42:8-25.

Proctor conceded that "it's certainly valid to consider" Green's voir dire of a juror was "some disordered thinking," but said it was not clear because "[t]here could be other reasons for why he meanders." HT6-43:14. Proctor proceeded to make several up. According to Proctor, the preferred explanation, for this passage, which Mosnik analyzed as a thought disorder, was that he didn't "think [Green] had written this out or anything. He's speaking. He's trying to get a point across." HT6-44:9-12.

Proctor's efforts to make up explanations besides mental illness for Green's performance at trial extended to interpreting transcripts to mean the exact opposite of what the court reporter had transcribed. Faced with transcripts indicating that Green had come to a conclusion that contradicted on its face what Green may have intended when he started speaking to express, Proctor denies that this was evidence that Green, due to a thought disorder, had derailed from his original topic or point. Instead, Proctor surmised that the contradiction was as an artifact created by the court reporter's omission of the word "not." HT6-46:1-6. He then concluded that the passage "represent a capacity in Green to factually and rationally understand what a peremptory strike is." HT6-46:17-19.

### 3. The thought experiment Proctor used to eliminate mental illness as an explanation for Green's conduct and verbal behavior distorts the process of differential diagnosis.

Dr. Proctor's tendency to supply rationales for speech captured in the transcripts that, in Dr. Mosnik's opinion, evinced a thought disorder appears to be consequence of his method for making a differential diagnosis. Proctor testified that when trying to "tease out what might be attributable to psychosis or to something else" that "one starting point for me

was imagining how I would expect him to behave in this situation representing himself if he were not psychotic." HT5-126. Proctor acknowledged that the transcripts contained statements that psychologist could reasonably consider evidence of disordered thinking. However, Proctor excluded mental illness as the cause if he could imagine Green making the statement even though he was not ill, but because of other traits, such as his low level of intelligence, low level of education, lack of familiarity with the legal system, or some combination of these traits.

Proctor's method betrays a misunderstanding of differential diagnosis. A psychologist making a differential diagnosis does not exclude a particular disease as a cause of a symptom because he can imagine someone exhibiting that symptom for some other reason. More than one disease or condition can cause a given symptom. Differential diagnosis is possible, nonetheless, because diseases, such as schizophrenia,[8] are characterized by multiple symptoms that have to be co-present in order to make a diagnosis. In such cases, it is a grave error exclude a behavior or physical reaction as a symptom of a certain disease because one can imagine other causes. Instead, one must look for contraindications or note the absence of symptoms that must be co-present.

Proctor's conclusion that there was no evidence at all at trial of mental illness is the product of applying his imaginative test over several domains (categories of symptoms) diagnostic of schizophrenia. For example, Proctor eliminated objective evidence of a thought

---

[8] According to the DSM V at 100, "the characteristic symptoms of schizophrenia involve a range of cognitive, and behavioral, and emotional functions, but no single symptom is pathagnomonic of the disorder. The diagnosis involves the recognition of a constellation of signs and symptoms associated with the impaired occupational or social functioning."

disorder because he could imagine Green producing the same speech because a constellation of other reasons, lack of education, low intelligence, anxiety, and so forth. HT6-182:12-24. Instead, of seeing Green's refusal to wear street clothes, and his attempt to disrobe, as evidence of grossly disorganized behavior, Proctor rechristened the conduct as "just unbuttoning a few buttons," in order to dismiss its psychological significance. HT5-157:4-8.

### 4. Proctor made basic mistakes that call his proficiency as a diagnostician into question.

Proctor testified that he was highly experienced in evaluating persons who have schizophrenia. However, his expertise was called into question by the fact that during deposition, Proctor made the basic mistake of supposing that a diagnosis of schizophrenia required the presence of hallucinations or delusions. However, contrary to Proctor's deposition testimony, a diagnosis of schizophrenia can and should be made in the absence of either hallucinations or delusions if a patient exhibits disorganized speech.

Proctor's misstatement of the basic criteria for diagnosing schizophrenia cannot be attributed to a mere slip or lapse. Proctor asserted the error during deposition more than once. Furthermore, Proctor did not mention disorganized speech, nor thought disorders, not even to exclude the phenomena, in the report he drafted in advance of his deposition. Furthermore, Dr. Proctor addressed Dr. Mosnik's report, that report contains an extensive opinion that Green exhibited disorganized speech at trial, with reference to multiple passages in the transcripts as supporting evidence, yet Dr. Proctor failed, until the hearing, to address the issue. Proctor's misapprehension about basic diagnostic criteria is particularly serious, since the issue of disorganized speech and its importance are central to this case.

C. GIVEN GREEN'S PRESENT DIAGNOSIS, AND BACKGROUND
   EVIDENCE PROVIDED BY EYE-WITNESSES TO GREEN'S BEHAVIOR
   BEFORE AND AT THE TIME OF TRIAL, THE BEST EXPLANATION FOR
   HIS CONDUCT AND SPEECH, DOCUMENTED IN THE TRIAL
   TRANSCRIPTS, IS MENTAL ILLNESS.

Disorganized speech is one of the domains characteristic of schizophrenia. The co-presence of symptoms characteristic of disorganized speech along with symptoms from another domain (of which there are five total), such as avolitional behavior, or grossly disorganized behavior, is diagnostic of schizophrenia, and permits a trained psychologist to make a diagnosis and eliminate candidate explanations.

Proctor's own explanation that Green's speech is the product of low intelligence, lack of education, and the stress of trial, acknowledges that Green had marked difficulties expressing himself. Furthermore, Proctor identified linguistic features in at least one passage in the transcripts of trial diagnostic of disorganized speech. Proctor realized reasonable psychologists could conclude, as did Mosnik, that other passages in the transcripts are records of disorganized speech.

