**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| TRAVIS DWIGHT GREEN, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-13-1899 |
| | § | |
| LORIE DAVIS, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Travis Dwight Green was convicted of capital murder in 2000 in Texas state court, and was sentenced to death. Green timely filed his federal petition for a writ of habeas corpus in 2014. Of the thirteen claims raised in Green's First Amended Petition, all but two were previously dismissed with prejudice. In his surviving claims, Green contends that he was tried while incompetent (Claim 4), and that he received ineffective assistance of counsel at sentencing (Claim 1). Green also seeks reconsideration of the Court's prior order dismissing, as procedurally unreviewable, his claim that he received ineffective assistance when counsel failed to bring his incompetence to the attention of the trial court (Claim 5). The Court held an evidentiary hearing on Green's incompetency claim and received extensive post-hearing briefing. Having considered the evidence developed at the hearing and the thorough arguments and briefing of counsel, the Court has determined that Green is entitled to federal habeas corpus relief. A writ of habeas corpus shall issue unless, within 180 days of the conclusion of any appeal from this Memorandum Opinion and Order, the State commences new proceedings against Green.[1]

---

[1] Once the State commences new proceedings, the Texas statutory framework for incompetency determinations established under Chapter 46B of the Texas Code of Criminal Procedure will

# I.   **BACKGROUND**

Petitioner Green was convicted of capital murder and sentenced to death in *State v. Green*, No. 823865, in the 209th District Court of Harris County, Texas, on December 7, 2000. (Doc. No. 30, at 1). He is currently detained in the Polunsky Unit, in Livingston, Texas. *Id.*

## A.  Facts Surrounding Underlying Crime

On September 1, 1999, Green met Kristin Loesch and her boyfriend, Robert Stewart, while he was riding by their apartment on a bike. 15 RR 120, 126–28.[2] Green agreed to help the couple get marijuana. *Id.* at 128. The three spent the rest of the evening together, rollerblading, drinking beer, and hanging out. *Id.* at 129–32. Green helped the couple obtain some marijuana, and Loesch and Green smoked it. *Id.* at 132. The couple then gave Green a ride to a nearby apartment complex, at which Green claimed he lived with his brother. *Id.* at 133–34. Before departing, the couple mentioned plans for a barbeque, but stated that they needed a barbeque pit. *Id.* Loesch and Stewart returned to their apartment. *Id.* at 135. Loesch fell asleep in the bedroom; Stewart fell asleep on the couch while watching television. *Id.* at 137, 139.

Stewart testified that he woke up on September 2, 1999, around 11:00 a.m., and found Loesch dead on the floor of the bedroom. *Id.* at 147–48. He called 911. *Id.* A neighbor told police that she had seen a black man wearing a cap enter the apartment at 7:30 a.m. *Id.* at 170–71. Another neighbor told police that at 7:30 a.m., she had seen a barbeque pit outside the patio gate of the apartment, and that the pit had not been there the day before. *Id.* at 82–84.

---

become applicable. *See* TEX. CODE CRIM. PROC. ANN. art. 46B.002 ("This chapter applies to a defendant charged with a felony or with a misdemeanor punishable by confinement."). Chapter 46B allows for civil commitment in the event "a defendant is incompetent to stand trial and is unlikely to be restored to competency in the foreseeable future." *Id.* art. 46B.071(b).

[2] The Court will refer to the Reporter's Record from Green's Appeal from the 209th District Court of Harris County, Texas, No. 74,036, as "_ RR _."

Police found Green through a records check. *Id.* at 247. Stewart then identified Green from a photo array. *Id.* at 250–51. Police arrested Green and took hair and blood samples. *Id.* at 154, 254. The Assistant Harris County Medical Examiner, Paul Shrode, concluded that Loesch had suffered sexual assault, strangulation, and blunt force trauma to her abdomen. 16 RR 110–13. DNA samples taken from vaginal swabs and finger nail scrapings at autopsy matched Green's DNA profile. *Id.* at 84.

### B. State Court Proceedings

On September 19, 1999, the State charged Green with capital murder. (Doc. No. 30, at 4). Green requested appointed counsel and the trial court appointed Bill Goode and Chuck Hinton. *Green v. Stephens*, No. H-13-1899, 2016 WL 1298994, at *1 (S.D. Tex. Mar. 29, 2016) (quoting *Green v. State*, No. AP-74,036, slip op. at 2–6 (Tex. Crim. App. June 26, 2002)). Before January 2000, the trial court replaced Goode with Wayne Hill. *Id.*

By late February 2000, Green had started filing pro se motions before the trial court, including a "motion for hybrid representation," in which he requested the right to file his own motions without waiving his right to counsel. *Id.* On March 2, 2000, Green filed a pro se motion to dismiss his court-appointed attorneys and proceed pro se. *Id.* Green filed these motions with the assistance of an inmate in Green's prison dorm, who was also the one originally to suggest to Green the possibility of pro se representation. HT2-21–43.[3] That same dormmate helped Green frequently practice over the course of three weeks what he would need to say at the hearing on his motion, in order to get the trial judge to agree to allow him to proceed pro se. HT2-48–49.

---

[3] The transcript for the six-day evidentiary hearing before this Court is located at docket entries 136, 140, 141, 147, 148, and 149. The Court will cite to the transcript as "HT_-__."

Judge Michael T. McSpadden held a *Faretta*[4] hearing on Green's motion on March 21, 2000. *Green*, 2016 WL 1298994, at *1 (quoting *Green*, slip op. at 2–6). At the hearing, Green requested that the court appoint two new attorneys to act as his "assistants." *Id.* Green stated that he had his "own confidential reasons" for wanting Hill and Hinton dismissed. *Id.* Judge McSpadden explained that he could appoint a standby attorney, who would only be available as a consultant. *Id.* Green agreed and told the court that he understood the standby attorney's role and that he was "competent enough and intelligent enough" to represent himself, although he may need assistance with certain legal issues. *Id.* The court proceeded with questioning pursuant to *Faretta*, finding that, although Green had no experience in the law, he understood that he would be required to follow the same rules as an attorney. *Id.* Green then executed a written waiver of his right to counsel. *Id.* Because Green refused to name a different attorney or give reasons for dismissing his current attorneys, Judge McSpadden continued the appointment of Hill and Hinton as standby attorneys. *Id.*

On April 4, 2000, the trial court appointed Tyrone Moncriffe to replace Hinton. *Id.* On July 17, 2000, Hill was allowed to withdraw because Green refused to communicate with Hill and refused to allow Hill to hire an investigator. *Id.* On August 3, 2000, Green filed a motion to dismiss the entire defense team. *Id.* The motion was denied. *Id.*

On August 17, 2000, Judge Robert Jones, who had taken over the case, held a second *Faretta* hearing. *Id.* Green again said that he understood what would be required of him if he were to proceed pro se, and executed his second written waiver of his right to counsel. *Id.* Moncriffe continued as Green's standby counsel. *Id.*

---

[4] *Faretta v. California*, 422 U.S. 806 (1975).

On September 21, 2000, the court held a hearing on Green's request to dismiss both Moncriffe as standby counsel and the court-appointed investigator. *Id.* Judge Jones denied Green's requests. At the hearing, Judge Jones also stated that he, "on [his] own motion," was going to order that Green be evaluated by a psychiatrist for competency to stand trial and insanity "in order that we'll get that matter out of the way in this case." 5 RR 5–6. A competency evaluation was attempted in October 2000, but was not completed. CR 213–14.[5] No further mention of Green's competency was made until November 20, 2000, the fifth day of voir dire. 11 RR at 8–9; CR at 243. At that time, Moncriffe as standby counsel expressed concern that Green's growing paranoia impeded his competence to represent himself. Judge Jones stated that he would, "out of an abundance of caution," order a competency evaluation. 11 RR at 8–9.

Dr. Mark Rubenzer was appointed to conduct the evaluation. Dr. Rubenzer's evaluation concluded that Green made his decision to represent himself voluntarily, that Green "does not appear to have a serious mental disorder," and that Green was competent to stand trial. (Doc. No. 30-5, at 7). The evaluation reported that Green "has sufficient present ability to consult with his attorney with a reasonable degree of rational understanding," and that he "as [sic] a rational and factual understanding of the charge against him." *Id.* Dr. Rubenzer did not expressly evaluate Green's sanity. *Green*, 2016 WL 1298994, at *2 (quoting *Green*, slip op. at 2–6). The report also omitted certain details and discounted potential symptoms of schizophrenia. For instance, the report stated that there was no record of previous psychiatric treatment or history of mental illness. (Doc. No. 30-5, at 7). This was later found to be incorrect, as Green had received psychotherapy between ages ten and thirteen, and had a history of suicide attempts and self-mutilation. (Doc. No.

---

[5] The Court will refer to the Clerk's Record from Green's Appeal from the 209th District Court of Harris County, Texas, No. 74,036, as "CR _."

30-1, at 23); (Doc. No. 30-3, at 2–3). The report also represented that Green was able to perform virtually all of the simple mental tasks he was assigned while omitting that Green did not complete simple but important attention and memory retrieval tasks. (Doc. No. 30-5, at 4); HT3-105–06. Dr. Rubenzer's report is dated November 30, 2000, but it does not appear to have been filed with the trial court until December 4, 2000—the same day that the State gave its opening statement and began its case in chief. (Doc. No. 30-5, at 2); 15 RR 3. There is no record that the court reviewed Dr. Rubenzer's evaluation. The court did not hold a hearing on the issue of Green's competency to stand trial, or otherwise evaluate in any way Dr. Rubenzer's conclusions as to Green's competency to stand trial.

General voir dire began on November 14, 2000. *Green*, 2016 WL 1298994, at *2 (quoting *Green*, slip op. at 2–6). Green represented himself through the guilt phase of the trial. The jury found him guilty on December 5, 2000. *Id.* The following day, right before the penalty phase of the trial commenced, Green reasserted his right to an attorney and Moncriffe took over the penalty phase. *Id.* Although Moncriffe was fully in control of the penalty phase, he did not request a continuance, a competency hearing, or appointment of a mental health expert. (Doc. No. 30, at 6). Instead, Moncriffe called eight witnesses, all of whom testified only briefly about past contacts with Green. (Doc. No. 43, at 85). Based on the jury's answers to the special issues set forth by Texas criminal statute, the trial judge sentenced Green to death on December 7, 2000. *Green*, 2016 WL 1298994, at *2 (quoting *Green*, slip op. at 2–6). The court appointed counsel Ken Goode to represent Green on direct appeal. *Id.*; (Doc. No. 158 at 7).

On direct appeal to the Texas Court of Criminal Appeals, Green through counsel raised nine points of error. *Id.* at 2. These points included arguments that the trial court erred in allowing Green to waive his right to counsel and represent himself. *Id.* The Court of Criminal Appeals

overruled all nine points, affirming Green's conviction and sentence. *See Ex parte Green*, No. WR-48,019-02, 2013 WL 831504, at *1 (Tex. Crim. App. Mar. 6, 2013).

Subsequently, on February 15, 2001, the trial court appointed Ken J. McLean to represent Green in state post-conviction proceedings. (Doc. No. 158, at 14). On October 15, 2001, McLean filed a post-conviction application for writ of habeas corpus before the trial court, challenging the validity of Green's conviction and resulting sentence. *Ex parte Green*, 2013 WL 831504, at *1; (Doc. No. 65-1). The petition raised seven claims; three claims, however, repeated claims already raised and denied on direct appeal and the other four claims were mere headers without supporting law and facts, which McLean promised to provide at a later time. (Doc. No. 65-1). The petition stated: "Applicant intends to develop the facts and law of these extra-record grounds for habeas relief with all deliberate speed." (Doc. No. 65-1, at 11). None of the seven issues addressed Green's competency to stand trial.

Six years passed with no word from McLean. During this time, Green attempted multiple times to file his own habeas application pro se, but the trial court dismissed these attempts on the basis that Green was already represented by McLean. (Doc. No. 158, at 15); SHR 68, 196.[6] After being prompted by the State, the court issued an order in November 2007 for the parties to file any supplemental materials. SHR 196–98. McLean tarried, requested an extension, and subpoenaed medical records from the Polunsky Unit where Green was housed. Finally, several months later on April 23, 2008, McLean filed a "Statement of Counsel," stating that he could not "in good faith file Proposed Findings of Fact and Conclusions of Law requesting that the Trial Court recommend to the Texas Court of Criminal Appeals that relief be granted." (Doc. No. 65-3, at 1). McLean summarily stated that he had reviewed the relevant record—including Green's medical records,

---

[6] The Court will refer to the State Habeas Record from Green's habeas proceedings as "SHR _."

which contained already at that point strong evidence of mental illness—and that there was no evidence of mental illness or incompetence and no hope for relief. *Id.* at 1–3.

It was another four years before the state court, after being prompted by the Court of Criminal Appeals, finally adopted the State's proposed findings of fact without an evidentiary hearing, and recommended that Green's petition be denied. *Ex parte Green*, 2013 WL 831504, at *1. The Texas Court of Criminal Appeals affirmed the denial on March 6, 2013. *Id.*

### C. Federal Court Proceedings

On March 6, 2014, Green filed a timely petition in federal district court for a writ of habeas corpus under 28 U.S.C. § 2254(d). (Doc. No. 19). Green subsequently filed an amended petition on October 2, 2014 (the "Petition"), which raised thirteen claims for relief.[7] (Doc. No. 30).

On March 29, 2016, the Court issued an order dismissing with prejudice all but Green's fourth claim, which asserted that Green was incompetent to stand trial. (Doc. No. 55, at 17). The

---

[7]Green's Petition included the following thirteen claims for relief:

1. Green received ineffective assistance of counsel at the penalty phase of trial in violation of *Strickland v. Washington*, 466 U.S. 668 (1984);
2. The trial court violated Green's Sixth and Fourteenth Amendment rights by failing to hold an evidentiary hearing as to his competency in violation of *Pate v. Robinson*, 383 U.S. 375, 384 (1966);
3. Green was deprived of his Sixth Amendment right to counsel because he did not unambiguously, voluntarily, knowingly, or intelligently waive his right to counsel;
4. Green was tried while actually incompetent, in violation of due process and the Sixth Amendment;
5. Green received ineffective assistance of trial counsel because appointed counsel failed to investigate and present evidence that Green was actually incompetent;
6. Trial counsel's failure to contest Green's waiver of counsel deprived him of his Sixth Amendment right to counsel in violation of *United States v. Cronic*, 466 U.S. 648 (1984);
7. The State presented false and misleading evidence in violation of *Giglio v. United States*, 405 U.S. 150 (1972);
8. The State violated Green's right to due process by suppressing material evidence about the criminal backgrounds, poverty, and mental health of Green's family in violation of *Brady v. Maryland*, 373 U.S. 83 (1963);

Court determined that many of Green's claims for relief were procedurally defaulted because they had not been exhausted in state court and Green did not sufficiently demonstrate cause to excuse the default. *See* (Doc. No. 55). The Court declined to find, however, that Green's substantive incompetency claim was procedurally barred, citing a circuit split as to whether substantive incompetency claims are subject to procedural default. (Doc. No. 55, at 15). Because "Green present[ed] substantial evidence that he was seriously mentally ill within a short time after arriving at TDCJ," the Court determined that an evidentiary hearing was necessary to adjudicate the remaining substantive incompetency claim. (Doc. No. 55, at 17).

The parties subsequently filed cross motions for reconsideration. Respondent sought reconsideration of the Court's ruling that Green's substantive incompetency claim required an evidentiary hearing. (Doc. No. 57). Green in turn sought reconsideration of the Court's ruling on his first claim for relief that he received ineffective assistance of counsel at the penalty phase of his trial because counsel failed to investigate and present mitigating evidence; his fifth claim for relief that trial counsel failed to bring evidence of Green's incompetence to stand trial to the trial court's attention; and his sixth claim for relief that trial counsel's failure to contest the knowing

---

9.  Green received ineffective assistance of appellate counsel in violation of Sixth Amendment and due process rights guaranteed by *Evitts v. Lucey*, 469 U.S. 387 (1985);

10. Green received ineffective assistance of trial and appellate counsel because neither objected that Texas's future dangerousness special issue violated Green's Sixth Amendment rights under *Apprendi v. New Jersey*, 530 U.S. 466 (2000);

11. Green received ineffective assistance of trial and appellate counsel because they failed to object to Texas's second special issue;

12. This Court should extend the Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304 (2002) that the Eighth Amendment renders Green ineligible for the death penalty because he is mentally ill; and

13. Green received ineffective assistance of trial counsel because appointed counsel failed to investigate an insanity defense.

(Doc. No. 30). Green expressly abandoned his ninth claim for relief in briefing. *Id.* at 6.

9

nature of his waiver of counsel deprived Green of his Sixth Amendment right to counsel. (Doc. No. 64). Green argued that ineffective assistance of his state habeas counsel established cause to excuse his procedural defaults, and accordingly that the Court's denial of relief "rests on manifestly erroneous findings of fact or manifestly erroneous legal rulings." (Doc. No. 64, at 1).

On May 10, 2017, the Court issued an Order denying Respondent's motion. (Doc. No. 72, at 20–22). The Order also denied Green's motion as to his fifth and sixth claims for relief, but granted Green's motion for reconsideration as to his first claim for relief. *Id.* at 19–20. Regarding this first claim, the Court concluded that Green had established cause to overcome the claim's procedural default because Green had shown both that his claim for ineffective assistance of penalty phase counsel is substantial, and that state habeas counsel was ineffective in failing to raise that claim. Under these circumstances, the Court concluded that Green's procedural default in failing to raise ineffective assistance of trial counsel at the state habeas level must be excused under *Trevino v. Thaler*, 569 U.S. 413 (2013), and that an evidentiary hearing was necessary to adjudicate Green's first claim for relief regarding the ineffective assistance of his penalty phase counsel. (Doc. No. 72, at 18–19).

On October 9, 2018, the case proceeded to an evidentiary hearing to determine whether Green was actually incompetent to stand trial and whether Green received ineffective assistance from his penalty phase counsel. The Court heard testimony from Tyrone Moncriffe, Robert Sudds, Michael Turner, Jerry Jacobs, John Patrick Forward, and Dr. Diane Mosnick on behalf of Green, and Bill Hawkins, Jeff Laird, and Tim Proctor on behalf of Respondent.

## II.   <u>LEGAL STANDARD</u>

Two fundamental tenets govern federal review of state convictions: "First, a state prisoner must exhaust available state remedies before presenting his claim to a federal habeas court. . . .

Second, a federal court may not review federal claims that were procedurally defaulted in state court." *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017). "These requirements ensure that the state courts have the first opportunity to correct any error with a state conviction and that their rulings receive due respect in subsequent federal challenges." *Skinner v. Switzer*, 562 U.S. 521, 541–42 (2011) (Thomas, J., dissenting). In the case of procedural default, however, the bar to federal review may be lifted if "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Maples v. Thomas*, 565 U.S. 266, 280 (2012) (alterations omitted) (quoting *Coleman v. Thompson*, 501 U.S. 722, 724 (1991)).

If an inmate has presented his claims in a manner allowing the state courts to resolve their merits, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides for a highly deferential federal review. Federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Kitchens v. Johnson*, 190 F.3d 698, 700 (5th Cir. 1999). Simply put, "AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). Federal courts also generally presume that the state courts have made correct factual findings, unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

However, where claims were not "adjudicated on the merits in State court proceedings," *id.* § 2254(d), the limitations on a federal habeas court's power to grant relief codified in § 2254(d) do not apply. *Cullen v. Pinholster*, 563 U.S. 181, 186 (2011) (quoting 28 U.S.C. § 2254(d)) ("[N]ot

all federal habeas claims by state prisoners fall within the scope of § 2254(d), which applies only to claims 'adjudicated on the merits in State court proceedings.'").

## III.   ANALYSIS

The Court considers three of Green's claims for relief. First, Green asserts that he was incompetent to stand trial. Second, Green claims he was given ineffective assistance by his penalty phase counsel. Green also seeks reconsideration of his claim of ineffective assistance of counsel for failing to bring evidence of Green's incompetence to the trial court's attention. The Court addresses these three claims in turn.

### A.  Competency to Stand Trial

Green's fourth claim for relief is that he was incompetent to stand trial pursuant to *Dusky v. United States*, 362 U.S. 402 (1960). Under *Dusky*, a defendant is competent to stand trial only if (1) "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," and (2) "he has a rational as well as factual understanding of the proceedings against him." *Id.* at 402; *see also Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."). It is well settled that the "Constitution does not permit trial of an individual who lacks 'mental competency,'" *Indiana v. Edwards*, 554 U.S. 164, 170 (2008), and that "the conviction of an accused person while he is legally incompetent violates due process," *Pate v. Robinson*, 383 U.S. 375, 378 (1966). Green argues that he was incompetent to stand trial during both the guilt and penalty phases of his trial. Before turning to the merits of Green's competency claim, the Court must first address whether his claim is properly before the Court.

### 1.  Procedural Reviewability

Respondent argues that Green's competency claim is procedurally defaulted because Green failed to litigate his claims in compliance with state law. A federal constitutional claim raised on federal habeas may not be reviewed if it has not been "fairly presented to the state courts for their initial consideration." *Cone v. Bell*, 556 U.S. 449, 467 (2009). Where a claim was not adequately presented in state court, but would now be barred from presentation in state court by independent and adequate state procedural grounds, the claim is considered procedurally defaulted. *See Coleman v. Thompson*, 501 U.S. 722, 735 & n.1 (1991); *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997). A procedural default may be excused, however, if a petitioner can show cause and prejudice to overcome the default. *See Coleman*, 501 U.S. at 750–51. The Court finds that Green has established cause and prejudice to overcome any procedural default of his substantive competency claim.

### a.  Green's Competency Claim is Procedurally Defaulted

All parties agree that Green's substantive competency claim was not "fairly presented to the state courts for their initial consideration." *Cone*, 556 U.S. at 467. Green did not properly exhaust his substantive competency claim in state court. Moreover, state procedural grounds would now bar Green from seeking to present such a claim in state court. Green's substantive competency claim is thus procedurally defaulted, and therefore technically exhausted, assuming that such claims are capable of procedural default.[8]

---

[8] In its March 29, 2016 Memorandum and Order, the Court determined that Green's competency claim was unexhausted but declined, in light of a circuit split over whether substantive competency claims may be procedurally defaulted, to find that the claim was procedurally defaulted. (Doc. No. 55, at 15); *see also* (Doc. No. 77, at 21). Respondent has since argued that intervening Fifth Circuit law—*Gonzales v. Davis*, 924 F.3d 236 (5th Cir. 2019)—requires a different result. (Doc. No. 164). The Court, however, finds that *Gonzales* is not directly on point, as it stands instead for the

Green never exhausted his substantive competency claim because that claim was not raised before the trial court, much less any higher state court. Texas law at the time required that a trial court evaluate a defendant's competency to stand trial "if the court determines there is evidence to support a finding of incompetency to stand trial on its own motion or on written motion by the defendant or his counsel." TEX. CODE CRIM. PROC. ANN. art. 46.02 § 2(a) (1999) (repealed 2003). Neither Green nor his counsel at any point before or during trial filed a written motion regarding, or even raised any concern about, Green's incompetency to stand trial.