In determining whether Green's speech, as reflected in the transcripts, is best explained by onset of schizophrenia before trial or best explained by low intelligence, education and the circumstance in which Green was expressing himself, the objective evidence of disorganized speech must be considered in conjunction with a constellation of other factors. Leaving aside the testimony of Moncriffe, Sudds, Jacobs, Turner and Forward, and the affidavit statements of LaDay and Duggar, these factors include Green's aberrant behavior in the courtroom, the paranoid and illogical expressions that appear in pleadings he wrote awaiting trial, the consensus that Green was psychotic no later than seven months

39

after trial, the rarity of onset later than the age Green was at trial, and the known course of the disease. Mental illness best explanation. The credible testimony of Moncriffe, Sudds, Jacobs, Turner, and Forward leaves onset of schizophrenia before trial as the only reasonable explanation for Green's behavior and speech.

### D. THERE IS SUBSTANTIAL EVIDENCE OF GREEN'S MENTAL ILLNESS AT ALL RELEVANT TIMES

#### 1. *Green Did Not Have a Rational Understanding of the Proceedings*

Moncriffe provided credible testimony that Green could not understand basic legal concepts or execute simple trial strategies. Moncriffe testified Green could not comprehend what a peremptory strike despite Moncriffe's repeated attempt to explain the process, nor could Green grasp the meaning of terms as basic, as "closing" or even "argument." Transcripts bear Moncriffe's recollections out. After several days of voir dire, for example, Green still had no idea what a peremptory strike was, and accepted a juror he had initially attempted to strike, and gave an irrational explanation, namely, that the juror new one out of three was 33%. Green also clearly did not understand that trial had ended with the announcement that the parties had closed, and exclaimed when told it was time for closing arguments, Well, if you want to play dirty, let's argue."

Moncriffe's demeanor and presentation at the evidentiary hearing, his reputation for honesty, attested to by both prosecutors, and evidence corroborating his testimony in the transcripts, leaves no reason to doubt the accuracy of his recollection that Green had severe difficulties comprehending and using basic legal concepts comparable to the problems that a mentally disabled individual would have attempting to learn an advanced subject such as

chemistry, nor doubt Moncriffe's testimony that Green's closing remarks were typical of Green's speech and reasoning. Forward's testimony that he had to explain "waiver" to Green using the analogy of waving ones hand goodbye corroborates the degree to which Green's mental illness impaired his understanding of the legal concepts and processes. Moreover, the record indicates Foreward's attempts failed. After two *Faretta* hearings at both of which the trial court took pains to explain that Green right to represent himself had been granted, Green nonetheless wrote a letter complaining that "judge's were slaming (sic) attorneys on this case to get him convicted."

The conclusion that Green was mentally ill at the time of trial affects implications to be drawn from Green's frequently illogical and nonsensical statements on the record. Instead of bearing out Proctor's theory that Green's halting or stumbling speech was caused some combination of low intelligence, lack of education and anxiety over speaking in an unfamiliar, pressured situation, testimony at the evidentiary hearing supported Mosnik's determination that a formal though disorder explains Green's disorganized speech. As Dr. Mosnik explains, a formal thought disorder is not a transient condition, but rather a pervasive one that pervasively affects the mentally ill person's thought processes. The record supports Dr. Mosnik's observation that whenever Green expressed himself at any length, the connection between his thought became loose and disjointed. Whether Green was asking attempting to ask a question, attempting to answering one, or making a statement, Green expressed himself in incomplete sentences that diverged further from the original subject the longer he was spoke. It follows that Green could not maintain a rational train of thought, and therefore could not rationally understand the proceedings against him.

41

### 2.  *Green Did Not Have a Factual Understanding of the Proceedings Against him*

Transcripts show that Green used the term "capital murder," talked about defending himself, and could refer to the judge, jurors, the State and the attorneys appointed to defend him. Green made statement, too, showing he realized that he was accused of killing the victim. However, Green did not understand basic roles. When interviewed by Rubenzer, he stated the judge controlled the courtroom, announced on the record that the State was going to assist him, expressed the belief that the State appointed his attorney on one occasion, and wrote on another occasion that the presiding judges had appointed counsel for the purpose, not of defending him, but to ensure his conviction.

A factual understanding of the processes also means having some understanding of the purpose and the results of trial proceedings. However, Green failed to appreciate either. After two *Faretta* hearings in which the court clearly granted his right to represent himself, and explained extensively the perils of self-representation, Green could not grasp that he had been given the right. Nor could he grasp what exercising that right entailed. The Court made clear that Moncriffe could not assist him, but Green had the fixed idea that he was going to be given an assistant, and announced to the jury at the beginning of trial that Moncriffe would assist him.

Green also insisted on a delusional defense. Green insisted that police had implemented his fingerprints on the neck of the victim. Green expressed this belief before trial, and persisted in this belief after trial. The imperviousness to actual facts of Greens deluded understanding of his case was underscored by the act that the State's witness Green

42

questioned testified that there were no fingerprints lifted from the victim's body, and specifically not from her neck. 15 **RR** 227. Green nonetheless argued to jury at the close of trial that his fingerprints had been implemented on the victim. 16 **RR** 149. In other words, he insisted on their being evidence that would incriminate him if it had existed because he had the fixed belief that police had planted it, and he would be set free by showing misconduct.

### 3. *Green did not have the present ability to consult with his lawyer with a reasonable degree of rational understanding.*

Green persistent belief in a delusional defense involving the false "implementation" and "re-implementation" of fingerprints on the victims neck that was also contradictory rendered him incompetent under *Dusky.* 15 **RR** 24. This was not just a fixture of Green's mental life; it was a belief with practical urgency for Green. He was intent on proving that he had been framed by a case the state was not sponsoring, and therefore could not rationally discuss how to defend the actual case against him.