Nor did the trial court *sua sponte* determine Green's incompetency to stand trial. At no point did the court hold a hearing to evaluate whether Green was competent to stand trial, and the record is devoid of any written or oral ruling on the issue. While the court held two *Faretta* hearings to determine whether Green was knowingly and intelligently waiving his right to counsel,[9] the court never held a hearing to assess whether there was evidence of Green's incompetence to stand trial.[10] Judge Jones recognized this distinction when—after having already

_____

proposition that a procedural *Pate* claim and related *Strickland* claim may be procedurally defaulted. Nonetheless, the Court need not address this issue further because, as discussed *infra*, Green can show cause and prejudice to overcome any procedural default. Thus, the Court assumes without deciding that Green's substantive competency claim may be procedurally defaulted.

[9] Judge McSpadden held the first *Faretta* hearing on March 21, 2000 after Green sought to dismiss his appointed counsel and proceed pro se. On August 17, 2000, Judge Jones held a second *Faretta* hearing after he took over the case because Green continued to seek dismissal of his standby counsel and the court-appointed investigator.

[10] The operative statute at the time provided:

Raising the Issue of Incompetency to Stand Trial

Sec. 2. (a) The issue of the defendant's incompetency to stand trial shall be determined in advance of the trial on the merits if the court determines there is evidence to support a finding of incompetency to stand trial on its own motion or on written motion by the defendant or his counsel filed prior to the date set for trial on the merits asserting that the defendant is incompetent to stand trial.

determined that Green's waiver of counsel was valid—he stated that he would, "on [his] own motion," order a psychiatric evaluation of Green as to his competency to stand trial and sanity. 5 RR 5–6. A competency evaluation was attempted on October 20, 2000; however, it was never completed. CR 213–14. No further mention of Green's competency was made until November 20, 2000, five days after voir dire began. At that point, Judge Jones ordered a competency evaluation after Moncriffe expressed concern about Green's "competen[ce] to continue to represent himself," 11 RR 8. Dr. Rubenzer's subsequent evaluation was not filed with the court until December 4, 2000, the day opening statements were made. After receiving the report, Judge Jones did not hold a hearing on the issue of Green's competency, nor did he issue a written or oral ruling on the matter.

Thus, the issue of whether Green was competent to stand trial was never presented by counsel and the trial court never made any ruling on the issue. Nor did Green present the issue to any higher court. On direct appeal, Green raised nine points of error. While several of the claims related to Green's waiver of counsel, none challenged his competence to stand trial. Green's post-conviction petition for habeas relief, which raised seven nominal claims, was similarly silent on the issue. To be fairly presented, a petitioner must raise the "same claim" before the state court as urged upon the federal courts. *Picard v. Connor*, 404 U.S. 270, 276 (1971). Green's claim for competency to stand trial was thus never "fairly presented to the state courts for their initial consideration." *Cone*, 556 U.S. at 467.

---

(b) If during the trial evidence of the defendant's incompetency is brought to the attention of the court from any source, the court must conduct a hearing out of the presence of the jury to determine whether or not there is evidence to support a finding of incompetency to stand trial.

TEX. CODE CRIM. PROC. ANN. art 46.02 (1999) (repealed 2003).

In other words, Green failed to exhaust his substantive competency claim. Under 28 U.S.C. § 2254(b)(1), a federal habeas claim is not properly before a federal court unless it has been fairly presented to the highest court of the state. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842–48 (1999); *see* 28 U.S.C. § 2254(b)(1). In Texas, the highest court is the Texas Court of Criminal Appeals. *Pond v. Davis*, No. H-13-1300, 2019 WL 4644836, at *5 (S.D. Tex. Sept. 24, 2019) (quoting *Tipton v. Thaler*, 354 F. App'x 138, 140 n.1 (5th Cir. 2009)); *see also Richardson v. Procunier*, 762 F.2d 429, 431 (5th Cir. 1985). Thus, an individual must satisfy the exhaustion requirement by presenting the factual and legal substance of his claim to the Texas Court of Criminal Appeals on direct appeal by a petition for discretionary review, or in post-conviction habeas proceedings. *See Ogan v. Cockrell*, 297 F.3d 349, 357 (5th Cir. 2002). Here, Green failed to exhaust available state remedies because he did not raise his substantive competency claim on direct appeal or in state habeas proceedings.

When a petitioner has failed to fairly present his claims in state court, he must ordinarily return to state court to properly exhaust his claims. However, if the petitioner "fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,'" the claim is deemed to be procedurally defaulted. *Nobles*, 127 F.3d at 420 (quoting *Coleman*, 501 U.S. at 735 n.1); *see O'Sullivan*, 526 U.S. at 848 (holding that where a prisoner fails to properly exhaust his remedies—by failing to properly present his federal habeas claims to the state appellate court—those claims are procedurally defaulted).

Such is the case for Green, who cannot now return to state court to properly exhaust his claim. *See Nobles*, 127 F.3d at 420. Because no competency hearing was conducted and additional extra-record evidence is required to substantiate the claim for incompetency to stand trial,

16

exhaustion in this case would require that Green file a subsequent state habeas application. *See generally*, *Scott v. Davis*, 2:16-CV-225-Z, 2020 WL 609292, at *6 (N.D. Tex. Jan. 13, 2020) (finding that petitioner's claim regarding competency to stand trial or failure to conduct a competency hearing was unexhausted and that a subsequent state habeas application would be dismissed); *Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997) (explaining that "where direct appeal cannot be expected to provide an adequate record to evaluate the claim in question, and the claim might be substantiated through additional evidence gathering in a habeas corpus proceeding," such extra-record claims should be brought in state habeas proceedings). The Texas abuse-of-the-writ doctrine, however, prohibits courts from considering a subsequent application for habeas relief after final disposition of an initial application challenging the same conviction unless the factual or legal basis of the new claim was unascertainable through the exercise of reasonable diligence before the filing of the first application. *See* TEX. CODE CRIM. PROC. ANN. art. 11.07 § 4(a)–(c); *Ford v. Davis*, 910 F.3d 232, 234 (5th Cir. 2018). In this case, Green's contention that he was incompetent to stand trial during trial was ascertainable prior to his original petition. Any attempt by Green to now file a successive habeas application in state court would thus be dismissed as procedurally barred by Article 11.07 § 4(a)–(c), which represents an adequate state procedural bar to federal habeas review. *See Smith v. Johnson*, 216 F.3d 521, 523 (5th Cir. 2000).

In sum, because Green did not fairly present the issue of his competence to stand trial before any state court, and because he cannot now properly exhaust his claim, this claim is procedurally defaulted and, accordingly, technically exhausted. *Nobles*, 127 F.3d at 420. Thus, for this claim to be reviewable, Green must establish cause and prejudice to overcome the procedural default, to which the Court turns next.

### b.  Cause and Prejudice to Overcome Procedural Default

A petitioner can overcome a procedural default if he can show cause for the default and actual prejudice as a result of the alleged violation of federal law. *Coleman*, 501 U.S. at 750. A petitioner establishes cause for a procedural default when "something *external* to the petitioner, something that cannot fairly be attributed to him . . . 'impeded [his] efforts to comply with the State's procedural rule.'" *Id.* at 753 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). In *Maples v. Thompson*, 565 U.S. 266, 289 (2012), the Supreme Court held that abandonment by post-conviction counsel can constitute cause to overcome procedural default. Green argues that he was unable to plead his competency claim in initial-review state collateral proceedings because his state habeas counsel, Ken J. McLean, abandoned him, thereby establishing cause for the procedural default of that claim under *Maples*. The Court agrees.

In *Maples*, two law firm associates filed *pro bono* a postconviction relief petition in Alabama state court on Maples' behalf. While the petition was pending, the associates accepted new employment that disabled them from representing Maples. Both associates ceased working on the case, without informing either Maples or the court, and no other attorney at the firm took responsibility for the case. As a result, no notice of appeal was timely filed after the Alabama trial court denied Maples' petition. When Maples learned of his attorneys' abandonment and the lapsed state court deadline, he first sought relief from the deadline in state court, but was afforded none. He then filed a petition for writ of habeas corpus in federal court. The district court denied the petition after determining that Maples could not establish cause to overcome the procedural default of his claims. The Eleventh Circuit affirmed. The Supreme Court reversed, holding that Maples' abandonment by post-conviction counsel constituted cause to overcome the procedural default of his claims. The Court reasoned that, where an attorney's actions have "severed the principal-agent

relationship, an attorney no longer acts, or fails to act, as the client's representative," and "[h]is acts or omissions therefore 'cannot fairly be attributed to the client.'" *Maples*, 565 U.S. at 281 (alteration omitted) (quoting *Coleman*, 501 U.S. at 753).

McLean's acts and omissions, like those of counsel in *Maples*, rise to the level of abandonment. McLean was appointed as state habeas counsel on February 15, 2001. After requesting an extension, McLean filed a state habeas petition on October 15, 2001, containing three claims that had already been raised and rejected on direct appeal,[11] as well as four other claims that consisted of mere headings without supporting statements of fact and law.[12] (Doc. No. 65-1). McLean concluded the petition by writing: "Applicant intends to develop the facts and law of these extra-record grounds for habeas relief with all deliberate speed." *Id.* at 11. Six years then passed without any further submissions from McLean. There is no indication McLean did any investigation or had any communication with Green during that period. In the meantime, Green sought to file two pro se habeas petitions, which were dismissed because McLean had already filed a petition on his behalf. SHR 68, 196. Green also wrote several letters to the Texas Court of

---

[11] These three claims are: (1) whether the trial court erroneously allowed Green to represent himself pro se, (2) whether Green's Sixth Amendment right of self-representation was abridged by inadequate access to the inmate library, and (3) whether Green's Sixth Amendment right of self-representation was abridged by the trial court's rescission of its own discovery order. (Doc. No. 65-1). The second of these claims was presented as a mere heading without factual or legal support.

[12] These headings read: (4) Applicant's due process right to a fair trial was compromised by the state's suppression of material evidence, the net effect of which raises a reasonable probability that its disclosure would have produced a difference result; (5) Applicant was denied his rights under Amendment VIII & XIV in that he was sentenced to a cruel and unusual punishment due to the procedures utilized during the trial; (6) Applicant was denied his rights under Amendment XIV because he is factually innocent, and has newly discovered evidence available to challenge the validity of the convictions; and (7) Applicant was denied due process of law pursuant to Amendment XIV by the admission of inadmissible and prejudicial evidence. (Doc. No. 65-1).

Criminal Appeals between 2003 and 2008, which, though clearly reflecting his deteriorating mental condition, expressed frustration over his attorneys' complete lack of communication with him.

In August 2005, the State filed proposed findings of fact and conclusions of law in relation to Green's state habeas petition. SHR 196. McLean still did not respond. On November 21, 2007, the State moved for disposition of Green's habeas petition. *Id.* The state court ordered that "both parties submit any additional filings on or before December 19, 2007." SHR 197. McLean requested an extension before finally subpoenaing Green's most recent prison psychological evaluation. Then, in April 2008, McLean filed a short "Statement of Counsel" with the state habeas trial court, stating: "Counsel for Applicant cannot in good faith file Proposed Findings of Fact and Conclusions of Law requesting that the Trial Court recommend to the Texas Court of Criminal Appeals that relief be granted." (Doc. No. 65-3). McLean then went on briefly to repudiate each of the claims he had previously raised. McLean also asserted: "Mr. Green was examined by mental health experts and found to be competent to stand trial and only saddled by a 'swollen' view of his intellect." *Id.* at ¶ 8. McLean added: "I have reviewed Mr. Green's most recent mental health examination dated May 17, 2007, at the Jester IV unit. There is no indication in those records that Mr. Green is mentally ill or incompetent." *Id.* at ¶ 2.

In making this last statement, McLean affirmatively misrepresented Green's medical record to the state court. The first page of the record that McLean said he reviewed states that Green has schizoaffective disorder. (Doc. No. 30-3, at 2). The report details Green's psychotic symptoms, including his "elaborate delusional system" and paranoia. *Id.* at 3. In particular, the report quotes Green as saying that he needed "someone to take this locator out of my head. The FBI put it in my brain sometime [sic] ago." *Id.* at 2. It also describes Green's history of suicide

attempts and self-mutilation, as well as the fact that he was taking an antipsychotic drug at the time. *Id.* at 2–3. Thus, McLean either falsely stated that he reviewed the report or grossly mischaracterized its contents. McLean also did not review Green's earlier medical records indicating he had schizophrenia of sufficient severity to require hospitalization by May 2003. Nor is it true, as McLean represented, that Green was examined by more than one mental health expert, or that that the trial court made a finding of competency to stand trial. As discussed above, only Dr. Rubenzer evaluated McLean's competency, and the trial court never directly addressed the contents of Dr. Rubenzer's report, much less made a finding based on that report.

McLean then died sometime the following year after what the State described as "a lengthy illness." SHR 292. In April 2009, Daniel Easterling was appointed to represent Green. *Id.* However, there is absolutely no evidence Easterling ever took any action in relation to Green's habeas petition; Easterling appears to have been counsel in name only. In August 2012, the Texas Court of Criminal Appeals ordered that the trial court resolve Green's petition within 90 days. SHR 296. The trial court adopted the State's proposed findings of fact without an evidentiary hearing, and recommended that the petition be denied. The Texas Court of Criminal Appeals affirmed the denial on March 6, 2013. *Ex parte Green*, 2013 WL 831504, at *1.

McLean's actions and omissions clearly severed his principal-agent relationship with Green. Though McLean filed an initial habeas petition on Green's behalf, *none* of the claims it contained were cognizable. The only two claims he supported with statements of facts were entirely record based and had already been rejected on direct appeal, rendering them unreviewable on state habeas. *See Ex parte Torres*, 943 S.W.2d at 475 (explaining that when record-based claims are previously raised and rejected on direct appeal, they are not cognizable on state habeas corpus). The five remaining claims, which consisted of mere headers, did not fairly present any issue to the

state habeas court. *See Ex parte Medina*, 361 S.W.3d 633, 642 (Tex. Crim. App. 2011) (explaining that for a writ application to be considered proper it "must contain *both* legal claims and factual contentions"); *see also Galtieri v. Wainwright*, 582 F.2d 348, 353 (5th Cir. 1978) ("For a claim to be exhausted, the state court system must have been apprised of the facts and the legal theory upon which the petitioner bases his assertion."). Thus, although the Fifth Circuit has observed that counsel's "failure to raise all issues a petitioner would like to argue does not amount to abandonment," *Wilkins v. Stephens*, 560 F. App'x 299, 304 (5th Cir. 2014), this is no such case. Instead, McLean failed to file even a single cognizable claim. This fact alone provides strong evidence that McLean abandoned Green from the beginning.

McLean's subsequent actions, however, make his abandonment even clearer. After filing the improper state habeas application, McLean completely failed to investigate and supplement the factual and legal grounds for Green's petition, or even to communicate with Green, for roughly seven years. Only when prodded by the court did McLean finally subpoena Green's most recent psychological evaluation. However, McLean then acted directly adverse to Green's interests, and in violation of his duty of candor to the court, by misrepresenting the contents of that evaluation to the court. The cause of McLean's misrepresentation is not entirely clear, but his years-long failure to investigate certainly created improper incentives to represent to the court in 2008 that Green had no viable claims. *Cf. Maples*, 565 U.S. at 285 n.8 (noting the grave conflict of interest created when attorneys from the same firm attempted to represent Maples after its former associates missed the crucial deadline). Regardless, by first failing to investigate any claims for seven years, and then misrepresenting the one mental health record he did investigate, McLean committed a serious breach of his duty of loyalty to Green, thereby severing any last thread that might have been holding their principal-agent relationship together. At the very least, had McLean

not misrepresented Green's mental health problems, new counsel could have been appointed to file a proper petition. *See Medina*, 361 S.W. 3d at 640 (appointing new counsel to investigate and file proper writ application after first habeas counsel intentionally failed to plead facts in support of defendant's habeas petition). Instead, the state court summarily adopted the State's proposed findings of fact and dismissed Green's habeas petition.

Accordingly, the Court concludes that McLean abandoned Green for the entirety of Green's state habeas application process and, indeed, made clear misrepresentations to the state court that harmed Green's case and severed any potentially lingering principal-agent relationship. Furthermore, Green has shown actual prejudice because, as discussed *infra*, his incompetence claim is meritorious. Accordingly, Green has established cause and prejudice excusing his default because he was abandoned by his state habeas counsel.[13]

### 2.   Standard of Review

Because the state courts did not adjudicate the merits of Green's substantive competency claim, § 2254(d) does not apply. *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000). The Court is therefore not limited to reviewing the record before the state court, and may consider the evidence adduced at the evidentiary hearing in support of Green's competency claim. *See Cullen v. Pinholster*, 563 U.S. 181, 186 (2011) (quoting 28 U.S.C. § 2254(d).[14] This Court's review of Green's competency claim is *de novo*. *Nobles v. Johnson*, 127 F.3d 409, 416 (5th Cir. 1997).

---

[13] Because Green can establish cause and prejudice under *Maples*, the Court need not consider his alternative incompetency-based argument for cause and prejudice. (Doc. No. 158, at 55–58).

[14] *See also Brown v. Johnson*, 224 F.3d 461, 465 (5th Cir. 2000) ("Where no findings of fact have been made by the state courts with respect to a particular habeas claim, however, a federal habeas petitioner is entitled to some form of federal evidentiary hearing so long as his 'allegations, if proved, would establish the right to habeas relief.'") (citing *Young v. Herring*, 938 F.2d 543, 559 (5th Cir. 1991)); *Williams v. Taylor*, 529 U.S. 420, 432 (2000) (explaining that AEDPA's restrictions on the availability of evidentiary hearings apply only when a state prisoner is at fault for failing to develop a record in state court). As discussed *supra*, the abandonment of post-

Respondent argues that, even though Green's competency claim was not adjudicated on the merits, the trial court nonetheless made an implicit finding that Green was competent to stand trial, and that such a finding is owed a presumption of correctness under § 2254(e)(1). *See Austin v. Davis*, 876 F.3d 757, 778–79 (5th Cir. 2017). Specifically, Respondent argues:

> Following Dr. Rubenzer's evaluation, the trial court did not state that it found Green was competent to stand trial. However, Dr. Rubenzer's competency evaluation was conducted on the trial court's order, CR 243, and Dr. Rubenzer's report was made a part of the trial record. 15 RR 13–14; CR 264–69. Consequently, even assuming the trial court did not make an explicit finding that Green was competent to stand trial, it impliedly did so by permitting the trial to proceed. The trial court's implied finding is entitled to deference under 28 U.S.C. § 2254(e).

(Doc. No. 157, at 35 n.10). Section 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Where the presumption applies, a petitioner bears the burden of rebutting it by clear and convincing evidence. *Id.*

However, § 2254(e)(1) applies, by its own terms, only where there has been "a determination of a factual issue." Implied findings of fact can trigger application of § 2254(e)(1). But courts ascertain implied findings of fact generally only where those findings are "necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001); *see also Goodwin v. Johnson*, 132 F.3d 162, 183 (5th Cir. 1997) (explaining that courts may "in appropriate circumstances, imply fact-findings from the state court's disposition of a federal claim that turns on the factual issue").

Here, the trial court did not reach any mixed question of law and fact, or dispose of any federal claim, after receiving Dr. Rubenzer's report. Instead, the trial court simply proceeded to

---

conviction counsel, rather than any lack of diligence on Green's part, caused the absence of any state court record on the issue of Green's incompetence.

trial without acknowledging the report or issuing any ruling that addressed the issue of Green's competence. Our adversary system will not tolerate inferring implied findings where a trial court *sua sponte* inquires into an issue, only to never actually address it, or reach any ruling that necessarily turns on the issue. Where, as here, there is no explicit determination of law from which to infer an implicit finding of fact, there is no implied "determination of a factual issue" to which § 2254(e)(1) applies.[15] The trial court did not make an implied finding of competency to which a presumption of correctness is owed. Moreover, and as discussed further *infra*, even if the trial court had made such an implied finding, Green has brought forth clear and convincing evidence to rebut any presumption of correctness.

### 3.   Merits of Green's Claim for Incompetency to Stand Trial

This Court held an evidentiary hearing to evaluate Green's competency during the guilt and penalty phases of his trial.[16] The Court first considers the relevant testimony from the evidentiary hearing before turning to the merits of Green's competency claim.

---

[15] Notably, Respondent does not attempt to argue that an implied finding of fact as to Green's competency can be inferred from the trial court's earlier *Faretta* determinations. There is reason for this. In *Austin*, the Fifth Circuit held that when the trial court concluded that Austin "could waive counsel and proceed pro se, the state trial court made an implicit finding that no bona fide doubt as to competency existed." 876 F.3d at 781. Here, in contrast, the trial court appears to have formed a bona fide doubt about Green's competency—triggered by Green's attempt to dismiss standby counsel and the court-appointed investigator—after the *Faretta* hearings. As a consequence, the trial court appointed Dr. Rubenzer to evaluate Green's competency (in contrast, in *Austin* a mental health evaluation finding Austin competent was conducted before the *Faretta* hearing). As just discussed, the record contains no subsequent ruling from which it can be inferred that the trial court necessarily ended up finding that Green was competent to stand trial.

[16] A district court may hold a retrospective hearing to determine competency to stand trial when "the quantity and quality of available evidence was adequate to arrive at an assessment that could be labeled as more than mere speculation." *Wheat v. Thigpen*, 793 F.2d 621, 630 (5th Cir. 1986) (quoting *Bruce v. Estelle*, 536 F.2d 1051, 1057 (5th Cir. 1976)). To determine the meaningfulness of a retrospective competency hearing, courts consider various factors including medical evidence near the time of trial, the opinion of psychiatric experts, the trial transcript, and the defendant's behavior during trial generally. *See Reese v. Wainwright*, 600 F.2d 1085, 1091 (5th Cir. 1979); *Martin v. Estelle*, 583 F.2s 1373, 1374 (5th Cir. 1978). In light of the record of Green's conduct at

### a. Evidentiary Hearing

The Court held a six-day evidentiary hearing in October and November 2018 to determine whether Green was actually incompetent to stand trial in 2001. At this hearing, the Court heard live testimony from fact witnesses Tyrone Moncriffe, Robert Sudds, Jr., Michael Turner, Jerry Jacobs, John Patrick Forward, Bill Hawkins, and Jeff Laird. The Court also heard testimony from expert witnesses Dr. Diane Mosnick and Dr. Tim Proctor. The Court recounts the testimony of each in turn as it applies to Green's competency claim.

#### i. Tyrone Moncriffe

Tyrone Moncriffe was Green's court-appointed counsel before and during trial. He was appointed on April 4, 2000 as standby counsel, and continued as standby counsel through the guilt phase of Green's criminal trial. Green reasserted his right to be represented by an attorney after the jury found him guilty; Moncriffe took over as active attorney for the penalty phase of Green's trial. Moncriffe was present for all pre-trial hearings and all trial proceedings. He also met with Green outside of court on multiple occasions.