Moncriffe credible testimony confirms that Green was not able to consult with his attorney with a reasonable degree of rational understanding. According to Moncriffe, at times Green appeared to understand and assent to Moncriffe's advice, but he could not execute even basic plans. Moncriffe, corroborated by Forward, provided convincing testimony that Green was unable to grasp or discuss basic legal concepts. Green's thought disorder, meanwhile prevented him from drawing logical connections, and prevented him from carrying on a conversation about a given topic without derailing off onto a different subject.

Green's opening remarks indicated that the content of his thought was so impoverished that he could not grasp what defending a case involved at the most basic level. Green indicated, in opening, that he was not going to contest the State's evidence, even though he simultaneously insisted that he had been framed. Instead, Green stated "so far I've heard some of the things that happened that day that's not true, [but] I'm not going to argue the point about it being not true," and instead would "prove what is to be true to be true beyond a reasonable doubt." 15 RR 23.

Moncriffe's testimony that Green could not carry out simple plans that he appeared to agree initially understand and agree with confirms that consultation with Green was a meaningless, errant exercise. Evidence at the hearing demonstrating that, at the time of trial, Green suffered from schizophrenia means that Green's failure to follow advice was not a the result of a rational decision to follow a different strategy. Instead, Green's fixed false beliefs, his illogical speech, and the impoverished contents of that speech were serious symptoms of his mental illness that rendered Green incapable of apprehending or modifying ideas about evidence and tactics through communications with his attorney.

## V.   PROCEDURAL MATTERS

### A.  THE HEARING EVIDENCE FURTHER SUPPORTS THIS COURT'S DETERMINATION THAT STATE HABEAS COUNSEL WAS INEFFECTIVE

This Court has already held that state habeas counsel McLean was ineffective for failing to conduct an extra-record investigation in to an ineffective-assistance claim attacking the death judgment. Mem. & Order (Doc. 72) at 17-19. The hearing evidence reinforces that judgment and adds to the evidence that Mr. Green's Claim 1 is substantial. The testimony

of Sudds, Jacobs, Turner, Forward, and, of course, Dr. Mosnik would have enabled a juror to conclude, due to Mr. Green's profound illness, that he would not be a danger in prison, or, if he would be, that the fact of his schizophrenia and its effects on his thinking and behavior are sufficient to call for a life sentence.

### B.  THIS COURT SHOULD RECONSIDER ITS RULING ON CLAIMS 4 AND 5 IN LIGHT OF EVIDENCE ADDUCED AT THE HEARING

A "district court ordinarily has the power to modify or rescind its orders at any point prior to final judgment in a civil case." *Dietz v. Bouldin*, 579 U.S. ___, 136 S. Ct. 1885, 1892 (2016); *see also Simmons v. Reliance Standard Life Ins. Co. of Texas*, 310 F.3d 865, 868 (5th Cir. 2002) (even after entry of judgment district court has power to reconsider its rulings).

"Rule 54(b) [of the Federal Rules of Civil Procedure] allows parties to seek reconsideration of interlocutory orders and authorizes the district court to 'revise[ ] at any time' 'any order or other decision ... [that] does not end the action.'" *Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 337 (5th Cir. 2017) (quoting Fed. R. Civ. P. 54(b)). "Under Rule 54(b), the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." *Austin*, 864 F.3d at 336 (internal quotation marks and citation omitted).

But any inherent power must be exercised with restraint. *Dietz*, 579 U.S. at 1893; *Seven Elves, Inc. v. Eskenazi*, 635 F.2d. 396, 402 (5th Cir. 1981).

When ruling on a motion for reconsideration under the more demanding standard of Fed. R. Civ. P. 59(e), *Austin, op. cit.*, the court must strike a balance "between the desideratum of finality and the demands of justice." *Seven Elves*, 635 F.2d at 402. Although

a less demanding standard applies here, Mr. Green notes that motions to alter or amend a judgment under Fed. R. Civ. P. 59(e) "serve 'the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence.'" *Quinn v. Guerrero*, 863 F.3d 363, 360 (5th Cir. 2017) (quoting *Templet v. HydroChem, Inc.*, 367 F.3d 473, 479 (5th Cir. 2004)).

As set forth in § IV, *supra*, the evidence adduced at the hearing constitutes new evidence meriting reconsideration.

### C. THE PROCEDURAL DEFAULT DOCTRINE DOES NOT BAR RELIEF ON CLAIMS 4 OR CLAIM 5

The parties do not dispute that state habeas counsel failed to present Claim 4 to the Texas state courts and there is no remedy available to Mr. Green now. 1st Am. Pet. (Doc. 30) at 14-18; Ans. (Doc. 43) at 29-30; Reply & Traverse (Doc. 49) at 28-29. The State asserts that merits review of Claim 4 is procedurally barred under *Coleman v. Thompson*, 591 U.S. 722, 732, 735 n.1 (1991). Ans. (Doc. 43) at 30-31. Ordinarily, the procedural default would preclude consideration of the claim absent a showing of cause and prejudice. *Ibid.* However, this case falls within exceptions to the doctrine.

This Court previously deemed Claim 4 to be unexhausted but not procedurally defaulted. Mem. & Order (Doc. 72) at 20-21 (denying Texas' motion for reconsideration of Mem. & Order (Doc. 55)). Evidence adduced at the evidentiary hearing—specifically, evidence that Mr. Green was incompetent throughout trial and post-conviction proceedings, and the evidence of his impaired post-conviction condition was readily available to post-conviction counsel—supports this Court's prior ruling and an alternative holding that even if

46

the exhaustion rule applies, and even if there was a default, Mr. Green can show cause and prejudice for the alleged default.