Moncriffe's testimony is particularly probative in evaluating Green's competency at the time of trial. "Because legal competency is primarily a function of defendant's role in assisting counsel in conducting the defense, the defendant's attorney is in the best position to determine whether the defendant's competency is suspect." *Watts v. Singletary*, 87 F.3d 1282, 1288 (11th Cir. 1996). Moreover, Moncriffe's testimony about Green is reliable. Respondents' witnesses

---

trial and the availability of sufficient information to make a reliable inquiry into Green's mental state, the Court decided that a retrospective competency hearing would be meaningful and accordingly ordered an evidentiary hearing. *See Aldridge v. Thaler*, No. H-05-608, 2010 WL 1050335, at *21 (S.D. Tex. Mar. 17, 2010).

testified to Moncriffe's reputation as an exceptional attorney who is very committed to his clients. HT5-41.

Moncriffe's testimony about his interactions with Green from even before trial reveal that Green was not competent to stand trial. For example, Moncriffe recalled that Green thought he "was so good himself that nobody could represent him," and "[t]he only person he felt qualified enough to represent him was Johnny Cochran." HT1-19–20; HT1-87 ("[H]e thought he was the greatest lawyer in the world; and Johnny Cochran was the only person who could compare with him . . . ."). Even when Moncriffe and Green's previous lawyers tried to explain to Green that Johnny Cochran was not going to take his case, Green did not seem to understand. HT1-20–21.

Moncriffe also testified that Green's behavior in the courtroom generally was not normal. Moncriffe actually alerted the Court to his concerns about Green's mental health and its impact on his ability to represent himself. HT1-21. Moncriffe had noticed that Green "would talk to himself." *Id.* Green would also swing between "very high modes," where his speech was "very rapid" and where it was "[v]ery difficult to get him to focus for long period of time," and "very low modes," where he had "no affect" and would "just sit there" and watch. *Id.* Green also exhibited other behavior that Moncriffe noted as abnormal. In reaction to objections, Green "would become agitated." HT1-22. When Moncriffe tried to teach Green about proper courtroom behavior, Moncriffe found it to be nearly impossible: "I just couldn't get across to him some simple concepts." *Id.*

Even when it appeared that Green understood what Moncriffe was instructing him to do, he was unable to execute the behavior after instruction. HT1-23. A particularly extreme example of Green's inappropriate behavior was his repeated attempts to take off his clothing in the courtroom. Green refused to wear any clothing other than his prison uniform.  HT1-24. Moncriffe

explained to Green why it was important for him to wear a suit in front of the jury. *Id.* However, despite Moncriffe's repeated instructions and explanations, Green would "start to take his clothes off" while he was in front of the jury. HT1-24–25. Moncriffe testified that he "was concerned [Green] would take [] all his clothes off," and would have to take Green out of the courtroom to "redress him."  HT1-25. Despite Moncriffe's many efforts, Green continued to offer "constant resistance" to the idea that he needed to keep his clothes on in the courtroom. HT1-25–26.

Moncriffe also described Green's "outbursts" during trial. While sitting at counsel's table, Green would often "say things out loud," either "to a juror" or "to himself."  HT1-26. The outbursts would range from "audible under his breath," to "loud," depending on "what mood he was in.*" Id.* Because the outbursts were "disruptive," HT1-100–01, Moncriffe would have to ask for a break, take him out of the courtroom, and "calm him down," HT1-26. At one point, Green struggled with asking a juror a question during voir dire and so he "just flipped." HT1-27. Moncriffe "took him in the back" and Green said "he wanted to stop." *Id.* Moncriffe had to remind Green, "[y]ou just can't stop asking questions. You're a lawyer. You're your own lawyer.*" Id.* Moncriffe noted that the outbursts were not recorded on the record. HT1-26–27. Moncriffe also testified that this behavior was "consistent" throughout the trial. HT1-100. Although Moncriffe tried to explain why Green needed to control his behavior, Moncriffe testified that "no matter what I was telling Mr. Green, . . . he listened to you; but he . . . wasn't registering what I was telling him." HT1-101. In Moncriffe's opinion, Green was unable to control his behavior. *Id.*

As to the actual content of the trial, Moncriffe testified that, in his opinion, Green did not have a "factual understanding of the case against him at all" or a "rational understanding of the proceedings against him." HT1-50. Even when Green was able to recite various facts of the case, he was unable to use those facts to support his defense; in Moncriffe's words, "he couldn't put it

to work." HT1-49. Additionally, when Moncriffe tried to explain even basic legal concepts to Green, he could not understand them. HT1-34–35. Moncriffe "spent extensive time just going over [legal] concepts with [Green]," HT1-35, but "he never could grasp those concepts," HT1-36, even though Moncriffe focused on "real basic things," HT1-92. "Eventually," testified Moncriffe, "I got to the point of realizing that he could not comprehend what I was telling him." HT1-66. For example, Moncriffe recalled that when the state closed its case, Green did not understand the concept: "And Green said, 'Close what?' Like, he didn't understand what that meant. He said, 'Close what?' even though we had talked about it." HT1-35. Or, when the judge called for closing arguments from the parties, "Green seemed to get the impression that it meant we're in a fight with someone. Like, I'm on the basketball court and we're getting into an argument. He didn't understand that 'argument' meant final arguments." *Id.* Additionally, despite Moncriffe's attempts to explain the concept of the burden of proof to Green, Moncriffe testified that "no matter what you tell him or how you tell him," Green could not understand the concept. HT1-36.

Moncriffe testified that Green struggled particularly with voir dire, because he did not "really underst[and] the process of what we were doing." HT1-28. Indeed, despite Moncriffe's attempts to explain the process of jury selection to Green, Green seemed to lack even a basic understanding of the goal of selecting a favorable jury, much less the mechanics of voir dire itself. For example, Moncriffe recalled an incident in which Green wanted to strike a juror:

> There was a [potential] juror we wanted . . . to get off [the jury] . . . [Green] set up the format to get him off; and then, he would turn around and accepted [sic] the juror. So, he would do just the opposite of what he should have been doing with the juror. . . . He attempted to strike a juror; and then, he turned around and accepted the juror.

29

*Id.* When asked why he thought Green acted that way, Moncriffe testified "I don't think he really understood the process of what we were doing. . . . I began to notice that he would mimic the State's position. If they accepted a juror, he would accept the same juror." *Id.*; *see* HT1-40.

Green's tendency to mimic the state's attorneys, rather than make good decisions for his own benefit, was on full display in the selection of one juror in particular. Green asked the juror, "[i]f an individual has three free throw shots and he shoots three shots but only made one, what would the percentage of that be of hundred?" HT1-31. When the juror answered the question correctly, Green found the juror's answer to "prove[] that he is . . . an honest person," reasoning that Moncriffe testified to be "typical" of Green throughout the trial. HT1-31–32. Then, despite finding the juror honest, Green made a motion to the court to strike for cause:

> My motion, your Honor, he seems to be a person who is honest. He got on this questionnaire, your Honor. He said that he was a victim of aggravated robbery twice and after and during the trial maybe submitted a photo or something that may have an influence or a reflection of something that's happened in the past. That could be vital in his decision, meaning that the moment of the circumstances right there in his face he may be, "A," you know, sound now; but after the demonstration of trial by the State that it could be influenced in the end. It could be vital. It could work on my behalf. I ask that he be on the challenge of cause for that matter.

HT1-32.

The court denied Green's motion to strike for cause; Green did not use a peremptory strike. *Id.* Moncriffe testified that, although he tried to explain to Green the difference between a strike for cause and a peremptory strike, he never "really understood it." HT1-33. After Green was finished, the state accepted the juror. HT1-34. Green then accepted the juror as well, despite having moved to strike for cause. *Id.* The trial judge stopped the proceedings to make sure Green intended to accept the juror. *Id.* Green stated:

> Yes, sir, I accept. He proved to me to be honest person who will go by the law. Just the facts that he stated in his question. That's why I demonstrated about those free throws, to see if he was actually an accountant as he sits here. He proved that to me.

It took me 20 damn years to figure out 33 and a third percent. This man did it in 20 seconds.

*Id.*

Ultimately, Moncriffe testified that Green "picked jurors who were there to kill him" and that "no criminal defense lawyer would have picked." HT1-37. As Moncriffe explained, attorneys in capital murder cases typically give potential jurors a number between one and seven: "One would be a juror who would never ever give the death penalty no matter what the situation. Seven would be a juror who would always give the death penalty no matter what the situation. And Mr. Green was putting people on the jury who were six and sevens." HT1-38. Moncriffe quickly realized that Green "could not follow my directions on things as simple as when to strike a juror, when not to strike a juror. So, I would make it real simple. One jurors help us; seven jurors hurt us." HT1-91. However, despite Moncriffe's efforts, Green still selected a jury that favored death. For example, Green picked a police officer who came to jury selection in his police uniform. HT1-38. Moncriffe noted that "what [the uniform] meant to any criminal defense lawyer was that 'I don't want to be here. Strike me off.' That was his signal to us." *Id.* Yet, despite that, and despite that the juror expressed that he was "greatly in favor of death," Green selected him to be on the jury. *Id.* Moncriffe testified that Green did not seem to have a plan when it came to selecting the jury: "If he had one . . . I still to this day don't know what it was." HT1-40. Moncriffe described Green's jury selection as "nothing like I've experienced before nor has it been anything like I've experienced since." HT1-41.

According to Moncriffe, Green could not understand that there was strong evidence against him. He remained confident that he would walk free. HT1-42. Moncriffe tried to explain to Green what DNA evidence was, but Moncriffe testified that he "could never really get it across where [Green] would understand it." *Id.* Instead, Green was fixated on what he called "fingerprint

implementation." HT1-43. Green believed that someone was trying to frame him by planting

fingerprints on the victim's neck. *Id.* Moncriffe believed that Green "had a high sense of paranoia."

*Id.* He believed that people were trying to poison him, so he would only accept water from

Moncriffe. HT1-43–44.

Moncriffe's choices during trial corroborate his testimony that Green was mentally ill.

Notably, Moncriffe stated that his goal in closing arguments was to convince the jurors that Green

was mentally ill:

> I was trying to get across to this jury, hopefully, one person on the jury saw that
> this young man was suffering from some mental illness; and that was the theme of
> my argument, that, at least, one person can see his demeanor throughout the trial,
> his questions, the way he would ask questions. . . . In my final argument, I made a
> statement to the fact that one thing I do know about America is we don't kill sick
> people; and that was the theme of my final argument.

HT1-37–38.

Moncriffe's testimony provides reliable, compelling, and specific evidence that Green did

not have a rational understanding of the proceedings and was unable effectively to consult with

his counsel with a rational degree of understanding. Moncriffe testifies to multiple instances

throughout trial where Green exhibited paranoid or disorganized behavior. Moncriffe observed

such behavior consistently throughout the trial, and noted that Green was unable to control or

change his behavior.

### ii.   *Robert Sudds, Jr.*

Robert Sudds, Jr. is Green's older half-brother; they share the same mother.  HT1-129, 131.

Sudds is four years older than Green. HT1-130. Sudds testified that Green's father disciplined

Green when Green was a child by hitting him with a belt. HT1-138. Green's father would

sometimes drink. HT1-140. Sudds testified that Green sometimes had a difficult relationship with

his father. HT1-147. Sudds was present in the courtroom for Green's entire trial. HT1-132.

Sudds also recalled in his testimony that Green expressed delusional or paranoid claims during the pendency of his criminal case. Sudds visited Green when he was held in pre-trial detention at Harris County Jail. HT1-156. Green complained to Sudds that the police or prosecution was coming to his jail cell at night to "harass him, trying to get him to agree." HT1-157. Green claimed that they had "implanted some instrument [in]to his skin," in his head, in order to "electroshock" him. *Id.* Green also told Sudds that the DNA in his case had been "switched," because "[i]t wasn't supervised right," HT1-158, even though his lawyers had told him that the DNA evidence was monitored twenty-four hours a day, seven days a week, HT1-169–70. Sudds testified that Green truly believed that the police were trying to frame him by switching the DNA, and that his lawyers were lying to him about it. *Id.* Sudds testified that this all sounded "crazy" to him at the time. HT1-170.

Green had also expressed to Sudds his delusional beliefs about his own legal skills. Sudds testified that Green "said if he couldn't get Johnny Cochran to represent him, he'd do it hisself [sic]." HT1-157. Sudds tried to explain to Green: "I told him, 'You need to get you a lawyer because you don't know the law.'" HT1-159. Green disagreed: "He said, 'I've been reading books, and I know how to do it.'" *Id.*

### iii.   Michael Turner

Michael Turner is a family friend who knew Green growing up. HT1-172. Turner testified that Green was hyperactive as a teenager and had difficulty concentrating. HT1-175–76. He stated that the Green family had financial problems because Green's mother had health issues that hampered her ability to hold a job. HT1-176.

Turner described an incident when Green was in his twenties. He was trying to get Green a job in maintenance. HT1-181. When Green came to interview, the secretary told Turner that she

was "a little scared," because Green was insisting that he wanted to start a detailing business and would not discuss the job for which he was applying. HT1-183. Green then went around to a restaurant that was inside the building and talked to the manager about the same thing. HT1-184. Turner testified that Green did not understand the purpose of the job interview. *Id.*

Turner was a witness at Green's trial and was present at the courtroom every day of the trial. HT1-187. Turner recalled that Green refused to change out of his jail clothes during the trial, and Turner had to go back and talk to him about it. HT1-185.

Turner also testified that Green maintained correspondence with Turner while he was imprisoned. HT1-190. After his conviction, Green sent Turner letters to send to other people who he wanted to ask for help. *Id*. These letters included a package for Johnny Cochran and a request for Turner to contact the FBI. *Id.* Green also sent a letter to Turner about a month after trial, requesting that he contact the Secret Service:

> [T]ell them that this case was tampered on part of DNA evidence, fingerprint information, fingernail scrapings, witness testimony, police acted illegally about the search warrant. They had at least three different judges who supposedly signed a search warrant for the initial arrest made on or about September, 1999. That was the day Sergeant Swaim and Allan Brown arrested me and took blood.

HT1-193.

Turner also testified about a letter that Green sent him roughly a month after the trial ended in which Green expressed his beliefs that he had read the lips of a juror who mouthed to him, "[s]it up straight. They forced us to kill you." HT1-194. Green concluded that "that means someone went into the jury room during deliberations interfering." *Id.* Green requested that Turner "get [the juror] to sign an affidavit." *Id*. In Turner's opinion, these were requests that Green actually wanted Turner to complete. *Id.*

#### iv.   Jerry Jacobs

Jerry Jacobs is Green's cousin. HT1-199. Jacobs described the home that he shared with Green during their childhood in Shreveport, Louisiana. He testified that it was crowded, with three rooms for nine people. HT1-200–01. Jacobs recalled that people in the neighborhood threatened them "with violence." They were beaten up badly and threatened on a daily basis. HT1-203. The people who picked on them would use weapons. Once, when Green was in junior high, someone threw a brick at Green that hit him in the back of the head. Green was bleeding badly and lost consciousness. HT1-204–05; HT1-215.

Jacobs recalled that Green "always felt fear of people" and "trusted nobody." HT1-209. He thought people were following him, even when Jacobs would reassure him that no one else was there. *Id.* After Green was hit with the brick, he started talking to himself. HT1-209–11. Jacobs recalled that he would interrupt Green whenever he started talking to himself. HT1-210. When Jacobs asked Green what was happening, Green would respond, "I'm just tripping." HT1-210–11. Jacobs testified that Green seemed really "anxious" when he was talking to himself, HT1-211, and would act like people were "messing with him," HT1-212. Jacobs testified that Green's personality changed dramatically after he was hit in the head with the brick. HT1-214.

Jacobs attended Green's criminal trial. HT1-212. Jacobs testified that Green "didn't want to come out in his suit. He wanted to come out in his jail clothes." HT1-212–13. Jacobs recalled that, when the judge ordered Green to go change in the back, Jacobs could hear "a lot of commotion" and "cursing." HT1-213.

*v.  John Patrick Forward*

John Patrick Forward was in the Harris County Jail with Green while Green was awaiting trial. HT2-14. Forward lived in the same dormitory as Green. *Id.* He estimated that he spent around 12 hours a day with Green and became friends with him during that time. HT2-14–15.

Forward recalled that Green "had a bad masturbation problem and talked to hisself a lot, laughed to hisself a lot, sometime make himself mad." HT2-20. The other inmates would call him "names like stupid and retarded and stuff like that," because "he would talk to himself a lot." HT2-19–20. Forward testified that the inmates were "singling him out" because "he just wasn't like everybody else." *Id.* Forward also testified that Green's habit of masturbating in front of the other inmates made the other inmates mad. HT2-20. However, Green would continue to do it. *Id.* Forward testified that it "got to the point to where . . . even inmates that was considered weak started calling him names," and, for safety concerns, Green had to move to another cell. *Id.*

Green did not take care of his personal hygiene. HT2-44. Forward had to tell Green "to shower and brush his teeth and wash his clothes." *Id.* This behavior also created problems for Green with the other inmates, but Green continued to behave in this way regardless. *Id.*

Forward also noticed that Green could not stay focused while speaking. HT2-45. He noted that Green "would start off talking about something; and he would jump to other subjects; and he never would finish what he started." *Id.* Forward testified that it was "common for [Green] to go from topic to topic to topic," and he could not keep Green on a single topic. HT2-52–53. Forward would have to try to bring Green "back around" to the original topic but, although it was easy for Forward to remember what the original topic was, it was very difficult for Green to get back to the original point. HT2-53. Forward testified that Green would often speak nonstop, without abiding by the flow of a dialogue. HT2-54. Forward described Green's behavior: "Sometimes, like we'd

36

say something, be speaking; and he'd laugh, you know; and he'd keep going. Or you'll be speaking, then, all of a sudden, he'll have, like, an angry look on his face like something bad was said or something; and he would just keep going throughout the conversation." HT2-53–54.

Forward testified that he has an older brother who was diagnosed with a serious mental illness. HT2-44. He testified that Green's behavior reminded him of his older brother's. HT2-45–46. He noted that "they both talked to themselves, laughed to themselves, get . . . theirselves mad and . . . can't stay focused on one thing." HT2-45.

Forward testified that Green did not have a rational understanding of his legal situation. HT2-46. Forward recalled that, when Green was first arrested, he thought "every day he was going home. He would call his people, his brother [and say] 'Come pick me up tomorrow. I'm going to be released. They're going to find out that it wasn't me, and I'm going to be released.'" HT2-46. Forward described Green as living "in a make-believe world." *Id.*

Green let Forward help with his criminal case, even though Green's was the only legal case Forward had ever worked on besides his own. HT2-63–64. In fact, several of Forward's own actions had been dismissed as frivolous. HT2-64. Forward suggested to Green that he should represent himself because his lawyers were not trustworthy. HT2-18–19. Forward considered self-representation to be very important to Green, so he did extensive research on how to convince the court to allow Green to proceed pro se. HT2-48. Forward found out that, if the court discovered Green was "mentally unstable," it would not grant Green's motion to proceed pro se. *Id.* Thus, Forward set out to prepare Green for his appearance before the court. *Id.* They "rehearsed over and over again things that I thought that the judge may ask so that he could have the right answers so that the judge could rule in his favor and he could get his motion to suppress heard." HT2-48. Forward testified that they rehearsed for a period of three weeks, "all the way up to the day he

went to court on that motion for self-representation." HT2-49, 55. During this preparation, Forward had to teach Green concepts on a "child-like level" to try to make Green understand. HT2-49. For example, to teach him the concept of "waive," he would wave his hand, as if "waving good-bye to your lawyer." *Id.*

Forward also drafted various pre-trial motions for Green, including his original motion for hybrid representation. HT2–29, 36. Forward testified that he would either write the motions himself or draft them and then have Green rewrite them in his own hand before submitting them to the court. HT2-22–39. Forward took the content of most of the motions from handbooks in the law library at the jail. HT2-63. Forward also noted that Green had no motivation to work on his case; even though Green was on trial for capital murder, Green just "wanted to sleep in." HT2-56.

### vi.   *William James Hawkins, Jr.*

William James Hawkins, Jr. was one of the prosecutors in Green's case. HT5-32. Hawkins testified that he did not question Green's competency to stand trial, HT5-38, though he tried on multiple occasions to persuade Green to not proceed pro se, HT5-42. In Hawkins's view, Green understood the charges against him and the potential punishment. HT5-38. He further testified that he did not have any trouble understanding Green in conversations with him or during trial. *Id.*

Although Hawkins did not remember specific details from trial, he testified that there were several disturbances in court. He testified, for example, that at some point during trial, Green did not want to "dress out," and that the judge ordered Green to put civilian clothes on. HT5-52–53. He also testified that he recalled that Green may have at one point unbuttoned his shirt. HT5-36.

Hawkins also testified that he did not remember whether fingerprints were found on the victim's body or neck, but that he would be "surprised" if any fingerprints were discovered. He acknowledged that even so, Green insisted that there were fingerprints on the victim. HT5-57–59.

### vii.   Jeffery Laird

Jeffery Laird was the other prosecutor on Green's case. HT5-69. Like Hawkins, Laird testified that he did not question Green's competency to stand trial, and that Green understood the charges against him and the potential punishment. HT5-74. He also testified that he did not have any trouble understanding Green in conversations with him or during trial. *Id.* Laird testified that he did not observe anything remarkable about Green's behavior, nor did he see Green talk to himself or disrobe in court. HT5-73–74.

### viii.   Dr. Diane M. Mosnik

Dr. Diane M. Mosnik has a doctorate in clinical neuropsychology. HT2-76. She has conducted research on schizophrenia, and, as of the time of the hearing, had done forensic psychology work for seventeen years. HT2-77–78. Dr. Mosnik was stipulated to as an expert. HT2-77.

In 2014, Dr. Mosnik conducted a current and retrospective diagnosis of Green to determine whether Green suffered from any intellectual disability or mental illness prior to and at the time of trial. HT2-126. Dr. Mosnik testified that she first diagnosed Green with schizophrenia in 2014 when she conducted her forensic examination. HT2-80–81. Using these present-day results in conjunction with contemporaneous testimony, reports, and transcripts from the trial period in 2000, Dr. Mosnik concluded that Green suffered from "disorganized type" schizophrenia in 2000, and that Green was, accordingly, not competent to stand trial. HT2-125. Dr. Mosnik further testified that Dr. Rubenzer's report was invalid.

1.  <u>Forensic Diagnosis of Schizophrenia and Incompetence to Stand Trial</u>

Dr. Mosnik testified that, in reaching her forensic diagnosis, she used the Fifth Edition of the Diagnostic and Statistical Manual of Mental Disorders (the "DSM-V"), which was the

operative standard for schizophrenia in 2014, as well as the Text Revision to the Fourth Edition of the DSM (the "DSM-IV-TR"), which was the operative standard at the time of trial in 2000. HT2-80, 125. According to Dr. Mosnik, the DSM-V identifies five characteristic symptoms of schizophrenia under Criteria A: (1) delusions; (2) hallucinations; (3) disorganized speech, also known as formal thought disorder; (4) grossly disorganized behavior or catatonic behavior; and (5) negative symptoms. HT2-90–92. To be diagnosed with schizophrenia, an individual must exhibit two or more of the symptoms, and one of those must be among the first three listed symptoms. HT2-93.