### 1. *This case falls within a narrow exception to the usual default rules.*

The procedural default doctrine of *Wainwright v. Sykes*, 433 U.S. 72 (1977), grew out of the exhaustion rule. *Coleman*, 501 U.S. at 732; *id.* at 744-46. Failure to exhaust a claim in state court does not preclude federal review where the petitioner "could prove that they were 'detained without opportunity to appeal because of *lack of counsel, incapacity*, or *some interference by officials*.'" *Coleman*, 501 U.S. at 744 (quoting *Brown v. Allen*, 344 U.S. 443, 485-86 (1953)) (emphasis added).[9] As set out in detail here, the evidence adduced at the evidentiary hearing, together with the state court record, and other documentary evidence before this Court, shows that all three of the *Brown* conditions exist in this case. Mr. Green's was without counsel due to Ken McLean's violation of his duty of loyalty to his client (i.e. he abandoned Mr. Green); Mr. Green was incompetent during state habeas proceedings; Texas prison officials and courts interfered with Mr. Green's access to the courts by failing to treat his schizophrenia to make him competent, prohibiting him from communicating with the courts except through McLean, and offering no remedy for McLean's abandonment of Mr.

---

[9] Although *Brown* was overruled by *Fay v. Noia*, 372 U.S. 391 (1963), *Sykes* "limited *Fay* to its facts." *Coleman*, 501 U.S. at 747. But *Sykes* also "left open the question whether the deliberate bypass standard still applied to a situation like that in *Fay*, where a petitioner has surrendered entirely his right to appeal his state conviction." *Ibid. Sykes* also restored *Brown* by "reject[ing] explicitly ... 'the sweeping language of *Fay v. Noia*, going far beyond the facts of the case eliciting it.'" *Ibid.* (quoting *Sykes*, 433 U.S. at 87-88). Thus, *Brown* remains good law. Indeed, the relevant standard is codified in 28 U.S.C. § 2254(b)(1)(B)(ii).

Green's interests. Therefore, as a matter of federal law, neither the exhaustion doctrine, nor the procedural default doctrine preclude merits review.

### 2. *There is cause for an alleged default*

Mr. Green does not concede that the procedural default doctrine applies. However, for the sake of simplicity, he shows there are four grounds for holding that any failure to exhaust or default should be excused: (1) Mr. Green was incompetent during state post-conviction proceedings and his incompetence—which is demonstrated by the testimony of the State's expert—constitutes cause for the supposed default; (2) *Coleman*'s rule that a habeas petitioner must bear the risk of his attorney's error does not apply to Mr. Green because state habeas counsel severed the agency relationship on which the *Coleman* rule is based, *see Maples v. Thomas*, 565 U.S. 266 (2012); (3) Texas law, and the actions of the habeas court, made the Texas corrective process ineffective to protect his rights such that Mr. Green was not required to exhaust his claim, 28 U.S.C. § 2254(b)(1)(B)(ii); and (4) equity requires this Court to hold that the ineffective assistance of state habeas counsel excuses any default.

### a. Cause/Prejudice Part 1: Incompetence

As this Court previously observed, the Supreme Court held in *Pate*, 383 U.S. 375, that "it is contradictory to argue that a defendant may be incompetent, and yet knowingly and intelligently 'waive' his right to have the court determine his competency." 383 U.S. at 384, *cited in* Mem. & Order (Doc. 55) at 15. And courts have held that the "language in *Pate* prohibiting waiver of competency claims applies to the procedural default doctrine as well." Mem. & Order (Doc. 55) at 15.

In addition, to that line of reasoning, the Court of Appeals for the Eighth Circuit has held that incompetence during state post-conviction proceedings constitutes cause for a procedural default. *Anderson v. White*, 32 F.3d 320, 321 (8th Cir. 1994). "A defendant is competent to waive post-conviction remedies if he is not suffering from a mental disease, disorder, or defect that may substantially affect his capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation." *Ibid.* Inversely, "[m]ental illness prejudices a petitioner if it interferes with or impedes his or her ability to comply with state procedural requirements, such as pursuing post-conviction relief within a specific time period." *Holt v. Bowersox*, 191 F.3d 970, 971 (8th Cir. 1999).

These lines of reasoning are entirely consistent with the Supreme Court's cases on cause/prejudice. Where the petitioner is represented by counsel, the Supreme Court has said "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Mr. Green will address the issue of counsel *infra*. Here, it suffices to say that psychosis is an objective factor external to the defense that impeded Mr. Green's ability to comply with Texas law.

When a federal court decides whether circumstances constitute cause, it is appropriate to consider where the equities lie. *Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017) (explaining that *Martinez v. Ryan*, 566 U.S. 1 (2013) "announced a narrow[] 'equitable ... qualification' of the rule in *Coleman*); *id.* at 2068 ("*Martinez* ... was responding to an equitable consideration" raised by state law). Texas law recognizes neither a right to be

49

competent during state post-conviction review nor a remedy if the petitioner, or his lawyer, is incompetent. *Ex parte Mines*, 26 S.W.3d 910, 912 (Tex. Crim. App. 2000). Accordingly, Texas should not be heard to complain when an incompetent applicant for state collateral review fails to raise a claim asserting that he also was incompetent to stand trial. *See Davila*, 137 S. Ct. at 2068 (State's deliberate choice regarding manner of review of federal claim "'not without consequences for the State's ability to assert a procedural default' in subsequent federal habeas proceedings") (quoting *Martinez*, 566 U.S. at 13).