Dr. Mosnik concluded that the onset of Green's schizophrenia occurred years before trial, likely when he was 24 or 25 years old. HT2-130, 141. In reaching her diagnosis, Dr. Mosnik considered her 2014 evaluation of Green, record evidence, affidavits from individuals who knew Green before trial, and transcripts from pre-trial hearings and the trial.

### a.   2014 Evaluation of Green

In 2014, Dr. Mosnik conducted a forensic evaluation of Green, which included a clinical diagnostic interview, psychiatric interview, and standardized neuropsychological tests and measures. HT2-81. She concluded that, at the time of her evaluation, Green exhibited all five symptoms of schizophrenia. HT2-102. For instance, he exhibited "persecutory . . . paranoid, delusions," HT2-95, through a fixed delusional system in which he believed that "people are conspiring against him" and that the FBI, CIA, and Secret Service "are involved in . . . electrocuting him; implanting things in his brain, in his body; stealing bodily fluids from him and semen while he's sleeping . . . poisoning him, [injecting] gas fumes . . . into his cell and altering his thoughts," HT2-95–96. He also experienced "command auditory hallucinations," involving voices that were not his own, which is a "hallmark characteristic of schizophrenia." HT2-96–97.

Dr. Mosnik also observed that Green exhibited three symptoms of disorganized speech based on her clinical interview with him: derailment (an individual's speech gets off track), incoherence (an individual becomes sidetracked mid-sentence), and tangentiality (an individual's response to a question does not directly answer the question posed). HT2-97–101. Dr. Mosnik testified that she was one "hundred percent confident that he meets" the requirements for schizophrenia under the DSM-V. HT2-101.

Dr. Mosnik testified that her 2014 evaluation of Green was relevant to her retrospective diagnosis in several critical ways. Dr. Mosnik testified that the typical onset of schizophrenia is between the ages of 16 and 25, most commonly between 18 and 22. HT2-127–128. She testified that the "incidence of having a new onset diagnosis in men over the age of 30 is less than one to two percent." *Id.* Green was 32 years old at the time of trial. *Id.* She also testified that an individual need only present symptoms in two of the five domains to be diagnosed with schizophrenia, and that while an individual's symptoms within a domain may change over time, the domain itself remains constant. HT2-126. In 2014, Green showed the requisite symptoms across all five domains. *Id.* Accordingly, based on the typical course of the disease, Green very likely developed all five symptoms of schizophrenia well before his trial.

### b.  Symptoms Before and During Trial

Dr. Mosnik testified that she also reviewed the pre-trial and trial transcripts as well as record evidence and the testimony of fact witnesses. She explained that these sources were significant because they provided her with a contemporary, first-hand account of Green's behavior during trial. After reviewing this evidence, Dr. Mosnik concluded that Green exhibited symptoms in multiple domains under the criteria for schizophrenia at the time of trial, and that he was therefore incompetent to stand trial.

*Delusions*

Dr. Mosnik testified that record evidence as well as fact witness testimony demonstrated that Green exhibited delusionary beliefs prior to trial. Dr. Mosnik pointed to a letter that Green wrote shortly after one of his pre-trial competency hearings on August 31, 2000. HT3-8. Green addressed the letter to the State Commission on Judicial Conduct and claimed that Judge McSpadden permitted detectives to "falsely reimplement[] fingerprint information stating that my fingerprints were found around the victim's neck, that is, falsified fingerprint information." HT3-8–9. Dr. Mosnik testified that Green problematically "hangs on to this belief incorrectly but very strongly" that false fingerprints were placed around the victim's neck to frame him, even though a witness had testified that no fingerprints were ever taken from the victim's neck. HT3-9–10. According to Dr. Mosnik, this was clear evidence of "impaired brain functioning" during trial. HT3-65. "That's why he cannot appropriately utilize factual information to drive his thoughts. He is driven by what his brain, unfortunately, negatively and falsely, believes when it's not true." *Id.*

This conclusion was further supported by trial testimony from Green's brother Robert Sudds and Green's cousin Jerry Jacobs, as well as an affidavit from Green's common law wife Deborah Dougar. Sudds testified that, while in pre-trial detention awaiting trial, Green confided in him that he believed his cell was being broken into during the night and that he was being electrocuted. Jacobs testified that Green grew up fearful of the gangs in their neighborhood and described how Green's "level of fear turned into paranoia and obvious suspiciousness and . . . a fixed belief that people were following him." HT3-72. Dougar states in her affidavit that Green's behavior changed significantly in his early twenties and that he began writing her "crazy letters" that went beyond the bounds of normal jealousy and were instead "extreme" and "paranoid." HT3-78–79. Dougar also attests that Green made up "crazy stories about . . . [how] his own mother was

doing things against him behind his back," HT3-79, and that despite Green's representations to the contrary, he never received his GED or received any special training to become an electrician or sound system specialist, HT3-79. According to Dr. Mosnik, this evidence collectively indicated that, prior to trial, Green "had already developed a system of delusional beliefs" that remained fixed through time. HT3-71. According to Dr. Mosnik, this evidence demonstrates that Green exhibited symptoms of schizophrenia prior to trial.

*Grossly Disorganized Behavior*

Dr. Mosnik testified that Green exhibited grossly disorganized behavior both in prison and in court during his pre-trial and trial proceedings. During pre-trial detention, Green was "engaging in public masturbation frequently . . . in front of other inmates; and they're complaining about it . . . . And he still doesn't stop." HT3-16. Dr. Mosnik explained that "public masturbation" is specifically listed as an example of grossly disorganized behavior in the DSM-IV-TR. HT3-37.

Moreover, Green failed to bathe or observe personal hygiene in prison despite others' entreaties. Dr. Mosnik observed that one of Green's friends in prison, John Patrick Forward, repeatedly urged Green to bathe and brush his teeth. She testified that it was significant that "even under circumstances where hygiene, I would assume, is lower than it is out in the free world, he's below the basic standards . . . and is not volitionally bathing, brushing his teeth, and is even arguing with Mr. Forward." HT3-16. Dr. Mosnik testified that in a conversation she had directly with Forward, he "described what himself and other inmates believed to be cognitive impairment, that inmates were referring to him as mentally retarded and slow." HT5-18. Dr. Mosnik also noted that Forward described instances in which Green sat in a corner talking to himself. *Id.*

Dr. Mosnik also described Green as exhibiting grossly disorganized behavior in court, including attempting to undress himself during court proceedings. Dr. Mosnik testified that this

pattern of abnormal behavior indicated that Green's conduct was not the result of low intelligence but was instead caused by his mental disorder, because even individuals with extremely low intelligence do not behave in this way.

_Disorganized Speech / Formal Thought Disorder_

Based on review of the pre-trial and trial transcripts, Dr. Mosnik testified that, when Green speaks at length, "he becomes much more disjointed; and there's evidence clearly throughout the record of disorganized speech, what I would call formal thought disorder." HT2-155. She noted examples of tangentiality, perseveration, incoherence, clanging, illogicality, and derailment throughout voir dire and the trial itself. _See e.g._, HT2-156–95. She emphasized that Green was unable to understand conceptual and abstract language, such as idioms and proverbs. HT3-18.

For example, as an illustration of Green's incoherence, Dr. Mosnik analyzed the following interaction between Green and Judge Jones at the August 17, 2000, _Faretta_ hearing:

> THE COURT: What is going to happen to you if we start this matter today, you're representing yourself and you make a mistake? Do you see where I'm going?
>
> GREEN:      The reason I can't answer that question because no one's perfect. We can't have a trial—would it be motion hearing first? We couldn't have a trial without—evidently we haven't had anything in this but a bunch of resets. I am going to let him do the talking.

HT2-179; 3 RR 17. Dr. Mosnik pointed out the breaks in Green's speech, noting that they were "not typical pauses of somebody thinking about what to say or finding the right words to say," but rather were "completely disjointed fragments of speech." HT2-180. Dr. Mosnik opined that they were "not complete sentences . . . the thought does not continue from one part of the sentence, one phrase, to the next." _Id._ She explained that this was an example of incoherence—"coming off of the rails." _Id._

*Negative Symptoms*

Dr. Mosnik testified that Green exhibited negative symptoms of schizophrenia including "poor hygiene . . . affective non-responsivity, inappropriate affect and laughing to himself . . . [and] poor history of job maintenance." HT3-37. She also testified that Green exhibited signs of avolition, which is a "[l]ack of initiative and persistence in achieving daily activities like maintaining a job, maintaining school, maintaining hygiene." *Id.* Dr. Mosnik pointed to Forward's testimony that he had to repeatedly urge Green to bathe and brush his teeth as support of Green's avolition—even though Green was charged with a serious offense, "he wanted to sleep in . . . and hang around and masturbate." HT3-38.

### c. *Post-Trial Diagnoses of Schizophrenia*

Dr. Mosnik testified that she also considered reports of Green's mental health following trial. Dr. Mosnik reviewed the report of Dr. Frederick Chen, dated May 14, 2003, in which Chen diagnosed Green with paranoid schizophrenia. HT2-145. Dr. Mosnik explained that Chen's report highlighted Green's delusions about gas coming out of the vents of his cell, that he was being poisoned, that global satellites had been implanted in his rectum to keep track of him, and that Freemasons were implanted around the prison and were communicating with him. HT2-145–46.

Dr. Mosnik also reviewed records from Jester IV, the psychiatric treatment facility associated with TDCJ. Dr. Mosnik testified that according to these records, Green was consistently diagnosed from 2003 onwards with either paranoid schizophrenia or delusional disorder, or some type of psychotic symptoms. HT2-149–50. These diagnoses were significant, Dr. Mosnik explained, because they "support[] consistency in the presentation of symptoms over time, which we know in schizophrenia is a common disease." *Id.*

### d. Other Factors

Dr. Mosnik also considered Green's family, medical, academic, employment, and socioeconomic history. As to family history, Dr. Mosnik explained that "[w]hen you have one family member with schizophrenia spectrum disorder or serious mental disease, that raises an individual's odds ten times" that they will themselves develop the disorder. HT2-133. In Green's case, his brother, maternal aunt, and mother all suffered from serious mental illnesses. *Id.*

As to Green's medical history, a significant head injury in 1996 when Green was hit in the back of the head with a brick and lost consciousness further supports Dr. Mosnik's findings that Green was schizophrenic at the time of trial. HT2-136, 141–42. Dr. Mosnik explained that according to the leading hypothesis on the development of schizophrenia—the "diathesis or vulnerability stress model"—when individuals with genetic vulnerabilities experience "environmental stressors, traumas," particularly between ages 16 and 25, those incidents may trigger or exacerbate presentation of schizophrenia. HT2-138. Dr. Mosnik believes that Green was genetically predisposed to the mental illness due to his family's history and that Green's head trauma, which occurred when he was about 15 years old, may have served as an environmental stressor that triggered the presentation of schizophrenia. HT2-139–41.

Dr. Mosnik further considered Green's academic and employment history. Green's academic record indicated that he was often "hyper and [had] attentional problems." HT2-133. While these tendencies were not by themselves dispositive, Dr. Mosnik explained that "individuals who later develop schizophrenia have a higher incidence of attentional and hyperactivity in adolescence prior to the onset of symptoms." *Id.* Thus, Green's tendencies in adolescence "raises a potential flag as high risk group." *Id.* Dr. Mosnik further found it significant that Green "had

limited consistency or persistence in maintaining work." HT2-135. His longest period of employment was only one year long.

Finally, Dr. Mosnik addressed Respondent's contention that aberrations in Green's speech and comprehension were attributable to his low intelligence, poor education, socioeconomic background, or lack of experience in the legal system. HT3-13. Dr. Mosnik stated that "[t]he pattern of the deficits and certainly the extent of the examples that we see are completely different in nature" than that exhibited by individuals with low IQ or levels of education. *Id.*; HT3-14–15. She noted that the fact witnesses testimony—which highlighted further grossly disorganized behavior and delusions—corroborates her assessment that Green's behavior during trial was a result of his disease: "All of that information shows that these were not isolated incidents of . . . simple language or lower vocabulary level which is what we would see typically in individuals with lower IQ or lower level of education." HT3-15. She also explained that the speech of someone suffering from schizophrenia, like Green, differs significantly from speech of someone with a low IQ or poor education:

> In terms of low/average IQ or education at a ninth grade or even middle school level, there are notable differences in the form of an individual's speech. There's some indication that they can have a simpler form of vocabulary. Even in mentally retarded individuals, upon which there is a large body of research that . . . shows that the form of their speech is the same as individuals with normal IQ. . . . But even though it's in the mentally retarded range, they speak in complete sentences with correct syntax and structure to their sentence; but their vocabulary is simpler in form; and the structure of their sentences is simpler. But they're not illogical, and there's no loosening of association as we see in the formal thought disorder of schizophrenia which we evaluate by accessing disorganized speech.

HT6-232. Nor was socioeconomic status the cause of Green's inabilities and behavior—as Dr. Mosnik explained, Green's cousin and brother testified that they grew up in the same environment as Green and yet, did not exhibit any of Green's abnormal behaviors.

Dr. Mosnik accordingly concluded that she is one-hundred percent confident in her diagnosis of schizophrenia both in 2014, when she performed her examination, and in 2000, when Green stood trial. HT4-150.

### 2.  Lack of Understanding of the Proceedings

Dr. Mosnik also testified that she is one-hundred percent confident that Green was incompetent to stand trial. *Id.* Dr. Mosnik testified that the pre-trial and trial record as well as fact witness testimony clearly demonstrates that Green did not have a rational or factual understanding of the proceedings and therefore, he was incompetent to stand trial. She testified that it was her "professional opinion that, at that time, [Green] did not have either a sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding nor did he have even a factual or rational understanding of the legal proceedings against him." HT3-5.

On a fundamental level, Dr. Mosnik explained that Green did not understand basic facts of the proceedings in his case. She noted that "throughout that record, we see that he is mistaking individuals in the courtroom." *Id.* He did not understand the role of the prosecution or the judge in the courtroom. She further testified that Green "can't maintain knowledge of simple facts, rules that have been discussed, who the Court is; who the State is; who his attorneys are, [or even] if he has an attorney." *Id.* As to the latter, Dr. Mosnik pointed out that Green repeatedly demonstrated in pre-trial proceedings that he did not understand what it meant to proceed pro se and that he wrongly believed that he would be appointed an "assistant" counsel. Moreover, Dr. Mosnik emphasized that Green repeatedly flipped between wanting and rejecting counsel. For instance, when the trial judge noted that Green had fired his attorneys for the record, Green responded: "What, you're not giving me attorneys?" HT3-4–6.

Dr. Mosnik testified that Green's incompetence to stand trial is further reflected in his clear misunderstanding of voir dire and the penalty phase of trial. When it was Green's turn to ask questions during voir dire, Green stated that the prosecutor "has pretty much covered everything. So I don't have a lot of questions." HT3-41. Moreover, several days into voir dire, Green used a peremptory strike against a juror without having talked to him or asked him any questions. HT3-55–56. Dr. Mosnik testified that these incidents demonstrate that Green did not understand his role in the proceedings or the purpose of voir dire. *Id.* Green demonstrated a similar lack of understanding of proceedings after trial had already concluded. Dr. Mosnik emphasized that, during the penalty phase of trial, when Green was no longer representing himself, Green interrupted court proceedings to complain that he was "not treated as an . . . attorney" and that he "was not allowed to object with the law accordingly. I was not allowed to give testimony. I was not allowed to prove my innocence. I was not allowed to give a statement." HT5-25. Dr. Mosnik testified that this shows that Green did not have a rational or factual understanding that the trial was over and that he was to be sentenced, or that during his trial nothing had in fact stopped him from doing what he says he was not allowed to do. HT5-25–27. She emphasized that at the end of the penalty phase, Green was removed from the courtroom because he insisted on the right to make a speech. HT5-28.

Dr. Mosnik further explained that testimony from Green's attorney Moncriffe demonstrated that Green did not have a factual understanding of his circumstances or surroundings. Dr. Mosnik stated that Moncriffe's testimony was particularly significant because he provided her with first-hand insight into Green's ability to consult with his attorney. HT3-73. Dr. Mosnik emphasized the portions of Moncriffe's testimony in which he opined that Green was unable "to execute even simple things and retain factual information. He could not discuss plan [sic] or

strategy with him in any kind of rational manner." *Id.* Moncriffe's testimony affirmed that Green's conduct pre-trial and during trial was "not single instances of inappropriate behavior or inappropriate affect or slips of the tongue like a neurotypical person would experience," but that it was a "pervasive pattern that exhibited despite repeated and ongoing coaching." *Id.* Based on Moncriffe's testimony about Green's disrobing and outbursts in court, Dr. Mosnik concluded that Green was not aware of the "social setting" in the courtroom. HT3-74. She explained that Green's behavior "was a direct result of mental illness, severe psychopathology with which he was suffering that . . . leaves the mind unaware and unaffected by feedback from the environment." *Id.*

In sum, Dr. Mosnik testified that she believed that Green did not have a rational understanding of his case or the proceedings against him, and that he was therefore incompetent throughout the pre-trial proceedings, voir dire, and the trial itself. HT3-68.

### 3.  Dr. Rubenzer's Report

Dr. Mosnik testified that Dr. Rubenzer's report, which concluded that Green was competent to stand trial and upon which the trial court relied, was "invalid." HT3-146–47. This was because, although Dr. Rubenzer engaged in some standardized testing to evaluate Green's competency, he failed to follow up on critical evidence that he gleaned during those tests. In other words, despite purporting to diagnose Green's lack of serious medial disorder, Dr. Rubenzer "did not[, in fact,] complete a differential diagnosis." HT3-125–26. He left the trial court "with the impression that he'[d] done a thorough evaluation when, in fact, he'[d] discounted and not thoroughly investigated whether or not symptoms of serious mental disorder that are known to be associated with a question of competence" were present. HT3-126.

In reaching this conclusion, Dr. Mosnik observed that Dr. Rubenzer's evaluation was deficient in several ways. First, Dr. Rubenzer "appeared to rely on the absence" of any prior

diagnosis and on a medical evaluation from the Harris County Jail that concluded that Green was not mentally ill. HT3-84–85. However, as Dr. Mosnik testified, the absence of a prior diagnosis does not preclude the existence of mental illness. *Id.* Dr. Mosnik testified that schizophrenia is often not detected at onset; rather, research indicates that there is an average delay of ten years prior to diagnosing schizophrenia even when the individual is fully in the active phase of schizophrenia. HT5-10–11. Moreover, the Harris County Jail's medical evaluation was not a proper psychiatric evaluation; rather, it was a standard medical screening checklist that asked only two questions relevant to mental illness—whether the patient experienced hallucinations or was confused—and was administered by a medical nurse, not a psychiatric nurse. HT3-85. Dr. Mosnik testified that an expert tasked with ascertaining Green's mental health and competency could consider the evaluation, but should not "solely depend on [it]." HT3-85.

Second, Dr. Mosnik testified that, throughout Dr. Rubenzer's evaluation of Green's mental health, Dr. Rubenzer obtained evidence of abnormalities, but failed to adequately consider or follow up on that evidence. For instance, Green scored 25 or 26 out of the 30 on the cognitive capacity screening examination administered by Dr. Rubenzer, and all of the questions that he missed fell within two domains: attentional difficulties and memory retrieval difficulties. HT3-87–88. According to Dr. Mosnik, Green's performance was significant because it fell below the typical performance range of 28 to 30 correct and below the threshold at which additional testing ought to be considered. HT3-88. She testified that an expert evaluator would have observed that all of Green's missed questions related to the same two domains—and notably, areas of impairment common in patients with schizophrenia—and would accordingly have ordered further assessment. *Id.* Dr. Rubenzer, however, did not conduct any further assessment before determining that Green did not have a serious mental illness.

51

Dr. Mosnik observed that Dr. Rubenzer similarly failed to adequately follow up on Green's tenuous understanding of legal proceedings during the McArthur test of competence to stand trial. During the evaluation, Dr. Rubenzer asked Green "[w]ho [is] in charge of the courtroom?" Green responded, "[t]he DA." HT3-91. Even after further questioning, Green was unable to state who was in fact in charge of the courtroom or what the judge's role was within the courtroom. HT3-91–92. Dr. Rubenzer stated in his report that Green displayed some "misconceptions," but did not conduct any further inquiry. HT3-92.

Indeed, Dr. Mosnik testified that, even when faced with indications that Green had issues in domains specific to schizophrenia, Dr. Rubenzer reached conclusions based on assumptions rather than evidence. For instance, Dr. Mosnik opined that Moncriffe's statement that Green acted as if he were hearing and reacting to voices in the courtroom could be evidence of hallucinations. HT3-118–20. Dr. Rubenzer, however, discounted this evidence by deeming it to be mere "dramatization" without further investigation. HT3-118. Dr. Mosnik testified that Dr. Rubenzer similarly summarily discounted potential evidence of grandiosity, another symptom of schizophrenia. During the pre-trial period, Green declared that he could present his defense better than any attorney. HT3-99. Dr. Rubenzer stated that Green's "appraisal appeared as much due to his poor regard for lawyers as an inflated view of his own abilities" and thus did not indicate grandiosity. HT3-100. Dr. Mosnik found that Dr. Rubenzer reached this conclusion by problematically relying on his "own personal attribution without evidence to support it." *Id.* Similarly, Dr. Rubenzer did not follow up on the negative symptoms of schizophrenia that Green exhibited, such as poor personal hygiene, which Dr. Rubenzer acknowledged in his report. HT3-121. In Dr. Mosnik's view, these deficiencies in Dr. Rubenzer's testing led to his inaccurate and invalid conclusion that Green was competent to stand trial and did not have a serious mental illness.

Finally, Dr. Mosnik testified that Dr. Rubenzer excluded critical information from his analysis. For instance, Dr. Rubenzer's represented in his report that Green was able to perform "virtually all of the simple mental tasks asked of him." HT3-105. However, Dr. Mosnik testified that, while Green did correctly identify simple information such as the date, month, and year, Dr. Rubenzer "conveniently leaves out of his report that [Green], in fact, did not accurately complete the simple mental tasks of attention and memory retrieval that he was evaluated on," which were some of the "most important questions." HT3-105–06. This information could only be gleaned from Dr. Rubenzer's personal notes, which were not included in the report. HT3-106. Because Dr. Rubenzer failed to follow up on potential signs of schizophrenia, and because his report failed to include some relevant information, Dr. Mosnik concluded that Dr. Rubenzer's conclusion that Green was competent and did not suffer from any mental illnesses was invalid.

### ix.   Dr. Timothy Proctor

Dr. Timothy Proctor holds a doctorate in clinical psychology and is a licensed psychologist working in forensic psychology. HT5-86–87. He is also a clinical associate professor at the University of Texas, Southwestern Medical Center in Dallas, where he teaches forensic psychology. HT5-87. Dr. Proctor was accepted as an expert witness in forensic psychology for the Respondent at the hearing. HT5-91.

Dr. Proctor stated that he based his opinion on Green's motions and letters, the transcripts from trial and pre-trial proceedings, TDCJ records, Dr. Rubenzer's evaluation, Dr. Mosnik's evaluations, Green's writings, mental health records from Harris County, and statements of people who know Green. HT5-92. Dr. Proctor also interviewed Moncriffe for approximately a half-hour and observed and interviewed Green for about an hour and a half at Jester IV. HT5-94, 98.