The cause inquiry focuses on "objective factors external to the defense" in order to distinguish the circumstances that can constitute cause from "a 'tactical' or 'intentional' decision to forgo a procedural opportunity" to raise a federal claim because such a decision "normally cannot constitute cause." *Amadeo v. Zant*, 486 U.S. 214, 221-222 (1988) (quoting *Reed v. Ross*, 468 U.S. 1, 14 (1984)). In *Amadeo*, the Court found cause where local officials concealed the factual basis for the petitioner's claim. *Id.*, 486 U.S. at 222. Here, as this Court previously found, state habeas counsel concealed evidence of Mr. Green's incompetence from the state court when he filed a statement with the court that "directly contradicts" the medical records he was describing. Mem. & Order (Doc. 72) at 7.

Evidence adduced at the hearing shows (a) that McLean had grounds to investigate Mr. Green's mental condition before he filed the state habeas application, and (b) that Mr. Green was incompetent during the state post-conviction proceedings. Based on prison records, and the progression of the disease, Dr. Proctor testified that Mr. Green had schizophrenia of sufficient severity to require hospitalization by May 2003, and he had the disease earlier. HT5-163-64. Dr. Mosnik testified that Mr. Green's incompetence started

50

before the trial and continued through the present. Dr. Proctor testified that the documents available to him showed that by September 2001, Mr. Green was exhibiting symptoms of schizophrenia. HT5-164.

McLean had a duty to maintain close contact with his client, particularly at the early stages of the representation. American Bar Association, *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 1005 (Guideline 10.5) (2003) ("ABA Guidelines"). The professional norm was to "monitor the client's personal condition for potential legal consequences." *Id.* at 1010, ABA Guideline 10.5, Commentary. McLean was appointed one month after the latest date on which Mr. Green's symptoms became apparent in his writings according to the State's expert.

It would be entirely consistent with longstanding precedent for this Court to hold that Mr. Green's undisputed incompetence during state post-conviction proceedings constitutes cause to excuse his procedural default, if any.

### b. Cause/Prejudice Part 2: *Maples*

Like the situation posited in *Brown*, Mr. Green was unable to plead his competency claim (and his ineffective-assistance claims) in initial-review collateral proceedings "because of lack of counsel." *Brown*, 344 U.S. at 485. Mr. Green's state habeas counsel did not simply fail to assert the claim. As this Court previously found, McLean misrepresented to the state court whether there was a factual basis for such a claim. Mem. & Order (Doc. 72) at 7. Whereas this Court correctly found prison medical records contained "substantial evidence that [Green] was seriously mentally ill within a short time after arriving at TDCJ," Mem. & Order (Doc. 55) at 17, McLean told the state court the records he reviewed contained "'no

indication ... that Mr. Green is mentally ill or incompetent.'" Mem. & Order (Doc. 72) at 7 (quoting McLean's "Statement of Counsel" (Doc. 30-2 at 1)). McLean's falsification of the evidence severed—or demonstrated the long-severed—principal/agent relationship to Mr. Green.

The procedural failures of counsel are attributed to his client under *Coleman* "because the attorney is the prisoner's agent, and under 'well-established principles of agency law,' the principal bears the risk of negligent conduct on the part of his agent." *Maples v. Thomas*, 565 U.S. 266, 280-81 (2012) (quoting *Coleman*, 501 U.S. at 753-54). But, where the attorney's actions "severed the principal-agent relationship, an attorney no longer acts, or fails to act, as the client's representative," and "[h]is acts or omissions therefore 'cannot fairly be attributed to the client.'" *Maples*, 565 U.S. at 281 (quoting with omitted alteration *Coleman*, 501 U.S. at 753).

Under well-established principles of agency law, McLean severed the principal-agency relationship. First, the *Maples* Court found the habeas petitioner did not bear the risk of his attorneys' failure to comply with an Alabama rule "requiring them to seek the trial court's permission to withdraw." 565 U.S. at 284. Under agency law "'it is ordinarily inferred that a principal does not intend an agent to do an illegal act.'" *Ibid.* (quoting with omitted alteration 1 Restatement (Second) Agency § 111, Comment *b*). In at least two respects, McLean failed to comply with the requirements of Texas law relevant to his appointment.

Texas law "requires [habeas] counsel to investigate *expeditiously* the factual and legal grounds for an application." *Ex parte Mines*, 26 S.W.3d 910, 912 (Tex. Crim. App. 2000) (citing Tex. Code Crim. Proc. art. 11.071, § 3(a)) (emphasis added). Texas law does not

permit habeas corpus to be used as a second appeal, or a proceeding in lieu of an appeal. *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1998); *Ex parte Brown*, 769 S.W.2d 539, 540 (Tex. Crim. App. 1989).

McLean was appointed on February 15, 2001. On October 15, 2001, McLean filed a petition that contained "three claims [that] had already been raised and rejected on direct appeal," one of which was only a claim heading followed immediately by four more. Mem. & Order (Doc. 72) at 6. Although McLean had already breached his duty to expeditiously investigate, he promised to catch up "'with all deliberate speed.'" *Ibid.* The only evidence of McLean conducting *any* investigation is his issuance of a subpoena for Mr. Green's prison medical records on February 28, 2008. But, (a) that was more than *seven years* after McLean promised to investigate speedily, and (b) McLean advised the trial court *three days earlier*, he had investigated and concluded he had preserved Mr. Green's claims for federal review and would be filing nothing further in the trial court. McLean's filing of *only* non-cognizable claims, his failure to investigate extra-record claims, and his false assertions regarding them were contrary to his duties under Texas law and therefore he was not acting as Mr. Green's agent at the time Mr. Green was required to raise his *Drope/Dusky* claim.