Dr. Proctor testified that there is no dispute that Green now has schizophrenia. HT5-107. He stated that, when he met with Green, he attempted to perform a clinical interview, but was unable to complete it because Green "was so highly psychotic." HT5-103–06. Dr. Proctor confirmed Dr. Mosnik's observations that Green had symptoms of looseness of association, being tangential, and derailing. HT5-117–19. Accordingly, Dr. Proctor testified that "it would be very, very, very, very hard for anyone to dispute" that Green is schizophrenic. HT5-111.

However, Dr. Proctor testified that, after reviewing the records and transcripts, he did not see sufficient evidence to diagnose Green with schizophrenia at the time of trial. In reaching this conclusion, Dr. Proctor explained that, at the time of trial, Green did not appear to have "very bizarre delusions" as he does now, and his speech was not as "highly disordered" as it is now. HT5-111–12. Dr. Proctor testified that, even assuming Green had a mental illness at the time of trial that was not diagnosed, "the symptoms are more, if they're there, of a milder level, like you described in a prodromal level, as opposed to now." HT5-112.

Dr. Proctor further testified that he believes that the record reflects that Green was competent to stand trial. Applying the Texas state law standard for competency, Dr. Proctor believed that, based on a review of the transcripts, Green had the capacity to rationally understand the charges and potential punishment of his trial. HT5-127–28. When asked about Green's repeated insistence that his fingerprints had been planted on the victim's neck and that he was being framed, Dr. Proctor testified that, without more explanation, Green's belief did not reflect a lack of capacity to understand the charges against him or the potential consequences. HT5-131.

Dr. Proctor also testified that Green had the capacity to engage in a reasoned choice of legal strategies and to understand the adversarial nature of the proceedings. Dr. Proctor believed that Green had a defense strategy at trial; namely, "questioning whether there were actually

fingerprints present, questioning regarding the color of clothing, that he could not be in two places at once, [or] trying to indicate that it was actually the victim's boyfriend" who was responsible. HT5-144. Dr. Proctor could not, however, cite to where in the transcript he was able to glean that strategy. HT5-145. Dr. Proctor also believed that Green had a strategy for conducting voir dire, even though Green selected police officers who were in favor of the death penalty for his jury. Dr. Proctor testified that in his interview with Moncriffe, Moncriffe said that Green told him that he planned to demonstrate police officer misconduct during the trial and believed that other police officers on the jury would be able to recognize that those officers were lying. HT5-142.

Dr. Proctor testified that ultimately Green understood that he was proceeding pro se. HT5-149–50. He understood that he was supposed to speak and ask questions in court, and in fact did so during trial. *Id.*; HT5-128. The fact that Green subsequently asked Moncriffe to serve as his attorney indicated, according to Dr. Proctor, that Green understood the difference between being pro se and having an actual attorney. HT5-150. Dr. Proctor also believed that Green had the capacity to understand the burden of proof. To the extent that Green may have had any confusion, Dr. Proctor stated that there were alternative explanations beyond psychosis. HT5-154.

Dr. Proctor also testified that Green had the capacity to reasonably interact with counsel. Dr. Proctor stated that he considered whether Green was paranoid about lawyers, but ultimately concluded that if there was in fact paranoia, it did not come across in how Green interacted with Moncriffe. HT5-139.

Dr. Proctor discounted Green's disruptive behavior in the courtroom. Dr. Proctor acknowledged that Green spoke out of turn during the trial and that this could reflect disorganized behavior. HT5-151. However, Dr. Proctor said that he did not see sufficient evidence that Green's disruption was caused by an illness rather than his own volition. *Id.* Dr. Proctor also testified that

Green's confused speaking did not rise to the level of thought disorder. HT5-193. In his view, alternative explanations for Green's speech such as his level of education or the stress of the situation were probable and Dr. Mosnik applied too high a standard when evaluating Green's speech through transcripts. *Id.*

Dr. Proctor relied heavily on the lack of corroborating evidence to discount fact witness testimony that reflected symptoms of schizophrenia, such as Green muttering to himself and frequently masturbating in public. HT5-178–79. He stated that he could not conclude that Green was schizophrenic because Dr. Rubenzer's competency evaluation, the transcripts, and the jail evaluation by the nurse did not support that conclusion. *Id.* Similarly, Dr. Proctor discounted witness testimony that Green frequently masturbated in public by relying on the fact that there was no TDCJ record or disciplinary infraction documenting those incidents. HT5-179–80.

When asked when Green developed schizophrenia, Dr. Proctor testified that Green was documented as experiencing signs of schizophrenia beginning in May 2003, when he was hospitalized at the prison unit and diagnosed with schizophrenia. Dr. Proctor acknowledged that Green "didn't just develop schizophrenia that day" and that Green already exhibited signs of schizophrenia in September 2001, nine months after he entered prison following trial. HT5-163–64. This was based on one of Green's letters, dated September 3, 2001, that manifested paranoia: in the letter, Green described gangs, attorneys, and judges that were conspiring against him. *Id.* Dr. Proctor acknowledged that schizophrenia most commonly emerges in the early to mid-twenties for men, but maintained that it can develop later. HT5-118.

### b.  Analysis

The Supreme Court has "repeatedly and consistently recognized that the criminal trial of an incompetent defendant violates due process." *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996)

(internal quotation marks and citation omitted); *Wheat v. Thigpen*, 793 F.2d 621, 629 (5th Cir. 1986). As the Supreme Court has explained, "[c]ompetency to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial," such as "the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so." *Cooper*, 517 U.S. at 354 (citation omitted).

Competency to stand trial is measured by the two-part *Dusky* standard. An inmate is only competent to stand trial if: (1) "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and (2) "he has a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402. "The proper inquiry for an incompetency claim is the petitioner's mental *state at or near the time of trial*." *Goynes v. Dretke*, 139 F. App'x 616, 619 (5th Cir. 2005). Green bears the burden of proving his incompetency to stand trial by a preponderance of the evidence. *Thigpen*, 793 F.2d at 630. "[I]f the evidence of incompetency is more convincing than the evidence otherwise, the court must find in [Green's] favor." *Aldridge v. Thaler*, 2010 WL 1050335, at *27 (S.D. Tex. Mar. 17, 2010); *see Bruce v. Estelle*, 536 F.2d 1051, 1059 (5th Cir. 1976) ("[P]roof by a preponderance . . . is all that is required. . . . To place a greater burden on the petitioner might bring up due process considerations.").

A finding that an individual is mentally ill does not necessarily mean that the individual is incompetent to stand trial. *See Mays v. Stephens*, 757 F.3d 211, 216 (5th Cir. 2014) ("A defendant can be both mentally ill and competent to stand trial."). Thus, the Fifth Circuit has recognized that meaningfully to apply the *Dusky* standard, courts "must often [first] ascertain the nature of petitioner's allegedly incapacitating illness" before determining whether the pervasiveness and

manifestation of that clinically recognized disorder degrades the core concerns of the competency inquiry: the petitioner's rational and factual understanding of the proceedings and rational ability to consult with counsel. *Estelle*, 536 F.2d at 1059. The Court follows this two-step analysis here, and concludes that Green was incompetent to stand trial in 2000.

*i.* *Green Suffered from Schizophrenia at the Time of Trial*

The Court turns first to whether Green suffered from an incapacitating illness at the time of his trial in 2000. There are three expert reports regarding Green's competency to stand trial in this case. Dr. Rubenzer briefly evaluated Green during voir dire in 2000 and concluded that Green did "not appear to have a serious mental disorder" and was competent to stand trial. (Doc. No. 30-5, at 7). Dr. Mosnik and Dr. Proctor conducted forensic examinations of Green in 2014 and 2018, respectively, and reached diverging conclusions. In determining Green's mental state at the time of trial in 2000, the Court "may rely on one of two competing competency opinions given by qualified experts." *United States v. Ghane*, 490 F.3d 1036, 1040 (8th Cir. 2007) (citation omitted).

Before turning to the diverging forensic diagnoses, the Court first addresses Dr. Rubenzer's contemporary report. The Court recognizes that contemporary competency evaluations are generally useful in determining a petitioner's mental state at the time of trial because the expert has the opportunity to observe the subject in real time. Here, however, several reasons counsel against crediting Dr. Rubenzer's report. First, as Dr. Mosnik points out, Dr. Rubenzer's report omits important information and context. For instance, Dr. Rubenzer represented in his report that Green "was able to perform virtually all of the simple mental tasks asked of him." (Doc. No. 30-5, at 4). Yet, the report omits that Green did not accurately complete the "simple mental tasks of attention and memory retrieval" that he was evaluated on, which Dr. Mosnik characterized as the "most important questions." HT3-105–06. This information was gleaned from Dr. Rubenzer's

58

personal notes, which were not included in his report. Moreover, the report represents that Green "has no record of previous evaluation or treatment within the public mental health system," and that at a recent medical evaluation Green's "mental status was described as completely normal." (Doc. No. 30-5, at 2). As Dr. Mosnik notes, however, this "completely normal" conclusion came from a standard medical screening checklist that asked only two questions relevant to mental illness and was administered by a medical nurse, not a psychiatric nurse. HT3-85.

Second, as Dr. Mosnik points out, Dr. Rubenzer obtained evidence of abnormalities during his evaluation but failed to adequately consider or conduct further inquiry on that evidence. For instance, the report observed that some of Green's statements during an interview with Dr. Rubenzer "were a bit vague and not fully rationally connected," but the report concludes that "it is quite possible that at such times he was not revealing his true thinking on the matter." *Id.* at 4. The report also stated that Green believed that the district attorney was "in charge of the courtroom rather than the judge," but that "this is a very common perception among defendants at the jail." *Id.* at 5. The report further stated that Moncriffe expressed concern that Green "acts like he's talking to a third party," but summarily concludes that "[t]his is not a recognized psychiatric symptom, and appears to be a dramatization." *Id.* at 6. Moreover, Dr. Mosnik testified that Green's performance on the cognitive capacity screening examination administered by Dr. Rubenzer was below the threshold at which additional testing ought to be considered. No follow-up examination was conducted. In light of these circumstances, and given that neither Dr. Rubenzer nor his report were ever scrutinized in court, the Court does not find Dr. Rubenzer's report persuasive. "[E]xpert opinion is not binding on the trier of fact if there is reason to discount it." *White v. Estelle*, 669 F.2d 973, 978 (5th Cir. 1982) (citation omitted). Such is the case here.

That leaves Dr. Mosnik and Dr. Proctor's opposing forensic evaluations. While both experts agreed that Green was undoubtedly schizophrenic at the time of their evaluations, Dr. Mosnik concluded that Green also suffered from schizophrenia at the time of trial and was incompetent to stand trial. Dr. Proctor concluded that the onset of Green's schizophrenia did not occur until after the trial—Dr. Proctor testified that, at most, Green was in the prodromal phase of schizophrenia during trial and that Green was competent in 2000.

The operative standard for schizophrenia at the time of trial was the DSM-IV-TR. Under this standard, an individual was diagnosed with schizophrenia if he exhibited two or more of the following symptoms, one of which must be among the first three listed symptoms: delusions, hallucinations, disorganized speech or formal thought disorder, grossly disorganized behavior or catatonic behavior, and negative symptoms. The record reflects ample evidence of Green's disorganized speech, grossly disorganized behavior, delusions, and negative symptoms before and during trial. The Court addresses evidence of each symptom in turn.

First, transcripts from the state pre-trial and trial proceedings reflect numerous manifestations of disorganized speech and formal thought disorder. At the evidentiary hearing, and as this Court has already discussed at length *supra*, Dr. Mosnik highlighted examples throughout the trial proceedings of tangentiality, perseveration, incoherence, clanging, illogicality, and derailment. Dr. Proctor contends that Dr. Mosnik applied too high a standard in evaluating Green's speech, arguing instead that Green's troubled speech could be explained through his poor education, the stress of trial, and his lack of legal training. Dr. Mosnik, however, persuasively explained the differences between the speech patterns of individuals with low IQ and levels of education with that of individuals suffering from schizophrenia, and opined that Green's cognitive

levels were significantly more deficient than his family members who testified in court despite having grown up in the same environment with the same educational resources.

Second, as to grossly disorganized behavior, Green exhibited this symptom both in pre-trial detention and in court during trial. Testimony from Forward, who lived in the same dormitory as Green at Harris County Jail and observed Green for twelve hours a day, emphasized the extent of Green's behavior in jail. According to Forward, Green "had a bad masturbation problem." HT2-20. Green frequently masturbated in front of other inmates, even when he was told to stop. Masturbation is specifically listed as an example of grossly disorganized behavior in the DSM-IV-TR. Forward also testified that Green likewise had issues with personal hygiene. Forward testified that Green's poor hygiene caused problems with other inmates, so he had to constantly urge Green to bathe and brush his teeth. Even accounting for different standards of hygiene in jail, Green's personal hygiene was below the most basic standards.

Fact witness testimony further reflects Green's grossly disorganized behavior in court during trial. Moncriffe testified that Green made repeated attempts to disrobe in open court. According to Moncriffe, Green would "start to take his clothes off" while he was in front of the jury, and Moncriffe would have to take Green out of the courtroom to "redress him." HT1-24–25. Moncriffe further testified that Green frequently talked to himself, including during trial proceedings. As documented in Dr. Rubenzer's contemporary report, Green "acts like he's talking to a third party"; he would "appear to act out of [sic] conversation between himself and another party." (Doc. No. 30-5, at 6). Green's habit of talking to himself was a long standing one. Jacobs, Green's cousin, testified that Green started talking to himself shortly after he was hit in the head with a brick in junior high, which caused Green to lose consciousness. Forward testified that Green, like his brother who was diagnosed with a serious mental illness, often talked and laughed to

himself, got himself angry, and could not stay focused. Finally, Moncriffe testified that Green had outbursts during trial in which he would "say things out loud." HT1-26. Dr. Mosnik testified that Green's abnormal behaviors in jail and in court were indicia of his mental disorder. Dr. Proctor does not appear to disagree that these behaviors are indicia of grossly disorganized behavior; instead, he opposes Dr. Mosnik's conclusion on the basis that there is insufficient corroborating evidence from the trial of Forward, Jacobs, and Moncriffes' testimony of the behaviors. According to Dr. Proctor, he would have expected to see such behavior reflected in the trial transcript. The Court does not share Dr. Proctor's skepticism of the fact witness's testimony under oath, and is mindful that "a printed record should be received with caution," as it may not capture the full context of proceedings. *Estelle*, 536 F.2d at 1062. The Court finds compelling the displays of Green's grossly disorganized behavior at the time of trial.

Third, numerous witnesses testified about Green's delusions, which remained constant before, during, and after trial. Dr. Mosnik highlighted Green's delusion that his fingerprints were falsely planted on the victim's neck to frame him. Green began expressing this delusion at least by August 2000, when he sent a handwritten letter to the State Commission on Judicial Conduct claiming that Judge McSpadden had permitted detectives to falsify his fingerprint information. Green then continued to belabor the theory at trial and in his closing statements. This was so even though a witness testified at trial that no fingerprints were ever taken from the victim's neck. Dr. Mosnik testified that Green's behavior was a fixed false belief driven by impaired brain functioning. As discussed in greater detail *infra*, other fact witnesses added even more troubling layers to reports of Green's delusions. Green told his brother that police broke into his cell during the night to electroshock him and implant an instrument in his skin. And Green's cousin testified that, even at a young age, Green was fearful and suspicious of people and believed that people

were following him. The record thus presents compelling evidence supporting Dr. Mosnik's conclusion that Green suffered from delusions at the time of trial.

Dr. Proctor's contrary conclusion is unpersuasive. Dr. Proctor discounted the testimony of Forward, Jacob, and Moncriffe as to Green's delusions because there was no corroborating evidence for their testimony at trial. However, the Court is sensitive to the impact that Green's self-representation had on the trial record. The Court is further convinced that the fact witnesses in question were credible and were uniquely positioned to observe Green before and during trial. Dr. Proctor also contends that Green's request for Moncriffe to represent him for the penalty phase is inconsistent with any delusions resulting in a mistrust of lawyers. Yet, the Court is unpersuaded that Green's request for Moncriffe's representation is dispositive on the issue of Green's delusion. Fact witness testimony identified a broader and more troubled scope of Green's delusions than simple mistrust of lawyers, and, in any event, Green attempted numerous times to have both Moncriffe and other lawyers removed.

Finally, as to negative symptoms, Green exhibited signs of avolition: "[l]ack of initiative and persistence in achieving daily activities like maintaining a job, maintaining school, maintaining hygiene." HT3-37. Forward, who drafted many pre-trial motions for Green to copy, testified that rather than work on his case Green instead preferred to "sleep in . . . and hang around and masturbate." HT2-56. Moreover, as discussed *supra*, there is ample evidence of Green's disregard for personal hygiene. While Dr. Proctor opined that Green's behavior may have been caused by emotional depression rather than a mental disorder, the record reflects a lack of initiative and motivation that weighs in favor of Dr. Mosnik's conclusion.

The Court is, accordingly, persuaded that Green exhibited the requisite symptoms of schizophrenia at the time of trial and accordingly agrees with Dr. Mosnik that Green suffered from

schizophrenia in 2000.[17] This conclusion is further bolstered by research regarding the onset of the disorder. Both experts agreed that peak onset generally occurs well before an individual turns thirty. The experts disagreed, however, about the likelihood of Green's onset of schizophrenia occurring after trial. According to Dr. Proctor, schizophrenia may not present itself until an individual is in his mid-thirties. Dr. Mosnik, however, testified that for male patients, there is a "one or less than one percent chance that an individual male will be diagnosed with schizophrenia at the age of 30 or older." HT6-234. Moreover, according to Dr. Mosnik, Green has several characteristics that, research shows, typically lowers an individual's age of onset—namely, he is a black male with a family history of serious mental illness. HT6-234–35. The Court finds that Green suffered from schizophrenia at the time of trial.

### ii.     Green Was Incompetent to Stand Trial

Having determined that Green suffered from schizophrenia at the time of his trial in 2000, the Court turns to the "ultimate question of whether [Green's] illness pushed him below the minimum level contemplated by *Dusky*." *Estelle*, 536 F.2d at 1062. In weighing the evidence, the Court is aware of the "difficulty of retrospectively determining an accused's competence to stand trial." *Pate*, 383 U.S. at 387 (citing *Dusky*, 362 U.S. at 403); *see also Thigpen*, 793 F.2d at 630 (quoting *United States v. Makris*, 535 F.2d 899, 904 (5th Cir. 1976)). The Court is guided, however, by the principle that "[b]ecause legal competency is primarily a function of defendant's role in assisting counsel in conducting the defense, the defendant's attorney is in the best position to

---

[17]In post-trial briefing, Respondent urged the Court to disregard Dr. Mosnik's forensic evaluation because she was biased and not credible. Respondent argues that Dr. Mosnik relied too heavily on her present-day diagnosis of schizophrenia, contending that her subsequent conclusion that Green also suffered from schizophrenia at the time of trial was driven by confirmation bias. (Doc. No. 157, at 55–60). The Court disagrees. As discussed at length *supra*, the Court finds ample evidence in the record to support Dr. Mosnik's analysis and conclusion.

determine whether the defendant's competency is suspect." *Thaler*, 2010 WL 1050335, at *6 (quoting *Watts*, 87 F.3d at 1288). The Court further notes that "[t]he observations of those interacting with petitioner surely are entitled to substantial weight." *Odle v. Woodford*, 238 F.3d 1084, 1089 (9th Cir. 2001).

Guided by these principles, and in light of Green's schizophrenia, the conclusion that Green's mental illness impeded his rational and factual understanding of the proceedings and his rational ability to consult with counsel is most compelling. The evidence presented shows "a profile of a defendant with a severe psychiatric disorder which most probably caused him to misperceive important elements of the proceedings against him and likely interfered with his ability to relate the true facts to his counsel." *Estelle*, 536 F.2d at 1063.

Turning to the first *Dusky* prong, although Green may have been able to state that he was charged with capital murder and knew some of the facts of the case, the trial transcript and witnesses show that Green did not have a rational understanding of the proceedings. This deficient understanding is apparent in Green's general incomprehension of basic facts and legal concepts, his difficulty in grasping the meaning of pro se representation, and his conduct during voir dire and the trial.

As a general matter, Green did not understand basic facts about the proceedings in his case. The record reflects that, before and during the trial, Green was unable to grasp who the Court was, who the State was, and the role of each. Dr. Rubenzer's report, for example, stated that while Green "was able to identify the District Attorney as responsible for proving him guilty," he believed that the "District Attorney is in charge of the courtroom rather than the judge." (Doc. No. 30-5, at 5). This fundamental misunderstanding of the role of the judge in the proceedings is further reflected in a letter Green wrote to the State Commission on Judicial Conduct shortly after his second

*Faretta* hearing several months before trial, in which he wrote: "I respectfully ask to have a supreme judge hear and dismiss this offense immediately." HT3-22. Nor did Green understand the meaning or finality of his trial proceedings. During the penalty phase, Green interrupted proceedings to declare that he was "not treated as an attorney. [He] was not allowed to object with the law accordingly. [He] was not allowed to give testimony. [He] was not allowed to prove [his] innocence. [He] was not allowed to give a statement." 17 RR 7–8. In fact, Green had delivered his closing statement the day before.

Moreover, Green's repeated inappropriate behavior in court belies his basic misapprehension of the gravity of the proceedings. Moncriffe, Turner, Jacobs, and Hawkins all testified that Green refused to wear civilian clothing to trial and insisted on wearing his jail garb, despite Moncriffe's repeated explanations about the importance of changing clothes. Moreover, there were numerous incidents in which Green tried to disrobe in court, as discussed *supra*. Green's conduct during trial demonstrates that he did not comprehend basic facts about the proceedings.

Green's lack of understanding of basic proceedings extended to his comprehension of his pro se representation. Pre-trial transcripts of the *Faretta* hearings reveal that, while Green claimed to understand the hazards of self-representation, he appears not to have fully comprehended the import of the *Faretta* hearing or that he would in fact be on his own. In his second *Faretta* hearing, for instance, in response to Judge Jones's explanation that Green's waiver of his right to counsel would remove all assistance during trial, Green stated "I asked for two new assistant counsels." 3 RR 12. Later in the hearing, after Judge Jones had emphasized on multiple occasions what it would mean to proceed pro se, Green nonetheless stated again, "[t]he Court will offer me two assistants." 3 RR 20; HT2-184. Moreover, Green oscillated between wanting and not wanting counsel. When

the Court stated, "[o]kay you've fired, you don't want these attorneys," Green responded, "[w]hat, you're not giving me attorneys?" HT3-4–6

It is no wonder that Green failed to grasp the import of proceeding pro se when one considers how Green came to insist upon self-representation and how he handled his pre-trial motions. Indeed, it became clear at the evidentiary hearing that Green's fellow inmate Forward helped Green extensively on his case. Forward drafted motions for Green to copy and it was Forward who suggested that Green seek to represent himself. After learning that Green would not be permitted to proceed pro se if he were deemed mentally unstable, Forward began coaching Green on how to respond to questions he would likely be asked by the judge to ensure that Green would be deemed capable of waiving his right to an attorney. The pair "rehearsed over and over again . . . all the way up to the day [Green] went to court on [his] motion for self-representation." HT2-48–49. That Green was coached to hide his mental illness bolsters the conclusion that Green did not fully understand what it meant for him to proceed pro se. Dr. Proctor refutes this conclusion, stating that Green understood that he was supposed to speak and ask questions in court, and that he did in fact do so. HT5-128, 149. But "[o]ne need not be catatonic . . . to be unable to understand the nature of the charges against him and to be unable to relate realistically to the problems of his defense." *Lokos v. Capps*, 625 F.2d 1258, 1267 (5th Cir. 1980). That Green spoke and queried during trial does not mean that he understood the purpose of the *Faretta* hearings or that he would be proceeding without "assistants."