McLean's conduct is similar to the conduct of the lawyer in *Holland v. Florida*, 560 U.S. 631 (2010). *Holland* held that a habeas petitioner whose counsel effectively abandoned him during the limitations period applicable to federal habeas claims, 28 U.S.C. § 2244(d), is entitled to equitable tolling of the statute of limitations. *Maples*, 565 U.S. at 281-82. *Maples* extended *Holland*'s equitable reasoning to the "cause" analysis in the context of procedural default. *Id.* at 283. *Maples* adopted Justice Alito's formulation of the rule from his concurring

opinion in *Holland*: "'Common sense dictates that a litigant cannot be held constructively responsible for the conduct of an attorney who is not operating as his agent in any meaningful sense of the word.'" *Maples*, 565 U.S. at 282 (quoting *Holland*, 560 U.S. at 659 (Alito, J., concurring)). In *Holland*, as here, the lawyer appointed for state collateral review repeatedly—and falsely—told his client that his rights to federal review was protected by the lawyer's actions and plans. *Holland*, 560 U.S. at 652 (noting the attorney "did not do the research necessary to find out the proper filing date"); *id.* at 641 (describing lawyer's erroneous statement about petitioner's filing deadline).

When McLean claimed he would substantiate Mr. Green's claims with all deliberate speed, he had not asserted, even as a claim heading, that Mr. Green was tried while incompetent, and therefore, any attempt by him to plead the claim after the filing deadline would have been treated as an abuse of the writ.[10] Similarly, when McLean claimed "that issues raised and briefed on direct appeal and habeas corpus are preserved under the Antiterrorism and Effective Death Penalty Act ("AEDPA") of April 24, 1996," he was misrepresenting the law. Although it is unclear what McLean could have meant by a claim being "preserved under" AEDPA,[11] because the statute contains no provision regarding

---

[10] After October 15, 2001, the extended filing date, any effort to supplement or amend the original filing would have been deemed a successive application. Tex. Code Crim. P. art. 11.071, § 5(f) ("If an amended or supplemental application is not filed within the time specified under Section 4(a) or (b), the court shall treat the application as a subsequent application under this section."); *Ex parte Jennings*, ___ S.W.3d ___, 2018 WL 2247764 at *1 (Tex. Crim. App. May 16, 2018); *Ex parte Eldridge*, 2005 WL 8154074 at *1 (Tex. Crim. App. Feb. 9, 2005); *see Ex parte Marshall*, 2014 WL 6462907 (Tex. Crim. App. Nov. 19, 2014); *Ex parte Ochoa*, 2009 WL 2525740 (Tex. Crim. App. Aug. 19, 2009).

[11] McLean could have been alluding to tolling the federal statute of limitations. *See* 28 U.S.C. § 2244(d)(2).

preservation of issues, claim headings with no factual support are not "fairly presented" claims for purposes of exhaustion. *See, e.g., Galtieri v. Wainwright*, 582 F.2d 348, 353 (5th Cir. 1978) (*en banc*) (exhaustion requires that petitioner "apprise" state court "of the facts and legal theory upon which petitioner bases his assertion"). To the extent anything in AEDPA addresses preservation, it would be § 2254(e)(2)'s bar of a federal hearing where the petitioner "failed to develop the factual basis of a claim in State court proceedings." That provision has been interpreted to require "that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law."[12] *Williams v. Taylor*, 529 U.S. 420, 438 (2000). McLean's filing was not even a cognizable application under Texas law. *Ex parte Medina*, 361 S.W.3d 633, 640 (Tex. Crim. App. 2011) (describing claim materially indistinguishable from this case and concluding "document filed in this case does not contain such specific facts and is not a proper 'application' for a writ of habeas corpus"). Thus, McLean misrepresented the law to both the state court and his client. That misrepresentation violated Texas Disciplinary Rule of Professional Conduct 3.03 and put an exclamation point on the severance of the principal-agent relationship. *See Maples*, 565 U.S. at 284.

While McLean did nothing and misrepresented both his inaction and the law to his client, he was receiving payments from the trial court. McLean's feathering his own nest while failing to fulfill his legal obligation to Mr. Green severed the principal-agent relationship.

---

[12] Section 2254(e)(2), by its terms, applies only where there were "State court proceedings" related to a claim. In addition, the statute requires that the petitioner was at fault for the lack of factual development in state court. *Williams v. Taylor*, 529 U.S. 420, 435-36 (2000). Where, as here, something external to the petitioner caused a procedural default, the petitioner was not at fault.

Restatement (Second) of Agency § 112, Cmt. b (1958) ("Agents are appointed to forward the principal's interests, and when the agent ceases to do this and prefers his own or another's interests, ordinarily the principal no longer would desire the agent to act for him, and this the agent should realize."); Restatement (Second) of Agency § 387 (1958) ("Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency.").

McLean's conduct breached the principal-agent relationship in a more conclusive way. McLean lied to the court about Mr. Green's mental condition, and he did so in a way that benefited himself and harmed his client. As this Court previously found, McLean falsely represented to the state habeas court the contents of Mr. Green's mental health records, and "falsity of th[e] statement" McLean made "raises questions as to the veracity of his contention of having reviewed the record." Mem. & Order (Doc. 72) at 7. Because even cursory review of the document "immediately reveals the falsity" of his description, then either McLean was lying about having reviewed it, as this Court said, or he reviewed it and lied about what he saw.

The record suggests the latter is more likely. Consider the context, including timing and the content of the state habeas application. McLean had promised to substantiate claims seven years earlier, and he had been paid in the meantime. If he failed to produce any substantive claims, the court might raise questions about his billing. Although the passage of seven years had given McLean plenty of neglect to cover up, events in early 2008 drastically increased his incentive to lie. The only evidence the state court had of McLean investigating, other than his fee vouchers, was his request to issue a subpoena for Mr. Green's prison

medical records. But three days before he served the subpoena he told the trial court he would not be filing anything more on Mr. Green's behalf. Then he got the records stating Mr. Green had received treatment before he went to prison, and for several years since getting to Death Row. None of the unsubstantiated "claims" in McLean's application touched on mental health issues. So the mention of mental problems in McLean's Statement of Counsel was something of a non sequitur.