Nor did Green understand the process of jury selection or the goal of selecting a favorable jury. Indeed, Moncriffe, who as Green's standby counsel observed Green and attempted to explain to him the concept and goals of voir dire, testified that Green could not grasp even a basic understanding of the process. The result was that Green "picked jurors who were there to kill him."

67

HT1-37. In one instance, Green selected an officer who came to court dressed in his uniform and who expressed that he was "greatly in favor of death." HT1-39. Green also did not understand proper use of strikes and peremptory strikes. Moncriffe recounted one instance in which Green sought to strike an unfavorable juror, but without explanation instead accepted the juror. In another example, Green used a peremptory strike on a juror without ever talking to him or asking any questions. HT3-55. Respondent contends that, to the contrary, Green's conduct during voir dire reflected his capacity to engage in reasoned strategies. According to Respondent, Green explained that he selected police officers for the jury because he intended to demonstrate police misconduct and believed that other police officers would be better suited to identify that misconduct. (Doc. No. 157, at 42). Even assuming this to be true, however, Green's selection of jurors who explicitly supported the death penalty undermines any claim that Green had a rational understanding of voir dire.

In contrast, Dr. Proctor contends that Green was competent because he had capacity to understand the charges against him, as exhibited by his reaction when his lawyers declined to file a motion to suppress the fingerprint evidence on his behalf and his request that Moncriffe represent him during the penalty phase. Dr. Proctor further supports his competency conclusion through Green's alleged capacity to engage in reasoned choice of legal strategies, as exhibited by his focus on disproving that his fingerprints were on the victim's neck. The Court is unpersuaded. That Green expressed emotion or requested assistance in the penalty phase does not outweigh the evidence just discussed, including Green's paranoid delusions that he was being framed. Moreover, even if Green had something resembling a strategy, it was an irrational one based on his unjustified fixation on the fingerprint issue, even after a witness testified that no such fingerprints were found. In sum, "what emerges from this record is a profile of a defendant with a severe psychiatric

disorder which most probably caused him to misperceive important elements of the proceedings against him." *Estelle*, 536 F.2d at 1063.

Green's ability to communicate rationally and effectively with counsel under the second prong of the *Dusky* standard similarly fell below constitutional levels. In reaching this conclusion, the Court observes that Moncriffe was in the "best position" to determine whether Green could rationally and effectively communicate with counsel given that he served as Green's standby counsel through almost all of pre-trial proceedings and all of the guilt phase of trial, and served as Green's active counsel through the penalty phase of trial. *Thaler*, 2010 WL 1050335, at *6 (quoting *Watts*, 87 F.3d at 1288). Moncriffe testified that, despite his extensive efforts to explain basic legal concepts to Green, he could not understand them. Green, for instance, could not grasp the concept of the burden of proof, nor did he understand what it meant for a party to "close" its case or what closing arguments were. Moreover, as discussed *supra*, despite Moncriffe's repeated coaching of Green throughout voir dire, Green did not understand the basic mechanics and purposes of questioning and striking jurors. This repeated inability to understand simple concepts eventually led Moncriffe to "realiz[e] that [Green] could not comprehend what I was telling him." HT1-66.

Moncriffe's inability to communicate effectively with Green was corroborated by Forward, Green's dorm-mate at the Harris County Jail who, as discussed *supra*, effectively served as Green's jailhouse lawyer. Forward testified that he had to teach Green concepts on a "child-like level" to try to make him understand. HT2-49. For instance, Forward resorted to waving his hand as if "waving good-bye to your lawyer" to teach Green the concepting of waiver of counsel. *Id.*

Dr. Proctor's diverging testimony that Green had the capacity reasonably to interact with counsel is unpersuasive. To the extent Dr. Proctor discounted Moncriffe's testimony at the evidentiary hearing because Moncriffe had not previously expressed those concerns, the record

demonstrates that Moncriffe's concerns about Green's competency is longstanding. Indeed, Moncriffe's closing statement at the penalty phase of trial emphasized Green's incompetency and inability to effectively communicate. He said:

> Something unusual about this case to you? Guy representing himself? Doesn't know how to ask questions. Having difficulty presenting questions. You tell me if you didn't see something wrong. We had no psychiatric examinations or reports to bring in. . . . But, folks, look, I want you to use some of your common sense with me. Something wrong [sic]. The behavior.

18 RR 5. He further opined: "We're not a society that kill [sic] sick people." *Id.* at 22. The Court is further unpersuaded by Dr. Proctor's claim that Green was capable of disclosing pertinent information to and interacting with Moncriffe, "including allowing him to represent him, saying he should have represented him all along." HT5-139. A "basic ability to talk with counsel . . . [is] not enough to satisfy the right to a fair trial." *Thaler*, 2010 WL 1050335, at *28. Competency requires the "ability to communicate *effectively* with counsel," *Cooper*, 517 U.S. at 364 (emphasis added), and an "ability to consult with his lawyer with a reasonable degree of *rational* understanding," *Dusky*, 362 U.S. at 402 (emphasis added). "Absent rational communication with counsel, a defendant's role as the 'master of his own defense' is illusory." *Thaler*, 2010 WL 1050335, at *28 (quoting *Moore v. Johnson*, 194 F.3d 586, 606 (5th Cir. 1999)). As discussed, the Court has serious doubts as to Green's ability to communicate effectively and rationally with Moncriffe.

Moreover, Green exhibited paranoid delusions throughout trial that impeded his ability effectively to engage in the proceedings. Testimony at the evidentiary hearing from Green's family and Turner indicates that Green suffered from paranoid delusions of a conspiracy involving the state, police, and his attorneys. These conspiratorial delusions began before trial and persisted after. Green's older half-brother, Sudds, testified that, during his pre-trial visits to Green at the Harris

County Jail, Green expressed a "crazy" delusion that the police and his lawyers were trying to frame him by switching his DNA in evidence. HT1-170. Green told Sudds that the police or the prosecution were coming into the jail at night to "harass him, trying to get him to agree." HT1-157. Green claimed that they "electroshock[ed]" him and "implanted some instrument to his skin." *Id.* Green's writings leading up to trial further corroborate these delusions and implicate the court. In an August 31, 2000 letter to the State Commission on Judicial Conduct, Green wrote that "Judge McSpadden allowed the detectives namely (Sergeant Swaine and Alan Brown) to falsified [sic] 'vital documentation' . . . falsely reimplementing fingerprint information stating that my fingerprints were found around the victims neck, that is, falsified fingerprint information." (Doc. No. 65-9, at 1); *see also* HT3-9. Moncriffe also reported that Green "had a high sense of paranoia" and believed that people were trying to poison him. HT1-43–44.

Green's conspiratorial delusions continued after his trial as well. According to Turner, Green's childhood friend, Green continued to express delusion that his DNA had been swapped. Within a month after trial, Green sent Turner a letter asking him to contact the Secret Service "and tell them that this case was tampered on part of DNA evidence . . . police acted illegally about the search warrant," and that "at least three different judges . . . supposedly signed a search warrant for the initial arrest." HT1-193. Dr. Mosnik testified that, approximately two years after trial, in a report by Dr. Chen in which Green is diagnosed with paranoid schizophrenia, Dr. Chen highlighted Green's delusions of "gas coming out of the vents in his cell. He's being poisoned. *Conspiracy noted dating back to 2000*. Global satellites have been implanted in his rectum to keep track of him. . . . Individuals communicating with him that he believes are signs that there's Freemasons implanted . . . around the prison." HT2-145–46 (emphasis added).

Courts have found defendants incompetent when they suffer from conspiratorial delusions, particularly where the delusion integrates police, counsel, and the court. *See, e.g.*, *Ghane*, 490 F.3d at 1040 (8th Cir. 2007) ("[A]lthough Ghane had a factual understanding of the charges against him, his understanding was not rational because he believed the charges were part of a wide ranging government conspiracy."). In *United States v. Boigegrain*, 155 F.3d 1181, 1189 (10th Cir. 1998), for example, the appellate court affirmed the district court's finding that the defendant was incompetent to stand trial where "the defendant was delusional and suffered from 'paranoid ideation,' causing him to believe that his lawyer was participating in a conspiracy, along with the prosecutor and the judge, to incarcerate him for reasons unrelated to the charge against him." Similarly, in *United States v. Hiebert*, 30 F.3d 1005, 1007 (8th Cir. 1994), the defendant was found to be incompetent to stand trial because he "apparently believed that the judge and the attorneys were part of a conspiracy against him." Green suffered from a paranoid delusion that the evidence in his case had been tampered with and that police were violently abusing him in jail. These delusions played a large role in Green's decision to proceed pro se, impeded his ability to communicate with counsel and understand the proceedings in his case, and informed his irrational decisions and strategy during voir dire and trial.[18]

At bottom, this case is about a schizophrenic individual who, plagued with delusions that he was being framed, was persuaded by a fellow inmate in his jail dormitory to represent himself at trial. Yet, throughout trial proceedings, he failed to grasp basic facts about the process. He confused the role of the court, selected jurors that explicitly and strongly supported the death

---

[18] Respondent relies on *Saldano v. Davis*, 759 F. App'x 276 (5th Cir. 2019), to support its contention that Green was competent to stand trial. Respondent contends that the symptoms of mental illness in *Saldano* were more severe than Green's, and even so the Fifth Circuit declined relief. Respondent's reliance is misplaced. The Fifth Circuit in *Saldano* never reached the substantive issue of incompetency because the petitioner abandoned it.

penalty, insisted on wearing his prison garb and disrobed in front of the jury, and, despite extensive coaching, could not grasp even the most basic concepts. Under these circumstances, Green has certainly met his burden of proving by a preponderance of the evidence that he had neither a rational understanding of the proceedings against him nor the ability to consult his attorney with a reasonable degree of rational understanding. *Estelle*, 536 F.2d at 1059 ("[P]roof by a preponderance . . . is all that is required. . . . To place a greater burden on the petitioner might bring up due process considerations."). Indeed, the evidence adduced from the state record and the witnesses from this Court's evidentiary hearing would compel the Court to conclude that Green's incompetence is clear and convincing if such a standard were applied here. The Court accordingly grants habeas relief on Green's fourth claim that he was incompetent to stand trial.

### B. Ineffective Assistance of Counsel at the Penalty Phase

In his first claim for relief, Green alleges that the death penalty was imposed in violation of his Sixth Amendment right to effective assistance of counsel. Specifically, Green alleges that Moncriffe, who served as standby counsel during the guilt phase of trial and was appointed as counsel immediately before the penalty phase began, was ineffective in failing to move for a continuance to investigate and present mitigating evidence on Green's behalf.[19] This failure was

---

[19] Respondent argues that Green "scarcely mentioned" Moncriffe's failure to request a continuance in his amended petition and that this should affect "how much weight" the Court should give the claim. (Doc. No. 157, at 121 n.35). Respondent does not, however, argue that Green has waived the argument that Moncriffe was ineffective for failing to request a continuance. Nor could Respondent, since Green raised continuance-related concerns in his amended petition. (Doc. No. 30, at 6) ("Moncriffe did not request a continuance, nor did he request appointment of a mental health expert."). In fact, such concerns are central to Green's first claim, as Moncriffe could not have conducted a mitigation investigation without requesting a continuance. Moreover, Respondent has twice now had an opportunity to brief the continuance issue (Doc. Nos. 68, 157). The claim was appropriately raised and is ripe for consideration.

compounded, Green alleges, by his counsel's deficient mitigation investigation during the months-long pre-trial period before Green waived his right to counsel.

It is agreed that Green's first claim is procedurally defaulted. But Green can establish cause and prejudice to overcome the default. The Court has already addressed the procedural reviewability of the claim in its Memorandum and Order granting in part Green's motion for reconsideration. (Doc. No. 72). The Court held that Green had shown cause and prejudice to excuse the procedural default under *Martinez v. Ryan*, 566 U.S. 1, 14 (2012), and *Trevino v. Thaler*, 569 U.S. 413, 429 (2013), which together established that a procedural default does not bar federal habeas review of a substantial claim of ineffective assistance at trial if counsel in the initial-review collateral proceeding was ineffective. Specifically, the Court concluded that Green had shown both that his claim for ineffective assistance of penalty phase counsel is substantial, and that state habeas counsel was ineffective in failing to raise that claim.[20]

The Court also concluded that an "evidentiary hearing is needed to further evaluate this claim, specifically to determine whether Mr. Green can prove prejudice as a result of his trial counsel's deficient performance." (Doc. No 72, at 19). Having now held the evidentiary hearing, the Court addresses the full merits of Green's claim that Moncriffe's performance at sentencing, and in particular his failure to request a continuance for development of mitigation evidence, violated his duties under *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Because no state

_____

[20] Although the Court does not repeat its *Martinez/Trevino* analysis here, there is substantial overlap with the *Martinez/Trevino* analysis that the Court performs *infra* in relation to Green's fifth claim for relief. Moreover, *Trevino* does not provide the only route to overcoming the procedural default of Green's ineffective assistance claims. As discussed *supra*, state habeas counsel's actions exceeded ineffectiveness, entering the realm of outright abandonment. As such, Green can also overcome the procedural default of his ineffective assistance claims under the *Maples* rubric, for the reasons discussed *supra*, so long as he shows prejudice by establishing the merit of those claims, which he does.

court has addressed the merits of this federal constitutional claim, this Court's review is *de novo*. *See Cone v. Bell*, 556 U.S. 449, 472 (2009).

### 1.   Background

To understand the deficiency of Moncriffe's representation at the penalty phase, it is first necessary to understand the ineffective assistance of counsel that Green received during pre-trial proceedings. Green was represented by attorneys Goode, Hill, and Hinton for a six-month period during pre-trial proceedings before Green first waived his right to counsel.[21] During that time, counsel never requested appointment of a psychiatric expert; failed to obtain Green's school, criminal, and medical records; and neglected to prepare a social and family history for Green. Respondent argues that Green's lack of cooperation is to blame. In particular, Respondent points to the fact that Hill requested the appointment of an investigator in February 2000, but that Green refused to cooperate with the investigator and unsuccessfully moved for his removal in August 2000. However, even where a defendant is "fatalistic or uncooperative, . . . that does not obviate the need for defense counsel to conduct *some* sort of mitigation investigation." *Porter v. McCollum*, 558 U.S. 30, 40 (2009) (citing *Rompilla v. Beard*, 545 U.S. 374, 381–82 (2005)) (emphasis in original). Respondent ignores that counsel waited over four months to request appointment of an investigator, that a competent investigator can still accomplish much absent input from a defendant, that counsel never requested appointment of a psychiatric expert, and that counsel took no other basic steps toward a mitigation investigation during this critical pre-trial period. The 1989 American Bar Association ("ABA") Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("Guidelines") unambiguously state that

---

[21] The pre-trial period lasted from September 19, 1999, until December 4, 2000. Goode, Hinton, and Hill represented Green from September 20, 1999, until March 21, 2000, a six-month span. Hill replaced Goode sometime in January of 2000.

"preparation for the sentencing phase, in the form of investigation, should begin immediately upon counsel's entry into the case." Guidelines 11.8.3(A), available at https://www.americanbar.org/groups/committees/death_penalty_representation/resources/aba_gu idelines/1989-guidelines; *see also Strickland*, 466 U.S. at 688–89 (discussing the use of ABA standards as guides for determining "[p]revailing norms of practice"). By not promptly commencing a mitigation investigation, Goode, Hill, and Hinton performed deficiently. Their deficient performance prejudiced Green, as the record now reflects that ample mitigation evidence was available, particularly on the issue of Green's mental illness, as discussed *supra*.

After Green waived his right to counsel, Moncriffe was appointed as standby counsel. Moncriffe was not allowed to conduct any mitigation investigation as standby counsel. In fact, the trial court ordered him to refrain from undertaking even basic procedural matters for Green. HT1-126. Nonetheless, Moncriffe recognized early on Green's mental instability and, at one point prior to trial, requested that the court appoint a psychiatrist to examine Green in preparation for the mitigation case at the penalty phase of trial. The state objected, arguing that Moncriffe should not be allowed to "step into the role of lead counsel." 11 RR 9. The trial court agreed and declined to order appointment of a psychiatrist to assist in preparing a mitigation case. Moncriffe, who was alarmed by the due process implications of the ruling, respectfully objected:

> Your Honor, then just for the record, standby counsel—for the record, I'm placed in a position where if Mr. Green decides not to represent himself during any phase of the trial, I don't have the expert witnesses for mitigation, for future dangerousness. And I think that would be a direct violation of due process, your Honor, for the 14th Amendment. And it just concerns me greatly at this point. I would like to have that at least available.

11 RR 10. The Court responded that it had "admonished Mr. Green time and time again" about the dangers of self-representation, and Green had "put himself in the position that he [did] not have all the tools that are available." *Id.*

76

Green continued pro se through the guilt phase of the trial, and, on December 5, 2000, the jury returned a guilty verdict. Penalty phase proceedings commenced the following morning. At the start, Green suddenly announced that he wanted Moncriffe to represent him during the penalty phase. 17 RR 10. The trial court agreed to the request. Yet, despite these rapid developments and Moncriffe's continued belief that Green was suffering under a mental illness, Moncriffe did not request a continuance, appointment of a mental health expert, or a competency hearing. Instead, within roughly an hour of Moncriffe's appointment, the penalty phase was underway.

Moncriffe resorted to calling the eight witnesses that Green had managed to subpoena: Green's mother, brother, and uncle, and five individuals loosely associated with Green. [22] Moncriffe did not have an opportunity to meet with these witnesses to prepare their testimony, HT1-160–61, 189, and, with the exception of Green's mother, appears not to have spoken with any of them in any great depth prior to the hearing. Moncriffe asked each of them roughly a dozen basic questions that covered identifying information and a cursory recapitulation of minor encounters with Green. The questioning of Richard Johnson, with whom Green played basketball, is typical:

> DIRECT EXAMINATION BY MR. MONCRIFFE:
>
> Q. Can you state your name for the record, sir?
>
> A. Richard Johnson.
>
> Q. Mr. Johnson, what do you do for a living?
>
> A. Supervisor at the University of Texas in the computer center.
>
> Q. And how long have you worked there, sir?
>
> A. For 27 years.

---

[22] These witnesses included the director of a recreational center where Green spent some time, an individual who volunteered with Green as part of a church group, Green's gym coach from seventeen years prior, Green's former Sunday school teacher with whom he lived for some time, and an individual who played pick-up basketball with Green. 17 RR 86, 91, 94, 103, 110.

Q. This young man -- do you have any children?

A. No.

Q. All right. This young man here who is sitting here at the table with me, could you tell the jury how you know him?

A. Through some friends from playing basketball.

Q. Did you have dealings with him when you played basketball?

A. Yes.

Q. Could you tell the jury what type of person you saw. What type of person is he?

A. Always calm. I've never seen him upset. A very quiet person.

Q. When was the last time you saw him?

A. Maybe about six months ago, maybe a year.

Q. Been a little while ago?

A. Yeah. It's been a while.

Q. You understand this jury has found him guilty of capital murder?

A. Correct.

Q. We've talked about that, haven't we?

A. Yes.

Q. You understand that their options are life or death?

A. Yes.

Q. Whatever this jury sees fit to do, sir, you going to respect that verdict?

A. Yes.

MR. MONCRIFFE: No further questions.

17 RR 110–11. Moncriffe ended his direct examination of almost every witness with the same question about respect for the jury's sentencing verdict. These witnesses answered the same way: yes. 17 RR 87, 93, 96, 98, 101, 109, 111.

The questioning of Green's family was no more in depth. Green's mother could have told the jury about the deprivation and abuse Green had suffered as a child, as well as the mental illness

that runs through their family.[23] Yet her direct examination totals three pages of transcript and touched on neither of these topics. The direct examination of Green's uncle consists of one page of testimony and is even sparser than the testimony from non-family witnesses, while the direct examination of Green's brother spans a mere two pages. After Moncriffe rested, the State put on six witnesses whose testimony was primarily directed at Green's criminal history. On redirect, the State also called Kristin Loesch's sister and mother. 17 RR 112, 116.

Moncriffe made Green's mental condition the central theme of his closing argument. HT1-37–38. Though he had no concrete mitigating evidence on point, Moncriffe hoped that at least one person on the jury had observed Green's demeanor throughout trial and could see that he was suffering from some mental illness. HT1-37. He said in his closing argument: "One thing I know about Americans, too. We're not a society that kill [sic] sick people. We don't kill sick people. And I want you to think about that." 18 RR 22–23. According to Moncriffe, this statement encapsulated his penalty phase strategy. HT1-37–38.

The State's closing statement emphasized not only Green's criminal history, but also the complete lack of mitigation evidence. The state remarked, "there's not a lick of mitigation here," and "[t]his case has absolutely no mitigation." 18 RR 42, 44. The state also argued that Green had been "brought up in the best of circumstances." 18 RR 33. The state explicitly pointed out that no evidence had been presented to support Moncriffe's suggestion of mental illness, and urged the jury to infer that "[t]here's nothing the least bit abnormal" about Green. 18 RR 41. The jury

---

[23] Though Green's mother did not testify at the evidentiary hearing, she did submit an affidavit detailing what she could have testified to at the penalty phase. However, because the contents of her affidavit and others submitted are largely inadmissible hearsay, the Court relies below for its prejudice analysis solely on testimony provided at the evidentiary hearing.

returned a verdict in favor of death in under four hours, 18 RR 48, 50, and the court sentenced Green to death the same day, 18 RR 53.

### 2.  Analysis

The issue before the Court is whether Green received ineffective assistance of counsel at the penalty phase of his trial because Moncriffe unreasonably failed to seek a continuance in order to investigate and present mitigation evidence on Green's behalf.

"An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). "To establish deficient performance, a petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness." *Id.* (internal quotation marks omitted). Reasonableness is measured against "prevailing professional norms" and must be viewed under the totality of the circumstances. *Id.* A showing of deficient performance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687. To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In a capital case, the question is "whether the changes to the mitigation case would have a reasonable probability of causing a juror to change his or her mind about imposing the death penalty." *Blanton v. Quarterman*, 543 F.3d 230, 236 (5th Cir. 2008). The focus of the collective inquiry is whether the "death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687.

The Court concludes that Moncriffe's decision to seek neither a mental health evaluation nor a continuance prior to commencement of the penalty phase was objectively unreasonable under the circumstances and that this deficient performance resulted in actual prejudice to Green.