Consider also McLean's falsehoods. In 2001, he claimed that he would substantiate the claims "with all deliberate speed," but other than asking for more time he did nothing until he requested the subpoena in 2008. His February 2008 filing made the dubious and nearly meaningless claim about having preserved claims under AEDPA. There was no reason for the state habeas court to be concerned with whether McLean preserved review under AEDPA. On the contrary, review under AEDPA's standard was *adverse* to his client's interests. Mr. Green's best hope lay in rigorous *state court* review, not federal review. Finally, as this Court observed, McLean may have been lying about having reviewed the records.

In any event, there can be no question that McLean's misrepresentation of the records, and perhaps about whether he read them, was "a serious breach of loyalty to the principal" that terminated McLean's authority to act on Mr. Green's behalf. Restatement (Second) of Agency § 112 (1958). The rules governing McLean's conduct provide that "[a] lawyer shall not knowingly ... make a false statement of material fact ... to a tribunal." Texas Disciplinary R. Prof. Conduct 3.03. McLean was representing to the court something of which he claimed to have personal knowledge. "[A]n assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or a representation of fact in open

court, may properly be made only when the lawyer knows the assertion is true or believes it
to be true on the basis of a reasonably diligent inquiry." *Id.*, Cmt. 2. McLean either made
two knowing misrepresentations (about reading the document and its content) or one (about
reading the document). Either way, he violated the rule requiring diligent inquiry.

McLean was knowingly making false statements, or misrepresenting his personal
knowledge in a way that was adverse to his client's interests. Had McLean not lied about Mr.
Green's mental health problems, new counsel could have been appointed to file a proper
petition. *See Medina, supra*, 361 S.W. 3d at 640 (appointing new counsel to investigate and
file proper writ application). McLean's action was directly adverse to his client's interests at
the same time it furthered McLean's own interests in covering up his failure to investigate as
the law required. That breach of loyalty meant he was not acting as Mr. Green's agent.
Restatement (Second) of Agency § 387 (1958) ("Unless otherwise agreed, an agent is subject
to a duty to his principal to act solely for the benefit of the principal in all matters connected
with his agency."); *id.* § 389 ("Unless otherwise agreed, an agent is subject to a duty not to
deal with his principal as an adverse party in a transaction connected with his agency without
the principal's knowledge.")

### c.   Cause/Prejudice Part 3: *Martinez*

Even if the exhaustion and default doctrines apply, and this Court were to conclude
McLean's conduct did not sever the principal-agent relationship, Mr. Green can establish
cause for any default due to McLean's ineffectiveness. *Martinez v. Ryan*, 566 U.S. 1 (2012);
*Trevino v. Thaler*, 569 U.S. 413 (2013). *Martinez* and *Trevino* created an exception to
*Coleman*'s rule holding the petitioner accountable for his counsel's negligent failure to assert

a claim at the time required by state law. But that exception was limited to claims of ineffective assistance of trial counsel. *Davila, supra*, 137 S. Ct. at 2065. That rule should be extended to claims of incompetence that are made after a trial proceeding in which no competency hearing took place.

*Trevino* held that *Martinez* applies in Texas because "the State's 'procedural framework, by reason of its design and operation, makes it unlikely in a typical case that a defendant will have a meaningful opportunity to raise' [an ineffective-assistance] claim on direct appeal." *Davila*, 137 S. Ct. at 2065 (quoting *Trevino*, 569 U.S. at 429). The question is whether the State has established procedures such that "collateral review normally constitutes the preferred—and indeed as a practical matter, the only—method for raising an" incompetence claim like this one, i.e. one that arising from a trial court that conducted no hearing on competency. *Trevino*, 569 U.S. at 427, *quoted in Davila*, 137 S. Ct. at 2068.[13] In Texas, an incompetent-to-stand-trial claim, like an ineffective-assistance claim, is properly considered on collateral review because, in the absence of a hearing in the trial court, the claim necessarily depends on evidence that is outside the trial record. *See Ex parte Yarborough*, 607 S.W.2d 565, 566 (Tex. Crim. App. 1980) (citing *Ex parte Tuttle*, 445 S.W.2d 194, 198-99 (Tex. Crim. App. 1969)). For both ineffective-assistance claims and incompetency claims, state habeas review is, by design and operation, an "initial-review

---

[13] The *Davila* Court stated that "*Martinez* ... was responding to an equitable consideration that is unique to claims of ineffective assistance of trial counsel." 137 S. Ct. at 2068. Although the Texas law cited in the text *supra* is sufficient to show ineffective-assistance claims are not uniquely channeled to state habeas proceedings, because competency claims are too, Mr. Green distinguishes *Davila* on additional grounds *infra*.

collateral proceeding," i.e. it is "'the first place a prisoner can present a challenge to his conviction.'" *Martinez*, 566 U.S. at 8 (quoting *Coleman*, 501 U.S. at 755).

As noted in the previous section, the *Martinez/Trevino* exception also was based on the shift in equities when state law channels review of a particular constitutional claim to collateral review. *Davila*, 137 S. Ct. at 2068 (State's deliberate choice to move ineffective-assistance review outside direct appeal "was 'not without consequences for the State's ability to assert procedural default' in subsequent federal habeas proceedings"), *quoting Martinez*, 566 U.S. at 13. As noted *supra*, the equities here weigh overwhelmingly in Mr. Green's favor because (a) he was incompetent at the time of his state collateral review proceedings, (b) his attorney effectively abandoned him, and (c) the court would hear from him only through his attorney.