### a.   Deficient Performance

"It has long been recognized that the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). Thus, once appointed, Moncriffe was under a duty to perform effectively. The Court is sympathetic to the challenges that made it difficult for Moncriffe to meet that duty. Because of pre-trial counsel's failure to commence a mitigation investigation, Moncriffe's limited role as standby counsel, and the trial court's subsequent refusal to appoint a psychiatrist to serve as a mitigation expert, Moncriffe had no chance of completing a full mitigation investigation before sentencing. As Moncriffe expressed at the evidentiary hearing, "to do this case adequately and right, [he] would need a two-year continuance"—an impossibility given that the jury was already impaneled. HT1-118.

However, Moncriffe was still obligated to provide effective assistance of counsel under the circumstances. A reasonable lawyer in Moncriffe's situation would have requested a continuance to allow for the development of mitigation evidence. Even a short continuance would have allowed Moncriffe to assemble more in-depth testimony from family members about Green's history and past mental illness, or request a succinct psychological evaluation. Nevertheless, Moncriffe did not request a continuance and instead began the penalty phase of trial within an hour after his appointment. The key issue is thus whether Moncriffe's failure to request a continuance to allow for further mitigation investigation amounted to deficient performance under the circumstances.

Other courts have determined that failure to request a penalty phase continuance in the face of a dramatically inadequate mitigation investigation amounts to deficient performance. In

*Marshall v. Hendricks*, the district court found deficient performance where trial counsel permitted the penalty phase in a capital case to commence immediately after the guilt phase, despite having not prepared a mitigation case. 313 F. Supp. 2d 423, 450 (D.N.J. 2004), *aff'd sub nom. Marshall v. Cathel*, 428 F.3d 452 (3d Cir. 2005). The district court explained:

> [B]y not requesting a continuance [counsel] was forced to go forward without having conducted any investigation into a case for life. . . . [N]o reasonable attorney in [counsel's] position would have gone forward without an adjournment. [Counsel] did not have a single witness ready to testify, nor was he aware of any useful mitigating evidence aside from a cursory understanding of [defendant's] charitable work and the fact that he had no prior criminal record. . . . [A] continuance would have permitted [counsel] to discover a substantial number of willing witnesses, including family members who could have testified on [Defendant's] behalf. Therefore, a continuance was absolutely necessary in this case and [counsel] acted unreasonably by not requesting one.

*Id.* at 449–50. Unlike counsel in *Marshall*, Moncriffe was not responsible for the lack of mitigation evidence, but if anything, that made his decision to not request a continuance more unreasonable. This is especially true because, similar to counsel in *Marshall*, Moncriffe did not have a single witness of his own selection on hand, he had no mitigating evidence available to him, and he had not had time to prepare testimony from family members who could have testified in much greater depth about Green's upbringing and family history of mental illness. Moncriffe's failure to request a continuance is particularly unreasonable given that Moncriffe had long believed that Green was mentally ill and had concerns about Green's competency to represent himself.

Similarly, in *Ferrell* v. *Hall*, the Eleventh Circuit held that counsel acted deficiently by conducting an inadequate mental health investigation despite obvious indicators that the defendant suffered from mental illness. 640 F.3d 1199, 1228 (11th Cir. 2011). It weighed heavily in the court's analysis that the strongest indicator of the defendant's mental illness (a seizure) occurred during trial, yet counsel did not seek a continuance of sentencing to further investigate the

defendant's mental health: "Remarkably, defense counsel never sought so much as a continuance to determine if there was some mental health issue that caused the seizure or to evaluate the defendant's mental health further." *Id.* at 1228. Here too, clear indicators of Green's mental illness appeared during trial. Yet Moncriffe did not ask for a continuance, appointment of a mental health expert, or a hearing on Green's competency to stand trial.

As in these cases, Moncriffe's failure to request a continuance fell below an objective standard of reasonableness. "Counsel may not exclude certain lines of defense for other than strategic reasons." *Strickland*, 466 U.S. at 681. At the evidentiary hearing, Moncriffe made clear he had no strategic reason to refrain from seeking a continuance or appointment of a mental health expert. Moncriffe testified that his strategy at sentencing was to argue that Green should not be sentenced to death because he was mentally ill. Yet, Moncriffe had no actual evidence of Green's mental illness to present to the jury. A continuance would have allowed him to develop such evidence. Even a very short continuance would have enabled Moncriffe to prepare mitigating testimony from family members regarding Green's upbringing, mental condition, and the mental illness in his family, especially because Moncriffe had already built working relationships with numerous family members over the course of the trial.[24] Such testimony would have proved much more impactful than the sparse direct examination that actually occurred. A somewhat longer continuance would have allowed Moncriffe to obtain an expert psychiatric evaluation. But

---

[24] Moncriffe testified that he had developed a working relationship with Green's mother and brother (Robert Sudds, Jr.) from talking to them when they came to court during trial. HT1-114. Green's mother connected Moncriffe to several other people who knew Green, with whom Moncriffe also spoke. HT1-114. Some of those people, such as Michael Turner, Green's childhood friend, were among the witnesses that Moncriffe called during the penalty phase. Testimony from Sudds and Turner, however, reflects that their interactions with Moncriffe before the sentencing were limited, and that Moncriffe did not have an opportunity to help them prepare testimony for the sentencing hearing. HT1-161, 189.

regardless, a brief continuance would have sufficed to develop substantial mitigating evidence of mental illness. After all, Dr. Rubenzer's evaluation took only a couple of days, and yet would have unearthed substantial evidence of mental illness according to Dr. Mosnik, had Dr. Rubenzer not disregarded or discounted critical pieces of information, including Green's attentional and memory difficulties, Green's tenuous understanding of legal proceedings, Moncriffe's testimony about Green's behavior, and Green's statements indicative of grandiosity.

In contrast to these potential benefits, Moncriffe had nothing to lose from asking for a continuance. At worst, the request would have been denied and the issue preserved for appeal. Because Moncriffe's decision to forgo the possibility of a critical mitigation investigation was not based on strategy, it fell below an objective standard of reasonableness and constituted deficient performance. *Cf. Canales v. Stephens*, 765 F.3d 551, 569 (5th Cir. 2014) ("[C]ounsel did not make a strategic choice to forego a mitigation investigation. Instead, he chose not to pursue that claim in any depth because he thought he could not receive any additional funding to pursue those claims. Accordingly, his performance fell below an objective standard of reasonableness.").

In fact, Moncriffe repeatedly acknowledged at the evidentiary hearing that he should have asked for a continuance. HT1-118, 122, 127. He testified he did not request a continuance because he believed it would be denied, but recognized that he should have at least preserved the issue for appeal. HT1-118–21. Moncriffe admitted that, given his ongoing concerns that Green suffered from a serious mental illness, he should have asked the trial court to appoint a psychiatrist to allow him to put on mitigating evidence of mental illness. HT1-124–27. Developing that evidence would have taken a couple of months. HT1-124. But Moncriffe would have had a strong argument for

such a continuance because of *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985),[25] and because he had diligently sought the appointment of a psychiatrist to assist with mitigation when he was standby counsel. Moncriffe also acknowledged that he should have asked for a hearing on Green's competency to stand trial, given that he believed Green was incompetent, and that no hearing on Green's competency to stand trial had yet taken place. HT1-123–24.

Respondent argues that Moncriffe had no duty to ask for a continuance because asking for one would have been futile, given that the trial court had repeatedly admonished Green that it would not tolerate delay of proceedings stemming from his self-representation. (Doc. No. 157, at 122); *see also Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir. 1984) (per curiam) ("Counsel is not required to engage in the filing of futile motions."). But it was not futile to request a continuance. It was certainly within the trial court's equitable power to grant a brief continuance for Moncriffe to secure other family witnesses, or to prepare to elicit more impactful testimony from those

---

[25] In *Ake*, the Supreme Court held that the Due Process Clause of the Fourteenth Amendment obligates states to both (1) provide indigent defendants with access to psychiatric examination and assistance when the defendant makes a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, and (2) provide indigent capital defendants access to the assistance of a psychiatric expert to meet the State's psychiatric expert testimony at sentencing. Texas courts have interpreted *Ake* broadly:

> In an adversarial system due process requires at least a reasonably level playing field at trial. In the present context that means more than just an examination by a "neutral" psychiatrist. It also means the appointment of a psychiatrist to provide technical assistance to the accused, to help evaluate the strength of his defense, to offer his own expert diagnosis at trial if it is favorable to that defense, and to identify the weaknesses in the State's case, if any, by testifying himself and/or preparing counsel to cross-examine opposing experts.

*De Freece v. State*, 848 S.W.2d 150, 159 (Tex. Crim. App. 1993). Texas courts have even extended the reasoning of *Ake* to support a right to free assistance of experts in other fields. *See Rey v. State,* 897 S.W.2d 333, 337–38 & n.4 (Tex. Crim. App. 1995) (listing cases recognizing right to assistance from experts in pathology, hypnosis, ballistics, and DNA analysis).

witnesses Green had managed to subpoena. *See White v. State*, 982 S.W.2d 642, 647 (Tex. App.—Texarkana 1998, pet. ref'd) ("Equitable motions for continuance typically allow a party a short delay to secure a witness."). In Texas, factors relevant to an equitable motion for continuance are "the diligence in interviewing and procuring the witness' presence; the probability of procuring the testimony within a reasonable time; the specificity of the witness' expected testimony; the degree the testimony is expected to be favorable to the accused; and the unique or cumulative nature of the witness' testimony . . . ." *Id.*

These factors weighed heavily in favor of a brief continuance. Because Moncriffe had already built a working relationship with Green's family members prior to his appointment, he was positioned to swiftly prepare for their testimony and indicate to the court with some specificity the family history testimony he sought to elicit. Such testimony would have proved both critical and unique—as detailed in the next subsection—especially given that a mitigation investigation had not otherwise been performed on Green's behalf. As for diligence, though Green's waiver of counsel no doubt impacted the preparation of mitigation evidence, it is also true that Moncriffe, as standby counsel, had diligently sought appointment of a psychiatrist to assist in preparing mitigation evidence—a request the trial court denied, leaving Moncriffe with no mitigation evidence to present the morning of his appointment. And it is further the case that Moncriffe could not have acted more diligently to prepare witness testimony at the sentencing hearing, as he was appointed immediately before the penalty phase commenced. Even a brief continuance would have allowed Moncriffe to engage in critical preparation that was otherwise impossible in the hour or less between his appointment and the commencement of the penalty phase.

Furthermore, had the court denied Green's request for a continuance, the issue would have at least been preserved for appeal. Raising the issue on appeal would have been by no means futile,

as Texas courts have held that the denial of a brief equitable continuance can amount to an abuse of discretion. *See Deaton v. State*, 948 S.W.2d 371, 376–77 (Tex. App.—Beaumont 1997) (finding that the court abused its discretion in denying continuance to accommodate temporary unavailability of defense witness even though continuance inconvenienced the jury and the court); *Petrick v. State*, 832 S.W.2d 767, 771 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd) (finding that the court abused its discretion by denying defendant short continuance to allow for presentation of alibi witnesses); *Richardson v. State*, 288 S.W.2d 500, 501 (Tex. Crim. App. 1956) (finding that the court abused its discretion in forcing defendant to trial with an unprepared attorney rather than granting a brief postponement while defendant's counsel of choice was detained in another trial).

Nor would it have been futile to request a continuance to obtain a psychiatric evaluation. While the trial court likely would have denied such a request, had Moncriffe moved for the continuance, the issue would have been preserved for appeal, and the trial court's denial would have been reviewed for abuse of discretion. *See Janecka v. State*, 937 S.W.2d 456, 468 (Tex. Crim. App. 1996) ("The trial court's ruling on a motion for continuance is reviewed for abuse of its discretion.").[26] "Where denial of a continuance has resulted in demonstrated prejudice, [Texas courts] have not hesitated to declare an abuse of discretion." *Id.* In *Janecka*, counsel in a capital case moved for a continuance on the ground that he had not been given adequate time to prepare.

---

[26] *See also Woods v. Comm'r of Corr.*, 857 A.2d 986 (Conn. App. Ct. 2004). The court in *Woods* held that counsel was ineffective for failing to seek a continuance to have the defendant evaluated by a psychiatrist after learning that the defendant had suspected organic brain damage. Counsel did not seek a continuance for an expert evaluation because the deadline to declare expert witnesses had passed, and she believed it was "too late" and "felt that the court would have denied such a request." *Id.* at 991–92. The court held that counsel's conduct was deficient because the court had the discretion to fashion a remedy, and a denial of the request for a continuance and expert assistance would have at least preserved the record for appeal. *Id.* at 992.

The court held that the denial of the continuance was not an abuse of discretion, but only because counsel did not establish specific prejudice, including that "crucial testimony would have been given by potential witnesses." *Id.* Here, in contrast, and as discussed *infra*, Green can show that a continuance would have allowed Moncriffe to develop critical mitigating evidence. Indeed, absent a continuance, Moncriffe was deprived of the ability to put on any mitigating evidence on Green's behalf. This Court recognizes that there is no set test for determining when the denial of a continuance violates due process. *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). But due process concerns, not to mention Sixth Amendment concerns, loom large when denial of a continuance "render[s] the right to defend with counsel an empty formality." *Id.*

In fact, additional due process considerations made requesting a continuance an even more critical matter in this instance. As Moncriffe flagged for the trial court while serving as standby counsel, *Ake v. Oklahoma* arguably secured Green a due process right to the assistance of an expert psychologist during the penalty phase of his trial, especially in light of how Texas courts had interpreted, and continue to interpret, *Ake*.[27] Moncriffe's representation fell below an objective standard of reasonableness when he failed to protect this due process right by not requesting a continuance for an expert evaluation. Moncriffe's decision was particularly deficient because he knew that Green's mental condition was highly relevant to the penalty phase and had reason to suspect that a mental evaluation would produce substantial mitigating evidence. Indeed, Moncriffe made Green's mental illness the centerpiece of his closing statements during the penalty phase.

---

[27] See footnote 24 *supra*. It is unsettled whether Green has such a due process right under the Fifth Circuit's interpretation of *Ake*. *See White v. Johnson*, 153 F.3d 197, 200 (5th Cir. 1998) (acknowledging but declining to decide key issues related to the scope of *Ake* in capital sentencings). But it is the interpretation of *Ake* reached by Texas, rather than the Fifth Circuit, that is most relevant to assessing the objective reasonableness of Moncriffe's decision not to request the appointment of an expert witness and a continuance to allow for Green's psychiatric evaluation.

Moreover, had Moncriffe requested a continuance for a mental evaluation, only to have it denied, Green would have had a powerful *Ake*-based argument on appeal, rendering the decision to not request a continuance all the more unreasonable. *Cf. Powell v. Collins*, 332 F.3d 376, 397 (6th Cir. 2003) (holding that a state trial court's denial of counsel's request for a continuance between the guilt and penalty phases of the trial for purposes of obtaining a mental evaluation for use as mitigation during the penalty phase violated defendant's due process rights under *Ake* and was an abuse of discretion, where the trial court had previously denied counsel's pre-trial request for appointment of such an expert).

Respondent argues that no appeal could have succeeded because Article 29.13 of the Texas Code of Criminal Procedure states that a continuance may be granted after trial has commenced when "by some unexpected occurrence," either the defendant or the state is "so taken by surprise that a fair trial cannot be had," and Green's decision to rescind his right of self-representation was neither unexpected nor a surprise. *See* TEX. CODE CRIM. PROC. ANN. art. 29.13, However, independent of this statutory provision, defendants may invoke the equitable powers of the trial court in seeking a continuance after trial begins, especially when due process rights are at stake. *See Vega v. State*, 898 S.W.2d 359, 361 (Tex. App.—San Antonio 1995, writ ref'd) (reviewing for abuse of discretion an equitable motion for continuance brought on due process grounds); *O'Rarden v. State*, 777 S.W.2d 455, 460 (Tex. App.—Dallas, pet. ref'd) (same); *see also* 43 George E. Dix & John M. Schmolesky, Tex. Prac., Crim. Prac. & Proc. § 33:24 (3d ed. 2019). "An equitable motion for continuance is reviewable for an abuse of discretion." *Vega*, 898 S.W.2d at

361. Because Green's due process rights were at stake, it was not futile for Moncriffe to seek a continuance from the state trial court.[28]

In sum, Moncriffe's failure to request a continuance, though made amid a challenging situation, was nonetheless an error so serious that it deprived Green of his Sixth Amendment right to counsel during the penalty phase of his trial. The totality of the circumstances at the time of Moncriffe's appointment leave no doubt as to the deficiency. Pre-trial counsel's almost non-existent mitigation investigation, coupled with the trial court's earlier refusal to appoint a psychiatrist to evaluate Green for mitigation, left Moncriffe with absolutely no mitigation evidence to offer on Green's behalf. At the same time, Moncriffe reasonably believed that a mental health evaluation would produce substantial evidence that Green was suffering from a mental illness. In fact, Moncriffe was aware that Green's due process right to assistance of a psychological expert in aid of mitigation had arguably been jeopardized. No strategic reason counselled against requesting a continuance or a mental evaluation for mitigation purposes. And yet Moncriffe requested neither, instead choosing to proceed with the penalty phase, where he elicited minimal testimony from the character witnesses that Green had managed to subpoena. Even a very brief

---

[28] The issue of whether Green was entitled to seek an equitable continuance should not be confused with the issue of whether such a continuance had to be requested through a sworn written motion to preserve appellate review. The Texas Code of Criminal Procedure provides that review of the denial of a motion for continuance is forfeited unless the motion is sworn and in writing. *See* TEX. CODE CRIM. PROC. ANN. arts. 29.03, 29.08. At the time of Green's trial, some Texas courts employed a "due process" exception to this statutory requirement. But in *Anderson v. State*, 301 S.W.3d 276, 278 (Tex. Crim App. 2009), the Texas Court of Criminal Appeals held that there is no such exception. *Anderson*, however, did not question the idea that defendants can request equitable continuances on due process grounds. *See* 43 Tex. Prac., Crim. Prac, & Proc. § 33:29 (3d ed. 2019) (explaining that Anderson "cannot, of course, mean that a defendant constitutionally entitled to delay cannot seek appellate relief if delay is refused"). *Anderson* at most places procedural constraints on the making of such a motion. The Court assumes for purposes of its analysis that Moncriffe would have complied with all relevant requirements for preserving review.

continuance would have allowed Moncriffe to instead unearth and elicit critical mitigating testimony from family members. And simply moving for a continuance would have preserved the issue for appeal. For all these reasons, no reasonable attorney would have immediately advanced to the penalty phase of the trial without requesting a continuance to allow for presentation of mitigating evidence.

### b. Prejudice

To show prejudice, Green must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is less than a preponderance. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). *Strickland*'s standard does not require Green to "show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 693. Still, the "likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

Here, the relevant inquiry is whether, had the jury been able to consider the mitigation evidence that Moncriffe failed to seek to develop, "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537; *accord Buck v. Davis*, 137 S. Ct. 759, 776 (2017). In conducting this inquiry, the court must "proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision." *Strickland*, 466 U.S. at 695. In Texas, as elsewhere, that means each juror was exercising her right to make an individual assessment of the strength and weight of the mitigation evidence, *McKoy v. North Carolina*, 494 U.S. 433, 442–43 (1990), and that any juror's vote for a life sentence would have prevented imposition of the death penalty, TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(e)–(g).

Testimony from lay and expert witnesses at the evidentiary hearing before this Court revealed substantial and compelling mitigation evidence that could have been presented at sentencing. Had Moncriffe sought and obtained a continuance, he would have uncovered and presented mitigating evidence in the form of testimony from family and friends, as well as a mental health evaluation. There is a "reasonable probability" that such evidence would have changed the mind of at least one juror.

At the evidentiary hearing, the Court heard testimony from Robert Sudds, Jr. (brother), Michael Turner (family friend), and Jerry Jacobs (cousin). Each was present during the entire course of Green's trial, and Sudds and Turner testified at Green's sentencing. At the evidentiary hearing, both Sudds and Turner testified that Moncriffe never met with them to prepare their testimony at the penalty phase, though both recalled briefly talking to Moncriffe.

As detailed *supra*, Sudds, Turner, and Jacobs each testified at the evidentiary hearing to incidents in Green's past that shed light on his upbringing and his mental condition. Sudds, for instance, spoke about his visits with Green in pre-trial detention. Sudds testified that Green was convinced the police were trying to frame him by switching his DNA while also trying to extract a confession from him through violent harassment and believed that police had implanted an instrument into his skin in order to electroshock him. Turner testified regarding an incident in which he arranged an interview for a handyman job for Green, but Green seemed to not understand the objective of the interview and would not stop pitching an idea for a window detailing business, first during the interview, and then—when Turner lost track of him—to the manager of a nearby restaurant. Jacobs testified that he and Green were frequently threatened and beaten up badly by others in their neighborhood growing up. In one incident, when Green was in middle school, someone threw a brick that hit Green's head, causing Green to bleed badly and lose consciousness.

Jacobs recalled that Green's behavior changed after that; he began talking to himself and was constantly afraid someone was following him. These behaviors increased after Green was the victim of a racially motivated attack in which white men threw a cup of liquid from a car that splashed in Green's eyes, leaving him with a permanent disruption to his blinking. Jacobs testified that Green talked fast, seemed anxious, and carried on conversations with invisible people.

This testimony—in particular, Sudds's testimony about Green's pre-trial delusions and paranoia and Jacobs' testimony about the brick injury—provides critical and compelling mitigation evidence of mental illness. With this testimony in hand, Moncriffe would have had actual concrete indicators of mental illness that he could have cited in his closing argument. Jacobs's testimony about the violence that he and Green faced growing up also would have thrown into sharp doubt the State's claim that Green was "brought up in the best of circumstances." 18 RR 33. Given the striking and credible nature of this testimony, the Court finds that there is a reasonable probability that at least one juror would have declined to impose the death penalty had they heard it. Even a brief continuance would have afforded Moncriffe time to learn of these incidents from Sudds, Turner, and Jacobs; arrange for Jacobs, and potentially other witnesses, to testify at the hearing; and work with these witnesses to prepare them to testify. Moncriffe's failure to request even a brief continuance to prepare lay witness testimony was thus not only deficient but also prejudicial.

Green was also prejudiced by Moncriffe's failure to request a continuance to conduct a psychological evaluation. At the evidentiary hearing, Dr. Mosnik provided extensive and detailed testimony establishing that Green was suffering from schizophrenia at the time of trial, as detailed *supra*. Thus, had Green received a mental evaluation before the penalty phase of trial, that evaluation would have produced mitigating evidence of mental illness. The symptoms that Dr.

Mosnik notes at the time of trial—including Green's delusionary beliefs, speech patterns reflective of a formal thought disorder, and lack of a basic understanding of court proceedings—would have been readily evident to an evaluating psychiatrist, had a continuance been granted to conduct a mental evaluation.[29] Evidence of Green's schizophrenia would have proved to be powerful mitigating evidence during the penalty phase. The Court is persuaded that, had such evidence been presented, there is a reasonable probability that at least one juror would have declined to impose the death penalty, especially when this evidence is considered in connection with the lay testimony described earlier.