In explaining the narrowness of the *Martinez/Trevino* exception the Supreme Court said that the *Martinez* Court had "exercised its equitable discretion in view of the unique importance of protecting a defendant's trial rights, particularly the right to effective assistance of counsel." *Davila*, 137 S. Ct. at 2066. The right to effective assistance is "'a bedrock principle in our justice system,'" *id.* at 2067, *quoting Martinez*, 566 U.S. at 12, and was given special protection in *Martinez* in part because the combination of ineffective trial counsel and post-conviction counsel will mean the claim gets no review at all. "*Martinez* was concerned that a claim of trial error ... might escape review" such that "[i]f postconviction counsel ... fails to raise the claim, no state court will ever review it" and, if *Coleman* applies, "no federal court could consider the claim either." *Ibid.* All these are equally true of incompetency claims.

But, as the Supreme Court has said, incompetency claims are even *more* important than ineffective-assistance claims, because an incompetent defendant cannot receive effective assistance of counsel.

> Competency to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including **the right to effective assistance of counsel**, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so.

*Cooper*, 517 U.S. at 354. Given that competence is a precondition to receiving effective representation, and all other fair-trial rights, there are more reasons to apply *Martinez/Trevino* to incompetency claims than there were to create an exception for ineffective-assistance claims.

The foregoing discussion has distinguished all but one aspect of the *Davila* decision rejecting the extension of *Martinez/Trevino* to claims of ineffective assistance of appellate counsel. The final consideration was that "[e]xtending *Martinez* to defaulted claims of ineffective assistance of appellate counsel would ... serve as a gateway to federal review of a host of trial errors." *Davila*, 137 S. Ct. at 2069. That is not the case here. A *Drope/Dusky* claim is not, like ineffective assistance of appellate counsel, a Trojan horse full of innumerable discrete trial errors. Although competence is necessary to the realization of other trial rights, a finding of incompetence does not necessitate review of other trial errors.

In sum, because competence is a prerequisite to effective trial representation and Texas makes collateral review an initial-review proceeding for incompetency claims arising from a trial where there was no competency hearing, those claims should be covered by the *Martinez/Trevino* exception to *Coleman*.

This Court has already found both that McLean was ineffective for "hav[ing] conducted no investigation outside the record," Mem. & Order (Doc. 72) at 17, and that he misrepresented the facts to the state court. *Id.* at 7. Dr. Proctor's hearing testimony about Mr. Green's letters showing symptoms of schizophrenia in September 2001, HT5-164, supports reconsideration of this Court's determination that McLean was not ineffective for failing to investigate incompetence. Mem. & Order (Doc. 55) at 13-14. As stated *supra*, McLean had a duty to meet with Mr. Green and develop a close rapport with him. ABA Guideline 10.5 & Commentary. If he had done so, he would have seen more indications of schizophrenia than Dr. Proctor saw in Mr. Green's letters. By 2003, Mr. McLean would have known that Mr. Green was in the hospital for schizophrenia, but he did not even have enough contact with his client to know.

Mr. McLean also had an obligation to "interview[] prior counsel." ABA Guideline 10.7(B)(1). The hearing record shows that if McLean had interviewed Mr. Moncriffe, he would have learned that trial counsel harbored serious doubts about Mr. Green's competence to stand trial and represent himself. HT1-21-23; *id.* at 28; *id.* at 34-36; 42-46; *id.* at 49-51; *id.* at 59; *id.* at 91-92; *id.* at 100-101. Mr. Moncriffe's description of Mr. Green during attorney-client conferences, *ibid.*, indicates that Mr. McLean would have seen signs of mental illness if he had interviewed Mr. Green particularly if, as Dr. Proctor testified, Mr. Green's condition rapidly deteriorated after he got to Death Row.

Lastly, Mr. Moncriffe's testimony that Mr. Green did not understand the proceedings or the advice of his standby counsel presents a "substantial" claim of deficient performance as it relates to Claim 5. *Martinez*, 566 U.S. at 17 (in order to overcome procedural bar,

defaulted ineffectiveness claim must be "substantial"). The testimony of lay witnesses and experts discussed here more than constitutes substantial evidence of prejudice. Therefore, for all the foregoing reasons and those presented independently regarding Claim 5, this Court should hold that Mr. Green was not required to exhaust state court remedies, the state corrective process was not effective to protect his rights, and, even if there was a procedural default, he has three valid grounds for cause: (1) incompetence; (2) abandonment by state habeas counsel; (3) ineffective assistance of state habeas counsel.

## VI.   CONCLUSION

For the foregoing reasons, Mr. Green respectfully requests this Court grant judgment in his favor and issue a writ of habeas corpus commanding the State to release him if it does not bring him to trial within 120 days of entry of judgment.

DATED:  April 1, 2019

                              Respectfully submitted,

                              **Hilder & Associates, P.C.**

              By:    */s/ James G. Rytting*
                              Philip H. Hilder
                              Texas Bar No. 19620050
                              James Rytting
                              State Bar No. 24002883
                              819 Lovett Boulevard
                              Houston, Texas 77006
                              Telephone (713) 655-9111
                              Facsimile (713) 655-9112

                              MAUREEN FRANCO
                              FEDERAL PUBLIC DEFENDER

*/s/Tivon Schardl*

Tivon Schardl
Capital Habeas Unit Chief
Fla. Bar No. 73016
Federal Defender Office
919 Congress, Suite 950
Austin, Texas 78701
737-207-3007 (tel.)
512-499-1584 (fax)
Tivon_Schardl@fd.org

Attorneys for Petitioner Travis Dwight Green

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of April 2019, I electronically filed the foregoing Petitioner's Post-Hearing Brief with the Clerk of Court using the CM/ECF system which will send notification of such filing and complete service of the same on all counsel of record.

*/s/Tivon Schardl*
Tivon Schardl