Accordingly, Green has established not only that Moncriffe acted deficiently, but that he was prejudiced by the deficient performance, and that he therefore received ineffective assistance of counsel at the penalty phase of his trial. Green is entitled to relief on his first claim for ineffective assistance of penalty phase counsel.

### C.  Ineffective Assistance of Counsel for Failure to Raise Incompetency

In Green's fifth claim for relief, Green asserts that his Sixth Amendment right to effective assistance of counsel was violated when counsel failed to bring evidence of his incompetence to the attention of the trial court. (Doc. No. 30, at 73). Specifically, Green asserts that Moncriffe provided ineffective assistance of counsel when he, upon taking over Green's representation at the penalty phase, failed to seek a judicial determination of Green's competency. (Doc. No. 64, at 10).

Respondent has consistently maintained that Green's fifth claim is unreviewable because it is procedurally defaulted. Green has consistently maintained that he can establish cause and

---

[29] Dr. Rubenzer did not do a full psychiatric evaluation and summarily disregarded many of these symptoms in the cursory evaluation he did complete. And even Dr. Proctor acknowledged based on these symptoms that Green may have been in the prodromal phase of schizophrenia during trial. HT5-112.

prejudice to overcome the default pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013). To establish cause under *Martinez/Trevino*, a petitioner must show that appointed counsel in initial review state habeas proceedings was ineffective in failing to raise the underlying ineffective assistance of counsel claim. *Martinez*, 566 U.S. at 14. That is, a petitioner must show that state habeas counsel was objectively unreasonable in failing to raise the claim and that there is a reasonable probability that the state habeas court would have granted relief on the claim had it been raised. *See Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). To establish prejudice, a petitioner must show that the underlying ineffectiveness claim is substantial. *Martinez*, 556 U.S. at 14.

This Court initially denied relief on Green's fifth claim after concluding that Green had not shown that post-conviction counsel was deficient for failing to raise the underlying ineffectiveness claim. (Doc. No. 55, at 12–14). Green moved for reconsideration on grounds that the Court had not applied the correct legal standards in its deficiency analysis. (Doc. No. 64, at 21–30). Although the Court granted reconsideration on these grounds for a similar ineffective assistance of counsel claim—Green's first claim, discussed *supra*—the Court did not at that time reconsider its analysis of Green's fifth claim. (Doc. No. 72, at 19–20). Following the Court's 2017 evidentiary hearing, Green has again moved for reconsideration of the Court's conclusion that his fifth claim is unreviewable. (Doc. No. 158, at 52–70). Respondent opposes reconsideration. (Doc. No. 159).

Rule 54(b) of the Federal Rules of Civil Procedure provides that any court order or decision "may be revised at any time before the entry of a judgment adjudicating all the claims[.]" Fed. R. Civ. P. 54(b). "Under Rule 54(b), the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 336 (5th Cir. 2017)

(internal quotation marks omitted); *see also Dietz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016) ("[A] district court ordinarily has the power to modify or rescind its orders at any point prior to final judgment in a civil case."). Having benefited from the evidence developed at the evidentiary hearing and the parties' post-hearing briefing, the Court finds that it has good reason to reconsider the reviewability of Green's fifth claim and, indeed, that justice so requires.

### 1.      Procedural Reviewability

The issue requiring reconsideration is whether Green has shown cause to overcome the procedural default of his fifth claim. To some extent, the Court has already resolved this issue *supra*. As detailed in relation to Green's fourth claim regarding his incompetency to stand trial, Green has shown cause to overcome his defaulted claims under *Maples v. Thomas*, 132 S. Ct. 912 (2012), because state habeas counsel, McLean, abandoned Green during state post-conviction proceedings. This fact alone renders Green's fifth claim reviewable, so long as Green also establishes prejudice in relation to that claim. However, *Martinez/Trevino* provides an alternate route to establishing cause to overcome the procedural default. Upon reconsideration, the Court concludes that Green has also shown cause to overcome the procedural default of his fifth claim under *Martinez/Trevino*.

To show cause under *Martinez/Trevino*, Green must first show that McLean was objectively unreasonable in failing to raise what is now Green's fifth claim. *See Strickland*, 466 U.S. at 687–88. Green argues, in his original and renewed motions for reconsideration, that McLean's performance was constitutionally deficient because his failure to bring Green's underlying ineffectiveness claim was not a strategic decision based on a reasonable extra-record investigation, since McLean conducted no such investigation. Green also argues that the trial record itself contains signs that Green's competency to stand trial was an issue, rendering

McLean's failure to investigate issues related to competency even more unreasonable. The Court agrees as to both points.

State habeas counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *see also Trevino v. Davis*, 829 F.3d 328, 348–49 (5th Cir. 2016) ("*Trevino II*") (holding that state habeas counsel is subject to the *Strickland* requirement "to perform some minimum investigation prior to bringing the initial state habeas petition"). "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). But "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. A decision not to investigate is deficient when it does not "reflect reasonable professional judgment." *Porter v. McCollum*, 558 U.S. 30, 40 (2009) (citing *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)). And where a failure to investigate "was the result of inattention," it may not be considered a "reasoned strategic judgment." *Wiggins*, 539 U.S. at 534. Deficient performance may also be found where counsel "ignored pertinent avenues for investigation of which he should have been aware." *Porter*, 558 U.S. at 40.

Prevailing professional norms at the time of McLean's appointment made clear that he had an obligation not only to be thoroughly familiar with the trial record, but also to conduct an extra-record investigation. In particular, it was incumbent on McLean to at least seek to interview Moncriffe and review his files. *See* ABA Guideline 11.9.3.B (1989); ABA Guideline 10.7.B.1 (2003). McLean also had a duty to monitor Green's "mental, physical and emotional condition" for potential legal consequences. *See* ABA Guideline 11.9.5.C (1989); ABA Guideline 10.15.1.E (2003). Texas law made the need for an extra-record investigation even clearer. Because of Texas's

97

post-conviction doctrines of cognizability and default, McLean could not reasonably confine his investigation to the appellate record. *See Ex parte Banks*, 769 S.W.2d 539, 540 (Tex. Crim. App. 1989) (op. on reh'g) (en banc) ("The Great Writ should not be used to litigate matters which should have been raised on appeal."); *see also Ex parte Ramsey*, 345 S.W.3d 928, 928 (Tex. Crim. App. 2011) (Keasler, J., dissenting) (explaining that a claim based on the trial record is "not cognizable on habeas" since petitioners "should have and could have raised it on direct appeal"). The need for extra-record investigation was particularly clear in relation to potential ineffective assistance of counsel claims because such claims generally cannot be supported solely by the record on direct appeal. *See Thompson v. State*, 9 S.W.3d 808, 813–14 & 814 n.6 (Tex. Crim. App. 1999).

McLean failed to conduct an extra-record investigation, despite promising the state habeas court that he would. He did not speak with Moncriffe, Green's penalty phase counsel. The hearing record shows that, if McLean had interviewed Moncriffe, he would have learned that he harbored serious doubts about Green's mental health and competence during the trial. *See* HT1-21–23, 28, 34–36, 42–46, 49–51, 59, 91–92, 100–01. For example, Moncriffe testified that he believed Green was "exhibiting signs of some mental illness" throughout trial, because he would "talk to himself," his speech was "very rapid," his mood would fluctuate greatly, he was susceptible to "outbursts," it was "very difficult to get him to focus," and he had "a high sense of paranoia." HT1-21–23, 26, 43. He also testified that he "just couldn't get across to [Green] some simple concepts," ranging from the purpose of voir dire to proper courtroom behavior, and that even when Green appeared to understand such concepts, he could not execute on them. HT1-22–23, 38–39.

Nor did McLean have any contact with Green. Had he interviewed Green and continued to monitor him, McLean would have seen signs of mental illness around the time of his appointment, as even the state's expert acknowledges that Green had a full psychotic break by February 2002,

and was writing letters with psychotic content by September 2001. HT6-137, 154; HT5-13. McLean also failed to request any of Green's medical records until over six years later when, after being prompted by the state court, he requested Green's most recent 2007 evaluation. Even then, he ignored evidence of mental illness in the 2007 report, and did not obtain earlier medical records indicating Green was hospitalized for schizophrenia by May 2003.

McLean's failure to investigate was the product of abandonment, not a reasonable professional judgment. Thus, his failure to raise claims regarding Moncriffe's ineffective assistance during the penalty phase cannot have been a strategic decision. *See Strickland*, 466 U.S. at 690–91; *Wiggins*, 539 U.S. at 534. Had McLean investigated potential ineffectiveness claims but determined they were meritless, his decision may have been reasonable. But that is not what happened here. McLean's representation fell below an objective standard of reasonableness because he did not even investigate possible trial-level ineffective assistance of counsel claims.

Respondent argues that McLean's representation was not deficient because the trial record supports his decision not to investigate the claim that Moncriffe was ineffective for failing to pursue a competency hearing. (Doc. No. 159, at 4–6). Upon reconsideration, the Court finds that this argument lacks merit. The foundational problem with this argument is that, as just discussed, McLean could not simply rely on the record because he had a duty to conduct at least a minimal extra-record investigation. *Cf. Trevino II*, 829 F.3d at 348–49 (explaining that there would be a "serious danger" that trial counsel errors would go unreviewed if state habeas counsel were not under a duty to investigate beyond the trial record). Moreover, this is not a case where the trial record contains strong evidence that Moncriffe's failure to raise competence-related claims was reasonable. Although Judges McSpadden and Jones each conducted a *Faretta* hearing, those hearings occurred six and three months before trial, and at neither did the trial court inquire in any

depth into whether Green had "sufficient present ability to consult" with counsel or a "rational as well as factual understanding of the proceedings." *See Dusky*, 362 U.S. 402, 402 (1960). A reasonable state habeas attorney would not have inferred from these hearings that there was no need to investigate whether Moncriffe was ineffective for not requesting a competency evaluation. Nor would reasonable state habeas counsel draw such an inference from Dr. Rubenzer's brief. After all, the report itself notes that Moncriffe was concerned about Green's mental health. The record also makes clear that the trial court neither held a hearing on Green's competency nor did it make a finding as to the issue.

In fact, the trial record contains numerous indications that Moncriffe had serious doubts about Green's mental health and competency and therefore should have requested a competency hearing. Dr. Rubenzer's report states that Moncriffe was concerned that Green was "suspicious and paranoid" and "acts like he's talking to a third party." CR 268. It also documents that Moncriffe found Green's trial decisions so irrational that he considered them tantamount to "literally killing himself." *Id.* The record also reflects that, during voir dire, Moncriffe expressed concerns to the court that Green's growing paranoia was impeding his ability to represent himself. Moncriffe's closing argument, the central theme of which was that Green should not be sentenced to death because he is "sick," further reveals his concerns. 18 RR 22. Finally, the record reflects Green's aberrant and irrational questions, decisions, and speech, which should have given McLean pause. McLean thus "'ignored pertinent avenues for investigation of which he should have been aware,' and indeed was aware." *Andrus v. Texas*, 140 S. Ct. 1875, 1882 (2020) (quoting *Porter*, 558 U.S. at 40).

In sum, McLean's failure to raise the claim that Moncriffe provided ineffective assistance when he failed to seek a judicial determination of Green's competency was not based on a

reasonable professional judgment. It could not have been, because McLean never investigated whether such a claim might have merit, despite prevailing professional norms requiring such an investigation. "Tactical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum." *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990). McLean failed to conduct an extra-record investigation that would have raised serious doubts about Green's mental condition during trial, and he disregarded record-based evidence of Moncriffe's concerns about Green's mental health and competency. These deficiencies place McLean's conduct well below an objective standard of reasonableness. Thus, upon reconsideration, the Court finds that Green has shown that McLean's conduct satisfies the deficiency prong of *Strickland*.

To satisfy the second *Strickland* prong in relation to McLean, thereby establishing cause under *Martinez/Trevino*, Green must also show that there is a reasonable probability that the state habeas court would have granted relief on the underlying claim regarding Moncriffe's ineffectiveness, had it been raised. Moreover, to establish prejudice under *Martinez/Trevino*, Green must show that the underlying ineffectiveness claim is substantial. *Martinez*, 556 U.S. at 14. Finally, if Green can establish cause and prejudice pursuant to *Martinez/Trevino*, the Court may review *de novo* the merits of the underlying claim. Clearly these inquires overlap extensively. For the reasons set forth *infra*, the Court finds that there is a reasonable probability that the state habeas court would have granted relief on the claim that Moncriffe was ineffective in not requesting a judicial determination of Green's competency or seeking to further investigate Green's competency, that the claim is substantial, and that, in fact, the claim is meritorious.

### 2.   Merits of Claim of Ineffective Assistance of Counsel for Failure to Raise Incompetency

To establish that Moncriffe provided ineffective assistance of counsel in failing to seek a competency evaluation, Green must establish that Moncriffe provided deficient performance, such

that it fell below an "objective standard of reasonableness," and that he was prejudiced by that deficient performance. *Strickland*, 466 U.S. at 687–88. Green claims that Moncriffe's failure to object to Green's incompetence, upon taking over Green's representation, was deficient because it deprived Green of his due process right to a hearing to determine whether he was competent to stand trial, and harmed Green because he was tried while actually incompetent. (Doc. No. 30, at 73–74; Doc. No. 64, at 20). The Court considers the issue of deficient performance before turning to the issue of prejudice.

It is well settled that due process prohibits prosecution of a defendant who is not competent to stand trial. *Cooper v. Oklahoma*, 517 U.S. 348 (1996); *Bouchillon*, 907 F.2d at 592. The test for determining competency is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402. Where substantial evidence is presented raising an issue as to the defendant's competency, a defendant is constitutionally entitled to a hearing on their competence to stand trial. *Pate v. Robinson*, 383 U.S. 375, 385 (1966). And where counsel notes evidence raising a bona fide doubt as to a defendant's competence, counsel has a duty to request a competency hearing. *Drope v. Missouri*, 420 U.S. 162, 180 (1975). Relatedly, "[t]rial counsel provides deficient performance if he fails to investigate a defendant's medical history when he has reason to believe that the defendant suffers from mental health problems." *Roberts v. Dretke*, 381 F.3d 491, 498 (5th Cir. 2004) (citing *Bouchillon*, 907 F.2d at 597).

Moncriffe credibly testified at the evidentiary hearing that he believed during trial that Green was incompetent. HT1-124. He also testified that he believed Green was exhibiting signs of mental illness throughout trial. HT1-21, 56. And he testified that he believed Dr. Rubenzer's

competency report had reached the wrong conclusion. HT1-125. Moncriffe acknowledged that he therefore should have requested a competency hearing after being appointed to represent Green in the penalty phase. HT1-127.[30]

Respondent argues that Moncriffe had no duty to request a competency hearing because he had no actual evidence to substantiate his "hunch" about Green's mental health. (Doc. No. 159, at 8). However, Moncriffe was aware of many indicators of Green's mental illness and incompetency during trial. Moncriffe saw Green's paranoia and how it interfered with his ability to conduct voir dire,[31] he witnessed Green talking as if to a third party though none was present, he observed Green make trial decision so irrational that he felt he could explain them only as suicidal, he experienced how Green's failure to understand and execute on even basic legal concepts, he experienced numerous "outbursts" from Green where Green seemed unable to control his behavior, he witnessed Green attempt to disrobe in the courtroom, he noted that it was very difficult to get Green to focus, and he experienced Green's rapid speech and highly variable moods.

Given these ample indicia of incompetency and mental illness, objectively reasonable counsel would have formed a doubt about Green's incompetence, as Moncriffe in fact did. *See Drope*, 420 U.S. at 180 (explaining that a wide range of manifestations, including a defendant's "irrational behavior" and "demeanor at trial" are relevant to assessing whether a further competency inquiry is required in any case). Objectively reasonable counsel would have therefore

---

[30] The Court emphasizes that it found Moncriffe's testimony credible and convincing in all respects. Although the Court has concluded that Moncriffe was ineffective in failing to request a continuance, mental health evaluation, and competency hearing after being appointed counsel immediately before the penalty phase, that conclusion in no way undermines the Court's trust in Moncriffe or his testimony. Moncriffe was given a thankless job at the eleventh hour. The fact that he himself has acknowledged that he should have done things differently in the critical period between his appointment and commencement of the penalty phase only bolsters his credibility.

[31] Although Moncriffe urged the court to order a psychiatric evaluation, at no point did he request a competency hearing.

both requested a competency hearing and sought a continuance to further investigate Green's mental condition. But Moncriffe did neither.

Moncriffe's failure to request a competency hearing was not a strategic decision. As discussed in detail *supra* in relation to Green's first claim, Moncriffe found himself in the difficult position of being appointed to represent Green at sentencing almost immediately before the penalty phase was set to commence. The trial court had cautioned that delay resulting from Green's self-representation would not be tolerated. Yet, Moncriffe had a duty to raise his competency concerns with the trial court, and there was nothing to lose in doing so. At worst, the court would have denied a competency hearing, and the denial would have been preserved for review on appeal.

Moncriffe suggested at the evidentiary hearing that Dr. Rubenzer's report deterred him from requesting a competency hearing, even though he believed the outcome of the report was incorrect. HT1-125. An objectively reasonable attorney would not have been so deterred. The Fifth Circuit's decision in *Profitt v. Waldron*, 831 F.2d 1245 (5th Cir. 1987) is instructive. A court-appointed psychiatrist submitted a report finding Profitt competent on the day before trial. *Id.* at 1248. Based solely on the report, defense counsel decided to forego further investigation into Profitt's mental condition and any potential insanity defense, despite knowing that Profitt had previously escaped from a mental institution. *Id.* at 1248–49. On appeal of Profitt's habeas petition, the State argued that the evaluation of the court-appointed psychiatrist absolved Profitt's attorneys of any further duty to investigate. *Id.* at 1249. The Fifth Circuit did not agree and held that counsel's failure to investigate was deficient performance under *Strickland*. *Id.* Likewise here, Dr. Rubenzer's report did not absolve Moncriffe of his obligation to seek a competency hearing or a continuance to further investigate Green's mental condition, especially because Moncriffe reasonably believed that the outcome of Dr. Rubenzer's report was incorrect.

Nor did Dr. Rubenzer's report make it futile to seek a judicial determination of Green's competency to stand trial. Texas law at the time provided

> If during the trial evidence of the defendant's incompetency is brought to the attention of the court from any source, the court must conduct a hearing out of the presence of the jury to determine whether or not there is evidence to support a finding of incompetency to stand trial.

TEX. CODE CRIM. PROC. ANN. art. 46.02.2(b) (1999) (repealed 2003).[32] Because the trial court never convened a hearing after receiving Dr. Rubenzer's report, the report was never subjected to cross examination or counterevidence. Had Moncriffe raised his competency concerns, the court would have had to convene an Article 46.02.2(b) hearing, at which Moncriffe would have questioned Dr. Rubenzer on critical issues, such as the limited scope of his inquiry and his reasons for discounting certain evidence of incompetence. Further, had Moncriffe sought and obtained even a brief continuance, he would have developed powerful counterevidence in the form of lay and expert testimony, as discussed *supra* in relation to Green's first and fourth claims.

In short, Moncriffe reacted to the substantial evidence of Green's incompetence during trial as objectively reasonable counsel would have: he formed a bona fide doubt about Green's incompetence. However, having formed such a doubt, objectively reasonable counsel would have requested a hearing on Green's competence to stand trial, and a continuance to further investigate Green's mental illness. Green made neither request, despite the fact that there was no strategic reason not to. These failures undermined Green's due process right to a competency hearing at an

---

[32] The statute further provided:

> If the court determines that there is evidence to support a finding of incompetency to stand trial, a jury shall be impaneled to determine the defendant's competency to stand trial. This determination shall be made by a jury that has not been selected to determine the guilt or innocence of the defendant.

TEX. CODE CRIM. PROC. ART. 46.02.4(a) (1999) (repealed 2003).

absolutely critical juncture of his trial. Green has thus shown that Moncriffe's failure to seek a judicial determination of Green's competency prior to the penalty phase was constitutionally deficient performance falling below an objective standard of reasonableness.

However, to establish that he is entitled to relief on his fifth claim, Green must also show that he was prejudiced by Moncriffe's deficient performance. To show prejudice, Green "need only demonstrate a 'reasonable probability' that he was incompetent, 'sufficient to undermine confidence in the outcome.'" *Bouchillon*, 907 F.2d at 595 (quoting *Strickland*, 466 U.S. at 694). "This is a lower burden of proof than the preponderance standard." *Id.* The Court has already held in relation to Green's fourth claim that Green has demonstrated that he was actually incompetent during trial. Green has thus certainly shown that there was a "reasonable probability" that he was incompetent during trial. Green has satisfied *Strickland*'s prejudice prong in relation to his fifth claim.

Green has thus shown that his fifth claim is meritorious. Returning to the issue of cause and prejudice under *Martinez/Trevino*, this result more than confirms that the claim is substantial and that there is a reasonable probability the state habeas court would have granted relief on it had McLean not deficiently failed to raise it. Because cause and prejudice have been established, the Court may reach a *de novo* determination of the claim. For the reasons just discussed, the Court determines that Green has shown that Moncriffe provided ineffective assistance of counsel when he, upon taking over Green's representation at the penalty phase, failed to seek a judicial determination of Green's competency. Green is therefore entitled to relief on his fifth claim.

## IV.   **CERTIFICATE OF APPEALABILITY**

Green has not requested a certificate of appealability ("COA"), but this Court may determine whether he is entitled to this relief in light of the foregoing rulings. *See Alexander v.*

*Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny [a] COA *sua sponte*. The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued."); *see also* 28 U.S.C. § 2253(c). A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has denied such a request. *See Whitehead v. Johnson*, 157 F.3d 384, 388 (5th Cir. 1998); *see also Hill v. Johnson*, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does.").

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also United States v. Kimler*, 150 F.3d 429, 431 (5th Cir. 1998). A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000). Where a claim is denied on procedural grounds, the district court should issue a COA where "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "[T]he determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000).

The Court has carefully considered each of Green's claims and concludes that each of the claims, with the exception of Green's first, fourth, and fifth claims, is foreclosed by clear, binding precedent. Green thus fails to make a "substantial showing of the denial of a constitutional right,"

28 U.S.C. § 2253(c)(2), with regard to any of the claims on which relief is denied. The Court therefore concludes that Green is not entitled to a certificate of appealability on any of the claims dismissed in this Memorandum Opinion and Order.

## V.    CONCLUSION AND ORDER

For the foregoing reasons, it is ORDERED as follows:

1.  Green's motion for reconsideration of his fifth claim is GRANTED.

2.  Green's First Amended Petition is CONDITIONALLY GRANTED as to Green's first, fourth, and fifth claims for relief. A writ of habeas corpus shall issue unless, within 180 days, the State of Texas commences new proceedings against Green. The 180-day time period shall not start until the conclusion of any appeal from this Memorandum Opinion and Order, either by the exhaustion of appellate remedies or the expiration of the time period in which to file such appellate proceedings. The 180-day period may also be extended on further order of the Court.

3.  No Certificate of Appealability shall issue with regard to the dismissed claims.

The Clerk shall notify all parties and provide them with a true copy of this Order.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this 18th day of August, 2020.

_____
**KEITH P. ELLISON**
**UNITED STATES DISTRICT JUDGE**